1  Grant P. Fondo (SBN 181530)
   *gfondo@goodwinprocter.com*
2  Nicole L. Chessari (SBN 259970)
   *nchessari@goodwinprocter.com*
3  **GOODWIN PROCTER LLP**
   135 Commonwealth Drive
4  Menlo Park, California 94025-1105
   Tel.: 650.752.3100
5  Fax.: 650.853.1038

6  Richard M. Strassberg (*Pro Hac Vice*)
   *rstrassberg@goodwinprocter.com*
7  **GOODWIN PROCTER LLP**
   353 East 72nd Street 36th Floor
8  New York, NY 10021
   Tel.: 212.813.8800
9  Fax.: 212.355.3333

10 Attorneys for Defendant/Cross-Plaintiff
   RIPPLE LABS INC.

11

12             **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14 | BITSTAMP LTD., a foreign company, | Case No. 15-cv-01503-WHO |

15 | Plaintiff, | **RIPPLE LABS INC.'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

16 | v. |

17 | RIPPLE LABS INC., a California Corporation, JACOB STEPHENSON, an individual, NANCY HARRIS, an individual, JED MCCALEB, an individual, and DOES 1 Through 10, Inclusive, |

18 |

19 |

20 | Defendant. | Date:        ***TBD*** |
                  | Time:        ***TBD*** |
21                | Location:    Courtroom 2, 17th Floor |

22 | RIPPLE LABS INC., a California Corporation, | Hon. William H. Orrick |

23 | Cross-Plaintiff, | ***IMMEDIATE ACTION REQUESTED*** |

24 | v. |

25 | JED MCCALEB, an individual, JACOB STEPHENSON, an individual, and DOES 1 Through 10, Inclusive, |

26 |

27 | Cross-Defendants. |

28

---

1    Defendant/Cross-Claimant Ripple Labs Inc. ("Ripple Labs") respectfully submits this *Ex*

2    *Parte* Application for Temporary Restraining Order and Order to Show Cause why a Preliminary

3    Injunction Should Not Issue, to enjoin Bitstamp from transferring the $1,038,172 in disputed

4    funds to Jed McCaleb and/or Stellar Development Foundation ("Stellar") and requiring Bitstamp

5    to instead deposit the funds with the Court.  Ripple Labs also moves for expedited discovery, in

6    that it requests that certain limited discovery be permitted to commence immediately and in

7    advance of a hearing on its request for a preliminary injunction instead of after the parties' July 16,

8    2015, case management conference.

9    This Application and Motion is based upon the Application and Motion and concurrently

10   filed Memorandum of Points and Authorities, Declaration of Grant P. Fondo, Declaration of

11   Rebecca Schwartz and the concurrently filed [Proposed] Order, the complete court file in this

12   action, all other matters judicially noticeable, and such further argument or evidence as may be

13   presented to the Court.

14   Pursuant to Local Rule 65-1(b), notice of this Application and Motion has been given to all

15   counsel of record as well as counsel for Jed McCaleb and non-party Stellar.

16

17   Dated:  May 14, 2015                          Respectfully submitted,

18                                        By:   /s/ Grant P. Fondo
                                               Grant P. Fondo (SBN 181530)
19                                             *gfondo@goodwinprocter.com*
                                               Nicole L. Chessari (SBN 259970)
20                                             *nchessari@goodwinprocter.com*
                                               **GOODWIN PROCTER LLP**
21                                             135 Commonwealth Drive
                                               Menlo Park, California 94025-1105
22                                             Tel.: 650.752.3100
                                               Fax.: 650.853.1038

23                                             Richard M. Strassberg (*Pro Hac Vice*)
                                               *rstrassberg@goodwinprocter.com*
24                                             **GOODWIN PROCTER LLP**
                                               353 East 72nd Street 36th Floor
25                                             New York, NY 10021
                                               Tel.: 212.813.8800
26                                             Fax.: 212.355.3333

27                                             Attorneys for Defendant/Cross-Plaintiff
                                               RIPPLE LABS INC.
28

RIPPLE LABS' *EX PARTE* APPLICATION FOR TRO AND AN ORDER TO SHOW CAUSE WHY A PRELIM. INJUNCTION
SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY, Case No. 15-cv-01503-WHO

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 2

    A.    Relationship Between Ripple Labs, Jed McCaleb, And Bitstamp. ........................ 2

    B.    The August 13, 2014 Settlement Agreement Between Ripple Labs And McCaleb. ...................................................................................................... 3

    C.    McCaleb's Subsequent XRP Sales In Violation Of The Settlement Agreement. .................................................................................................. 4

        1.    McCaleb Sells $10,000 Worth Per Week ................................................ 4

        2.    August And September 2014 XRP Sales. ................................................ 4

        3.    Stellar's Failed Auction. ........................................................................ 5

        4.    March 20, 2015 XRP Sale. ..................................................................... 6

        5.    McCaleb's Friends And Family's Removal Of All XRP From The Ripple Protocol. .................................................................................... 8

    D.    Bitstamp Has Expressed An Intent To Transfer The Disputed Funds To Stellar Because Of Threats From McCaleb And Stellar. ............................... 8

III.  ARGUMENT ..................................................................................................... 9

    A.    Legal Standard .............................................................................................. 9

    B.    Ripple Labs Is Likely To Succeed On The Merits Of Its Claim For Injunctive Relief. ..................................................................................... 10

        1.    Ripple Labs, Not Stellar, Has Staked Claim To The Disputed Funds With The Court. ..................................................................... 11

        2.    Ripple Labs Will Demonstrate That McCaleb Breached The Settlement Agreement. ....................................................................... 11

        3.    Ripple Labs Was Required To Mitigate Its Damages Resulting From McCaleb's Breach. ..................................................................... 12

    C.    Ripple Labs Will Suffer Irreparable Harm Absent Preliminary Relief. ................ 12

    D.    The Balance Of Hardships Weigh Heavily In Favor Of Granting Preliminary Relief. ..................................................................................... 14

    E.    Public Policy Weighs In Favor Of Enjoining Bitstamp From Transferring The Disputed Funds To Stellar ................................................................... 15

    F.    The Requested Relief Does Not Change the Status Quo Ante. ........................... 16

IV.   REQUEST FOR EXPEDITED RELIEF .......................................................... 17

    A.    The Good Cause Factors Weigh Heavily In Favor Of Permitting Expedited Discovery. ............................................................................... 17

V.    CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alameda Cnty. v. Weinberger*,
   520 F.2d 344 (9th Cir. 1975).............................................................................................10

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)........................................................................................10

*Am. Impex Corp. v. Int'l Ace Tex, Inc.*,
   No. CV 09-7082 PA (EX), 2009 WL 3963791 (C.D. Cal. Nov. 16, 2009) ...................13, 15, 16

*Bracco v. Lackner*,
   462 F. Supp. 436 (N.D. Cal. 1978) ..............................................................................10

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills*,
   321 F. 3d 878 (9th Cir. 2003)........................................................................................13

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   542 F. Supp. 2d 1160 (C.D. Cal. 2008)........................................................................17

*Davies v. Grossmont Union High Sch. Dist.*,
   930 F.2d 1390 (9th Cir. 1991)......................................................................................16

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
   415 U.S. 423 (1974) ........................................................................................................9

*Hard Drive Prods., Inc. v. Does 1-118*,
   No. 11-cv-1567 LB, 2011 WL 1431612 (N.D. Cal. April 14, 2011) ...........................17

*Interserve, Inc. v. Fusion Garage PTE, Ltd.*,
   No. 09-cv-05812 JW (PVT), 2010 WL 143665 (N.D. Cal. Jan. 7, 2010)..............17, 18, 19

*IO Grp., Inc. v. Does 1–65*,
   No. 10-cv-4377 SC, 2010 WL 4055667 (N.D. Cal. Oct. 15, 2010)............................17

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009)......................................................................................10

*KLA-Tencor Corp. v. Murphy*,
   717 F. Supp. 2d 895 (N.D. Cal. 2010) .........................................................................18

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*,
   887 F. Supp. 1320 (N.D. Cal. 1995) ............................................................................10

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012)........................................................................................14

*Ortiz v. Bank of Am. Nat. Trust & Sav. Ass'n*,
   852 F.2d 383 (9th Cir. 1987) ........................................................................................12

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013)......................................................................................14

*Roul v. George*,
   No. 2:13-CV-01686-GMN, 2013 WL 5781736 (D. Nev. Oct. 25, 2013)....................15

*Sackett v. Spindler*,
   248 Cal. App. 2d 220 (1967)........................................................................................12

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
   208 F.R.D. 273 (N.D. Cal. 2002) ...........................................................................17, 18

- iii -

*Sharp v. Brandman*,
No. C 05-02010 JSW, 2006 WL 3456612 (N.D. Cal. Nov. 29, 2006) ...................................12

*Shutterfly, Inc. v. ForeverArts, Inc.*,
No. CR 12-3671 SI, 2012 WL 2911887 (N.D. Cal. July 13, 2012)..........................................14

*Skout, Inc v. Jen Processing, Ltd*,
No. 14-CV-02341-JSC, 2015 WL 224930 (N.D. Cal. Jan. 15, 2015) ......................................18

*Stuhlbarg Int'l. Sales Co., Inc. v. John D. Brush and Co., Inc.*,
240 F.3d 832 (9th Cir. 2001) ................................................................................................10

*True N. Commc'ns Inc. v. Publicis S.A.*,
711 A.2d 34 (Del.Ch. 1997) ................................................................................................13

*Trustees of ILWU-PMA Pension Plan v. Coates*,
No. C-11-3998 EMC, 2013 WL 556800 (N.D. Cal. Feb. 12, 2013).........................................15

*Uber Technologies, Inc. v. Doe*,
No. 15-CV-00908-LB, 2015 WL 1926291 (N.D. Cal. Apr. 27, 2015) .....................................18

*Washington Capitols Basketball Club, Inc. v. Barry*,
419 F.2d 472 (9th Cir. 1969)................................................................................................17

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) ................................................................................................................10

*Zynga Game Network Inc. v. Williams*,
No. 10-cv-1022 JF (PVT), 2010 WL 2077191 (N.D. Cal. May 20, 2010) ...............................17

**Statute**

31 U.S.C. § 5318(h)(1) .........................................................................................................16

**Rules**

26 C.F.R.
§ 1.6011–4 .........................................................................................................................16
§ 301.6111–3 ......................................................................................................................16

Fed. R. Civ. Proc.
Rule 26(d) ...................................................................................................................17, 18
Rule 26(f) ...................................................................................................................17, 18
Rule 65(b)(1)(A) .................................................................................................................9

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Ripple Labs Inc. ("Ripple Labs") files this *ex parte* application simply to preserve the status quo, to permit this Court, rather than a non-party, to determine the rightful owner of the $1,038,172 in disputed funds ("Disputed Funds"). Bitstamp filed this interpleader and froze the Disputed Funds as a result of competing claims to the Disputed Funds, and due to concerns about potential illegal activity on the part of Defendant Jed McCaleb. Now, McCaleb's company, Stellar Development Foundation ("Stellar"), through threats of a lawsuit against Bitstamp for filing the interpleader and keeping the funds frozen, seeks to circumvent the judicial process by attempting to coerce Bitstamp to immediately transfer the Disputed Funds to it. Ripple Labs respectfully asserts these efforts are improper and should not be permitted.

Unfortunately, it appears Bitstamp felt it had to succumb to those threats, even though at least until a few days ago it had concerns about whether the manner in which the sale of the XRP in question took place violated any federal laws. McCaleb is currently under investigation by the U.S. Department of Justice for potential criminal wrongdoing. Ripple Labs' understanding is that the criminal investigation relates, at least in part, to financial transactions by McCaleb. Without providing evidence demonstrating that Stellar is entitled to the Disputed Funds over Ripple Labs, on May 13, 2015, Bitstamp filed a motion with the Court requesting, in part, authorization to transfer the Disputed Funds to Stellar, apparently based on a recent email from Defendant Jacob Stephenson. *See* Dkt. No. 20 (Bitstamp's Motion to Discharge), at 1, 6, 7, 8. Bitstamp also informed Ripple Labs that it may transfer the Disputed Funds to Stellar *even before* the Court has an opportunity to decide on its motion.

For the foregoing reasons and for reasons more fully explained in this Application, Ripple Labs requests this Court issue an immediate Order (1) prohibiting the transfer of funds to any private party until this matter is fully adjudicated, or at least until this Application and Bitstamp's Motion to Discharge (Dkt. No. 20) may be heard by the Court,[1] (2) directing Bitstamp deposit the

---

[1] Bitstamp currently has its related Motion for an Order of Discharge or, in the Alternative, for Voluntary Dismissal scheduled to be heard on June 10, 2015. Ripple Labs suggests this date for a hearing on this Application, in the event that the Court is not inclined to issue an expedited order without a hearing on this matter.

1   Disputed Funds with the Court, (3) requiring Bitstamp to show cause why a preliminary injunction

2   should not issue, and (4) expediting discovery from McCaleb and Stephenson in anticipation of

3   the preliminary injunction hearing.

4   **II.      BACKGROUND**

5         **A.      Relationship Between Ripple Labs, Jed McCaleb, And Bitstamp.**

6         Ripple Labs is a San Francisco-based company which develops software that implements

7   and interacts with what is known as the Ripple protocol.  Schwartz Decl., ¶ 2.[2]  The Ripple

8   protocol is a decentralized ledger payment standard software used to transfer and exchange things

9   of value, including U.S dollars, foreign currency and a digital currency known as XRP.  *Id.*  XRP

10  is the native currency of the Ripple protocol and cannot be used outside of the Ripple protocol. *Id.*

11        Jed McCaleb is the founder of Mt. Gox and former Chief Technology Officer ("CTO"),

12  director and co-founder of Ripple Labs.  *Id.,* ¶¶ 3, 4.  In conjunction with his role at Ripple Labs,

13  McCaleb helped create and retained 9 billion XRP for himself.  *Id.,* ¶ 5.  A finite number of 100

14  billion XRP exists and only approximately 32 billion of that XRP is currently available to the

15  public – including the 9 billion XRP retained by McCaleb.  *Id.*  In or around July 2013, McCaleb

16  resigned as CTO of Ripple Labs, but remained as a director until March 2014.  *Id., ¶* 6.  After his

17  resignation as CTO, McCaleb began working on developing a new rival crypto currency company,

18  now known as Stellar, based largely on Ripple Labs' technology.[3]  *Id., ¶* 7.

19        Bitstamp is a large "gateway" for XRP, and plays an important role in the Ripple protocol

20  ecosystem.  *Id.,* ¶ 9.  Bitstamp is a leading gateway that holds the currency that Ripple protocol

21  users send to one another.  *Id.*  Ripple Labs' Chief Risk Officer, Greg Kidd, is a Bitstamp investor

22  and Arthur Britto, a Ripple Labs co-founder and advisor, is on Bitstamp's Board of Directors.  *Id.,*

23  ¶ 10.  In addition to Mr. Britto, Bitstamp's Board consists of four additional individuals, including

24  Bitstamp's Chief Executive Officer, Bitstamp's Chief Technology Officer, Pantera Capital's

25

26  [2] References to "Schwartz Decl." refer to the Declaration of Rebecca Schwartz in Support of Ripple Labs Inc.'s *Ex Parte* Application for a TRO and an Order to Show Cause why a Preliminary Injunction Should not Issue; Motion for Expedited Discovery, filed herewith.

27

28  [3] The original code used to create the Stellar protocol was a "fork" of the Ripple protocol.  In software engineering, a fork is a competing project based on a version of the pre-existing project's source code.  *Id., ¶* 8.

1   ("Pantera") Chief Executive Officer, who serves as the chairman, and a Pantera partner.  *Id.*, ¶ 11.

2   McCaleb is also a venture partner at Pantera, but does not sit on Bitstamp's Board.  *Id.*, ¶¶ 11-12.

3   **B.      The August 13, 2014 Settlement Agreement Between Ripple Labs And McCaleb.**

4

5   In March 2014, McCaleb resigned from Ripple Labs' Board of Directors and, almost

6   immediately, began selling large amounts of XRP, negatively impacting the XRP market price.

7   *Id.*, ¶ 13.  Then, on May 22, 2014, McCaleb publicly announced his intention to sell all of his

8   remaining XRP to the public, beginning on or about June 6, 2014.  *Id.*, ¶ 14.  He continued selling

9   large amounts of XRP thereafter, which continued to negatively impact the XRP market price.  *Id.*

10  Meanwhile, a dispute arose over whether McCaleb even had legal rights to the XRP that he was

11  selling.  *Id.*, ¶ 15.  Ripple Labs, McCaleb and other related parties engaged in discussions to

12  resolve this dispute, which resulted in the culmination of a Settlement Agreement on August 13,

13  2014, between Ripple Labs and Christian Larsen (Ripple Labs' Chief Executive Officer) on one

14  hand and McCaleb, Joyce Kim (McCaleb's girlfriend and co-founder of Stellar), and Stellar on the

15  other hand (the "Settlement Agreement"). [4]  *Id.*, ¶ 15.

16  Under the terms of the Settlement Agreement, McCaleb agreed, among other things, that

17  for the first year of the Settlement Agreement, he would limit his sales of "McCaleb XRP" to

18  $10,000 per week, $20,000 per week for years two and three, and larger amounts for a number of

19  years thereafter.  Dkt. No. 10-4, ¶ 2.a.  "McCaleb XRP" is defined under the Settlement

20  Agreement as "the approximately 7,500,000,000 XRP currently in the Ripple Network in accounts

21  owned or controlled by Jed McCaleb, as reflected in Exhibit A hereto, including XRP held by or

22  for the benefit of his children or other family members."  *Id.*, ¶ 20.c.  McCaleb further

23  acknowledged and agreed, "that each party hereto will be irreparably damaged in the event any of

24  the provisions of this [Settlement] Agreement are not performed by the parties in accordance with

25  their specific terms or are otherwise breached.  Accordingly, it is agreed that each of [Ripple Labs]

26

27  _____

[4] For the Court's reference, a true and correct copy of the Settlement Agreement was filed by Ripple Labs, under seal, and lodged with the Court on April 30, 2015, as Exhibit 1 to Ripple Labs' Answer and Crossclaims.  *See* Docket No. 10-4.

28

1   and McCaleb shall be entitled to an injunction to prevent breaches of this Agreement, and to

2   specific enforcement of this Agreement and its terms and provisions . . . ." *Id.,* ¶ 10.

3   **C.      McCaleb's Subsequent XRP Sales In Violation Of The Settlement Agreement.**

4   **1.      McCaleb Sells $10,000 Worth Per Week.**

5   Immediately after executing the settlement agreement, Mr. McCaleb sold, and has

6   continually sold, approximately $10,000 worth of XRP per week from an account that he

7   identified as belonging to him.  Schwartz Decl., ¶ 16.  Ripple Labs does not take issue with these

8   sales, but does take issue with the sales discussed below.

9   **2.      August And September 2014 XRP Sales.**

10  On August 14, 2014, just one day after executing the Settlement Agreement, Ripple

11  account r3Q3B6A2giHDMef83AztzBStBm1JBmxUKX ("r3Q"), an account purportedly owned

12  by McCaleb's cousin, Jacob Stephenson, a resident of Arkansas, sold approximately $16,884

13  worth of XRP - well over the agreed-upon limit.  *Id.,* ¶ 17.  r3Q continued to regularly sell well

14  over the $10,000 worth of XRP per week, totaling $398,877 over a six-week period.  *Id.*

15  On September 10, 2014, upon noticing these atypical and large sales by r3Q, Ripple Labs

16  telephoned Stephenson to confirm that he was aware of these transactions and had, in fact,

17  authorized them.  *Id.*, ¶ 18.  Stephenson represented that he was responsible for these August and

18  September 2014 sales by r3Q.  *Id.*  On September 23, 2014, Ripple Labs called Stephenson again

19  to discuss the recent sales by r3Q and advise him that these sales violated the Settlement

20  Agreement.  *Id.*, ¶ 19.  Again, Stephenson represented that he executed the recent sales from r3Q.

21  *Id.*  Ripple Labs notified Stephenson that McCaleb entered into a legal agreement with Ripple

22  Labs, that it appeared that the XRP sales, through r3Q, violated that agreement, and advised

23  Stephenson that Ripple Labs would consider taking legal action against him unless he ceased and

24  desisted from making further XRP sales.  *Id.*  The sales by r3Q persisted until September 25, 2014,

25  when it ran out of XRP.  *Id.*, ¶ 17.

26  Ripple Labs also has reason to believe that those XRP sales by r3Q and sales by another

27  Ripple account, rnj8sNUBCw3J6sSstY9QDDoncnijFwH7Cs ("rnj8"), were executed by McCaleb,

28  at McCaleb's direction, and/or on McCaleb's behalf, in further violation of the Settlement

1  Agreement.  First, within hours of r3Q's depletion, rnj8, one of McCaleb's original or "genesis"

2  accounts, which was first created on or before December 2012 and had never before sold XRP,

3  also began selling substantial amounts of XRP.  *Id.*, ¶ 20.  rnj8 regularly sold well in excess of the

4  $10,000 XRP per week limit, selling approximately $93,400 worth of XRP over a two-week

5  period, until it ran out of XRP on October 8, 2014.  *Id.*  This indicates that r3Q and rnj8 were

6  acting in concert to sell the XRP in those accounts.

7          Second, very unique and highly distinctive selling patterns employed by both r3Q and rnj8

8  link these sales to McCaleb.  Both accounts made small sales of XRP in unrounded amounts just

9  seconds apart – too close in time to be manually entered – indicating that the sales were executed

10  using "bots."[5]  *Id.*, ¶ 21.  Bots require technical expertise and a working knowledge of the Ripple

11  protocol to properly design and implement sales of XRP.  *Id.*  Because McCaleb helped write the

12  Ripple protocol, he has intimate working knowledge of the program and is, therefore, one of the

13  few individuals with the expertise to design and operate a bot within the Ripple protocol.  *Id.*,

14  ¶ 22.  Further, McCaleb used bots in the past to execute sales within the Ripple protocol from his

15  own account and for others.  *Id.*  For example, in or around October 2013 through December 2013,

16  McCaleb operated a business through the website coinconverter.com.  *Id.*  Users within the

17  Ripple protocol could log on to McCaleb's website and purchase services whereby McCaleb

18  would use a bot to execute XRP sales within the Ripple protocol with minimal human interaction.

19  *Id.*  Those Ripple protocol users gave McCaleb their Ripple account numbers along with their

20  passwords, and McCaleb logged onto their accounts to execute the sales through bots of his own

21  design in exchange for 1% of the proceeds from those bot sales.  *Id.*  Unlike McCaleb, it is not

22  likely that Stephenson or the purported owner of rnj8 have the capabilities to develop and use a

23  bot to execute their XRP sales.

24                  **3.       Stellar's Failed Auction.**

25          Stellar, McCaleb's purported "not-for profit" virtual currency company, has had a number

26  _____

27  [5] Bots are highly sophisticated computerized trading programs, specially designed to place bids and offers on a digital currency exchange at speeds that no human individual can reproduce.  Bots can be programmed to offer small amounts for sale over an extended period of time, which prevents the market price on an exchange from falling too

28  rapidly, so that a large amount of XRP can be sold at a stable market price, enhancing profitability.  *Id.*, ¶ 21.

1   of difficulties and failures, and appears to be strapped for cash.  On or around March 16, 2015,

2   Stellar initiated an auction of its native currency, STR, in order to cover its operating expenses.

3   *Id.*, ¶ 23.  Stellar's unaudited quarterly financials, as of September 30, 2014, showed that its

4   expenses were in the range of $700,000 for the past six months, about half of which was for

5   payroll.  *Id.*  Thus, Stellar placed 650 million STR into an account on the Coinex gateway from

6   which the auction would draw ("Auction STR").  *Id.*  The auction was not a success.  *See id.*, ¶ 24.

7   As of March 19, 2015 – three days into the auction – Stellar had yet to sell more than 99% of the

8   Stellar, leaving more than 649 million Auction STR on the Coinex gateway.  *Id.*, ¶ 24.  The listed

9   price for Auction STR was $0.0031 US dollars per STR.  *Id.*  As such, a few days into its auction

10  Stellar only raised an estimated $1,479 of the apparently $2,000,000 it hoped to raise.  *Id.*

11                    **4.     March 20, 2015 XRP Sale.**

12          After the failure of Stellar's auction, McCaleb turned to his family members in an attempt

13  to purchase the auctioned STR and circumvent the Settlement Agreement without detection.

14  Nancy Harris, Jacob Stephenson's mother and McCaleb's aunt, transferred XRP she purportedly

15  received from McCaleb years ago to the r3Q account (again, purportedly owned by Stephenson).

16  *Id.*, ¶ 25.  Then, on or around March 19, 2015, r3Q offered 98,846,600 XRP it received from

17  Harris, for sale on the Ripple protocol.  *Id.*, ¶ 26.  Ripple Labs quickly realized that this offer was

18  made by McCaleb's family member and/or by or for McCaleb, in violation of the Settlement

19  Agreement, and called Stephenson to inquire about the unusual activity from the account.  *Id.*,

20  ¶ 27.  Stephenson represented that he placed this offer on his own account, using funds he received

21  from his mother, but refused to tell Ripple Labs how he intended to use the $1 million plus

22  proceeds from his offer.  *Id.*  He also represented that Stephenson, his mother (Harris), and his

23  brother received Ripple accounts containing XRP from McCaleb a few years ago, and Stephenson

24  controls all of their accounts.  *Id.*  Stephenson concluded the call by stating that he knew there was

25  "bad blood," but that this transaction was not part of that and that this was the last of the XRP in

26  his family members' possession, so this will "not be an ongoing problem" anymore.  *Id.*

27          Soon after the call, r3Q withdrew its approximately 98 million XRP offer and, on

28  March 20, 2015, placed a renewed offer for 96,342,361.6 XRP, which again contained XRP it

1   received from Harris, for sale on the Ripple protocol.  *Id.*, ¶ 28.  It is Ripple Labs' belief that

2   McCaleb, at a minimum, requested his family members make this sale.  In order to ensure that it

3   would not be unduly damaged by McCaleb's breach of the Settlement Agreement, Ripple Labs

4   quickly purchased all of the XRP from r3Q in order to mitigate its damages, by preventing the

5   XRP from flooding the open market.  *Id.*  The purchase price was $1,038,172.  *Id.*  This

6   $1,038,172 constitutes the Disputed Funds at issue in this action.

7        Bitstamp acted as the gateway for this transaction.  *Id.*, ¶ 30.  In other words, Ripple Labs

8   delivered the money to Bitstamp, r3Q delivered the XRP to Bitstamp, and both parties used

9   Bitstamp to facilitate the transfer of the money/XRP to the other party.  *Id.*  However, this

10   exchange only happened on the Ripple protocol, and was not a physical transfer of funds.  *Id.*

11   Rather, the "transfer" was electronic, with Bitstamp holding all of the U.S. dollars and Ripple

12   Labs holding the 96,342,361.6 XRP.  *Id.*  Bitstamp continues to hold the U.S. dollars.  *See* Dkt.

13   No. 20 (Bitstamp's Motion to Discharge).

14        After executing the March 20, 2015 transaction, r3Q attempted to use the Disputed Funds

15   to purchase Auction STR through the Coinex gateway.  *Id., ¶* 31.  However, Bitstamp was

16   concerned by the suspicious nature and size of the transaction.  *See* Dkt. No. 1 (Interpleader

17   Complaint), ¶ 24; *see also* Dkt. No. 20 (Bitstamp's Motion to Discharge), at p. 4.  Further,

18   McCaleb is under criminal investigation by the U.S. Department of Justice, and it is believed that

19   this investigation relates, at least in part, to alleged illegal financial transactions.[6]  Fondo Decl.,

20   ¶ 5.  Bitstamp was undoubtedly concerned that facilitating the transaction might cause it to run

21   afoul of laws and regulations or otherwise be implicated in activities it did not wish to facilitate in

22   any manner. Separately, Bitstamp faced conflicting demands for the Disputed funds from both

23   Ripple Labs and Stephenson.  Indeed, as it recognized, "Bitstamp does not know to [sic] which of

24   said Defendants is entitled to the Disputed Funds" and it "has a real and reasonable fear of liability

25   or vexatious, conflicting claims directed against the Disputed Funds and is not in the position to

26

27   [6] References to "Fondo Decl." refer to the Declaration of Grant P. Fondo in Support of Ripple Labs Inc.'s *Ex Parte*
Application for a TRO and an Order to Show Cause why a Preliminary Injunction Should not Issue; Motion for

28   Expedited Discovery, filed herewith.

1   safely determine which party's claim to the Disputed Funds is meritorious without great hazard

2   and possible multiple liability."  Dkt. No. 1, (Interpleader Complaint) at ¶¶ 33-34.

3        Bitstamp froze the U.S. dollars, preventing r3Q from moving the Disputed Funds to

4   Coinex and off of the Ripple protocol to Stellar.  *Id.*, ¶ 24.  On April 1, 2015, Bitstamp filed this

5   interpleader action to enable the Court to decide the proper owner of the Disputed Funds.

6          **5.**     **McCaleb's Friends And Family's Removal Of All XRP From The**
                **Ripple Protocol.**

7

8        On or around March 24, 2015 – just four days after the $1 million transaction – McCaleb,

9   Stephenson, and seven of McCaleb's family and/or friends, attempted to cash out all of their

10  accounts on the Ripple protocol, through Bitstamp.  Schwartz Decl., ¶ 32.  Bitstamp initially froze

11  these transactions as suspicious, but ultimately allowed these individuals to remove all U.S.

12  dollars in their Ripple accounts and transfer them to their personal bank accounts.  *Id.*  While it is

13  not clear what these individuals did with the funds, this is additional evidence that McCaleb and

14  his family members were working in concert, and that McCaleb was involved with the March 20,

15  2015 transfer.

16         **D.**     **Bitstamp Has Expressed An Intent To Transfer The Disputed Funds To**
                **Stellar Because Of Threats From McCaleb And Stellar.**

17

18       Although McCaleb and Stellar are well aware of this proceeding, neither has made a

19  formal claim to the Disputed Funds.  Fondo Decl., ¶ 2.  Instead, rather than letting the judicial

20  process run its course, McCaleb and Stellar have threatened to sue Bitstamp, unless Bitstamp

21  agreed to dismiss this case in its entirety and send the Disputed Funds to Stellar.  *Id.*, ¶ 3.  While it

22  is not surprising McCaleb and Stellar would prefer not to have judicial intervention in this matter,

23  or for this matter to play out in a public courtroom, that is not a basis for circumventing the

24  Court's jurisdiction and interfering with this litigation.

25       As part of this effort, Stephenson recently submitted an email to Bitstamp asserting that he

26  transferred the Disputed Funds to Stellar in exchange for STR – XRP that originated from Harris,

27  not Stephenson.  *See* Dkt. No. 21 (Frost Declaration in Support of Bitstamp's Motion to

28  Discharge), ¶ 4; *see also* Schwartz Decl., ¶¶ 25, 28.  It defies common sense to believe that Harris,

1    after holding the XRP for over two years, suddenly had a desire to use all her XRP to purchase

2    over $1 million worth of STRs – at the very same time Stellar was struggling financially and its

3    auction had failed.  But regardless, that is for the trier of fact to determine, not Stellar or Bitstamp.

4          Not surprisingly, Bitstamp does not want to be in the middle of this fight and it has

5    succumbed to McCaleb's and Stellar's pressure.  Although no new information has surfaced to

6    allow Bitstamp to ascertain the true owner of the Disputed Funds, Bitstamp now seeks leave of

7    Court to immediately transfer the Disputed Funds to Stellar.[7]  *See* Dkt. No. 20 (Bitstamp's Motion

8    to Discharge).  In fact, notwithstanding its Motion to Discharge, Bitstamp recently represented to

9    Ripple Labs that it may not wait for a Court ruling and may instead decide to immediately transfer

10   the Disputed Funds.  Fondo Decl., ¶ 4.  Ripple Labs further understands that Bitstamp's Board

11   recently passed a resolution directing the funds to be transferred to Stellar.  *Id.*  Thus, Ripple Labs

12   has no choice but to seek an immediate temporary restraining order to prevent Bitstamp from

13   transferring the Disputed Funds to Stellar – a party that has not even appeared in this action – and

14   to retain jurisdiction over this matter at least until Ripple Labs' request for a preliminary

15   injunction can be heard by the Court.  Ripple Labs is also requesting that the Court order Bitstamp

16   to deposit the Disputed Funds with the Court.  Ripple Labs is likewise willing to deposit the XRP

17   at issue with the Court.

18   **III.    ARGUMENT**

19        **A.    Legal Standard**

20        The purpose of a temporary restraining order ("TRO") is to preserve the status quo and to

21   prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer."  *Granny*

22   *Goose Foods, Inc. v. Bhd. of Teamster*s, 415 U.S. 423, 439 (1974).  A TRO may be issued upon a

23   showing "that immediate and irreparable injury, loss, or damage will result to the movant before

24   the adverse party can be heard in opposition."  Fed. R. Civ. Proc. 65(b)(1)(A).  A preliminary

25   injunction barring an asset transfer is available where the suit seeks equitable relief.  *Johnson v.*

26   _____

27   [7] In its Motion to Discharge, Bitstamp also seeks to be discharged from the case, or alternatively, a full dismissal of
     the matter.  *See Id.*  While Ripple Labs does not object to Bitstamp's discharge it does intend to object to any attempt
     to dismiss the case and will file a limited opposition to Bitstamp's motion.  The exigency here warranting this *ex parte*
28   application pertains to Bitstamp's expressed intent to immediately transfer the Disputed Funds to Stellar.

RIPPLE LABS' *EX PARTE* APPLICATION FOR TRO AND AN ORDER TO SHOW CAUSE WHY A PRELIM. INJUNCTION
SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY, Case No. 15-cv-01503-WHO

1   *Couturier*, 572 F.3d 1067, 1083-84 (9th Cir. 2009).  Indeed, Courts have granted temporary

2   restraining orders and other similar relief where the party seeking to freeze an asset is able to show

3   "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages,

4   if relief is not granted."  *Id.* at 1085.

5      "The standard for issuing a temporary restraining order is identical to the standard for

6   issuing a preliminary injunction."  *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*,

7   887 F. Supp. 1320, 1323 (N.D. Cal. 1995); *see also Stuhlbarg Int'l. Sales Co., Inc. v. John D.*

8   *Brush and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standards for issuing a TRO are

9   "substantially identical" to those for issuing a preliminary injunction).  A party seeking a TRO

10  and/or a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a

11  likelihood that it will suffer irreparable harm in the absence of preliminary relief; (3) that the

12  balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Winter v.*

13  *Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

14     The Ninth Circuit employs a "sliding scale" approach to the Supreme Court's four-element

15  test.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Under this

16  approach, a preliminary injunction may issue if the movant raises "serious questions going to the

17  merits" and demonstrates that "the balance of hardship tips sharply towards the [movant's] favor,"

18  where the moving party also demonstrates that irreparable harm is likely, and the injunction is in

19  the public interest.  *Id.* (internal quotation marks omitted).

20  **B.      Ripple Labs Is Likely To Succeed On The Merits Of Its Claim For Injunctive**
           **Relief.**

21

22     For the purposes of a temporary restraining order, the showing of success on the merits

23  need not be strong; the moving party need only show that it can "raise serious questions going to

24  the merits of the litigation and demonstrate a balance of hardships tipping sharply in their favor."

25  *See Bracco v. Lackner*, 462 F. Supp. 436, 452 (N.D. Cal. 1978); s*ee also Alameda Cnty. v.*

26  *Weinberger*, 520 F.2d 344, 351 (9th Cir. 1975) (affirming issuance of temporary restraining order

27  where district court found that the moving party "raised serious and substantial questions,

28  indicating likely success on the merits").

- 10 -

1   **1.      Ripple Labs, Not Stellar, Has Staked Claim To The Disputed Funds
            With The Court.**

2

3   Ripple Labs can show that it is likely to succeed on the merits in this interpleader action.

4   Although Bitstamp filed its interpleader complaint six weeks ago, Ripple Labs is the only party

5   that has made a claim to the Disputed Funds with the Court. Although Stellar is well-aware of this

6   action, it has not intervened to assert its claim to the Disputed Funds. Given that Ripple Labs, not

7   Stellar, is the only party formally staking its claim to the Disputed Funds, it is likely to succeed on

8   the merits of the case.

9   **2.      Ripple Labs Will Demonstrate That McCaleb Breached The Settlement
            Agreement.**

10

11  Ripple Labs will also be able to prove that the March 20, 2015 XRP sale of over $1 million

12  worth of XRP violated the Settlement Agreement, entitling Ripple Labs to take necessary

13  measures to mitigate its damages, because it was executed by McCaleb's family member, it was

14  done at McCaleb's direction, and it was for the benefit of McCaleb and Stellar. Under the

15  Settlement Agreement, McCaleb agreed that for the first year of the Settlement Agreement, he

16  would limit his sales of "McCaleb XRP" to $10,000 per week. "McCaleb XRP" is defined as the

17  approximately 7,500,000,000 XRP currently in the Ripple Network in accounts owned or

18  controlled by Jed McCaleb, ***including XRP held by or for the benefit of his children or other***

19  ***family members.*** Thus, the limits for the amount of XRP that could be sold applied to both XRP

20  owned and/or controlled by McCaleb and XRP held by his cousins and aunt.

21  Even before discovery has commenced, there is ample evidence in support of Ripple Labs'

22  claim that the March 20, 2015 XRP sale violated the Settlement Agreement. First, Jacob

23  Stephenson, McCaleb's cousin, represented to Ripple Labs and to Bitstamp that he was

24  responsible for the March 20, 2015 sale from the r3Q account. Second, it is Ripple Labs'

25  understanding that McCaleb asked his family members to execute the transaction—directing

26  family members to sell their XRP to buy the STRs in excess of the agreed upon limit. Third,

27  evidence of the bot sales from r3Q and rnj8 supports Ripple Labs' contention that the March 20,

28  2015 sale was done at McCaleb's direction. Finally, Ripple Labs will be able to demonstrate that,

- 11 -

1  with his company running out of money, McCaleb attempted to prop up the Stellar auction, raise

2  cash, and used his cousin to sell XRP, at his direction.  The fact that Stephenson immediately used

3  the proceeds to purchase $1 million STR from Stellar is clear evidence of McCaleb's involvement

4  in this transaction.  There is simply no other viable reason why Harris/Stephenson would suddenly

5  on their own buy $1 million of STR, just days after Stellar's failed auction.  Indeed, Stephenson's

6  unwillingness to disclose the intended purpose of the $1 million transaction, when questioned by

7  Ripple Labs, knowing full well that sales for McCaleb would be a breach of the Settlement

8  Agreement, indicates Stephenson's attempt to protect McCeleb and himself from liability.

9          **3.      Ripple Labs Was Required To Mitigate Its Damages Resulting From
                  McCaleb's Breach.**

10

11         Ripple Labs will show that it is entitled to the Disputed Funds because it was not only

12  justified, but was required to purchase the XRP offered for sale by r3Q on March 20, 2015 to

13  mitigate its damages caused by McCaleb's violation of the Settlement Agreement.  "Under

14  California law a party has a duty to act reasonably to minimize damages flowing from a breach of

15  contract[.]" *Ortiz v. Bank of Am. Nat. Trust & Sav. Ass'n*, 852 F.2d 383, 387 (9th Cir. 1987)

16  (internal citations omitted) (citing *Sackett v. Spindler*, 248 Cal. App. 2d 220, 239 (1967)); *Sharp v.*

17  *Brandman*, No. C 05-02010 JSW, 2006 WL 3456612, at *3 (N.D. Cal. Nov. 29, 2006); *see also*

18  *Sackett*, 248 Cal. App. 2d at 238 ("It is well established in California that a party injured by a

19  breach of contract is required to do everything reasonably possible to minimize his own loss and

20  thus reduce the damages for which the other party has become liable.")  By purchasing the XRP,

21  Ripple Labs preserved the status quo and avoided a potential drop in the price of XRP, which

22  would have exposed McCaleb and Stephenson to significant damage claims.  In turn, Ripple Labs

23  is entitled to recover the Disputed Funds and essentially "undo" the transaction, with the

24  understanding that it will return the XRP to its rightful owner, pursuant to a Court order that the

25  owner will not turn around and resell the XRP, yet again, in excess of the contractual limits set

26  forth in the Settlement Agreement.

27      **C.      Ripple Labs Will Suffer Irreparable Harm Absent Preliminary Relief.**

28         The Settlement Agreement entered into between McCaleb and Ripple Labs (and Stellar)

- 12 -

RIPPLE LABS' *EX PARTE* APPLICATION FOR TRO AND AN ORDER TO SHOW CAUSE WHY A PRELIM. INJUNCTION
SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY, Case No. 15-cv-01503-WHO

1  expressly acknowledged that any breach of the agreement would cause immediate and irreparable

2  injury and is grounds for injunctive relief.  Courts have held that the irreparable injury prong may

3  be established where a contract provides that such harm would occur in the event of a breach.  *See*

4  *Am. Impex Corp. v. Int'l Ace Tex, Inc.*, No. CV 09-7082 PA (EX), 2009 WL 3963791, at *3 (C.D.

5  Cal. Nov. 16, 2009) (holding that the moving party demonstrated a likelihood of irreparable harm,

6  "since the parties expressly acknowledged in the Settlement Agreement that any breach would

7  cause immediate and irreparable injury"); *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 44

8  (Del.Ch. 1997) ("The irreparable harm element of the injunction standard is established by

9  [defendant's] own contractual stipulation.... Defendants cannot now say there is no irreparable

10  harm....").  Bitstamp's transfer of the Disputed Funds would facilitate McCaleb's breach of the

11  Settlement Agreement by completing the $1 million transaction; a situation where the parties

12  agreed that Ripple Labs would be irreparably harmed.  Accordingly, such transfer should not be

13  permitted.

14      Bitstamp is facing threats from Stellar's counsel that it will sue Bitstamp if Bitstamp does

15  not immediately transfer the funds to Stellar.  Bitstamp's May 13, 2015 Motion to Discharge

16  demonstrates that Bitstamp intends to bow to Stellar's demands.  Absent immediate relief from the

17  Court, it is not clear when and if Bitstamp will further succumb to this pressure by  releasing the

18  Disputed Funds to Stellar prior to the Court's ruling on Bitstamp's motion, as it told Ripple Labs it

19  might do.  Thus a TRO is imperative to preserve Ripple Labs' claim to and the Court's jurisdiction

20  over the Disputed Funds.  *See Connecticut General Life Ins. Co. v. New Images of Beverly Hills*,

21  321 F. 3d 878, 883 (9th Cir. 2003) (affirming district court's granting of preliminary injunction to

22  freeze party's assets on the grounds that it was probable that the party would conceal or dissipate

23  those assets).

24      Claims over the Disputed Funds must be resolved in this Court, which has jurisdiction and

25  authority over the Disputed Funds and the parties to the action.  Permitting Bitstamp to transfer the

26  funds to Stellar, a party that has not even subjected itself to the Court's jurisdiction, significantly

27  undermines the Court's authority, and prevents the Court from exercising its jurisdiction over the

28  Disputed Funds, causing irreparable harm to Ripple Labs.  Permitting the release of those funds

- 13 -

1    rewards McCaleb's breach and Stellar's extra-judicial pressures, and punishes Ripple Labs for

2    attempting to cure the breach and following the judicial process.  And all without a hearing or any

3    submission of evidence by Stellar or McCaleb.  Stellar and McCaleb should not be permitted to

4    circumvent the Court's jurisdiction at Ripple Labs' detriment.  Rather, if Stellar has a valid claim

5    to the Disputed Funds, it should follow the proper procedure by filing its claim with the Court and

6    should provide evidence to support its claim.

7           **D.      The Balance Of Hardships Weigh Heavily In Favor Of Granting Preliminary
                      Relief.**
8

9           When non-moving parties would not be materially harmed, a temporary restraining order

10   should issue.  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (finding balance of

11   equities favored granting preliminary injunction where non-moving party was able to "provide[]

12   almost no evidence that it would be harmed in any way by the district court's order"); *Melendres*

13   *v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (finding balance of equities favored granting

14   preliminary injunction where non-moving parties "have not established that they will be harmed if

15   this injunction is permitted to stand while the district court reaches a final judgment on the

16   merits"); *Shutterfly, Inc. v. ForeverArts, Inc.*, No. CR 12-3671 SI, 2012 WL 2911887, at *3 (N.D.

17   Cal. July 13, 2012) (granting temporary restraining order where the restraint "will not burden

18   defendants").  For all of the reasons discussed above, Ripple Labs would suffer irreparable harm

19   absent the requested relief.

20          Conversely, Bitstamp would not be harmed because it was the party that initiated this

21   action and ultimately seeks to be discharged as a disinterested stakeholder.  Indeed, an Order

22   requiring Bitstamp to deposit the Disputed Funds with the Court would actually help Bitstamp by

23   relieving it from any potential civil or criminal exposure, and by alleviating the pressure it

24   currently faces from McCaleb and Stellar to immediately transfer the Disputed Funds to Stellar.

25   Likewise, McCaleb would not suffer any hardship if injunctive relief is granted because apparently

26   Stellar, not McCaleb (although they are essentially one-in-the-same), is now asserting an extra-

27   judicial claim to the Dispute Funds.  Further, any injunctive relief would only obligate McCaleb to

28   do what he is already required to do under the Settlement Agreement.  *See Am. Impex Corp.*, 2009

- 14 -

1   WL 3963791, at *3 (holding that "[t]he balance of equities tips in Plaintiff's favor, since Plaintiff

2   only seeks an injunction ordering Defendants to do what they have already agreed to do [under the

3   parties' settlement agreement]").  Finally, Stellar would not suffer any hardship because, if it is the

4   rightful owner of the Disputed Funds, it can simply file a claim for the Disputed Funds with this

5   Court and let the judicial process run its course.

6         Thus, the balance of hardships weighs heavily in Ripple Labs favor as it should not be

7   deprived of the opportunity to claim its right to the Disputed Funds due to Stellar and McCaleb's

8   improper conduct to circumvent the judicial process.  *See Roul v. George*, No. 2:13-CV-01686-

9   GMN, 2013 WL 5781736, at *4 (D. Nev. Oct. 25, 2013) ("Plaintiffs have provided a substantial

10  amount of allegations of serious fraudulent activity amounting to an alleged misappropriation of

11  nearly $1 million. Therefore, the Court finds that the balance of equities favors the entry of a

12  temporary restraining order enjoining all Defendants from distributing or transferring the

13  Deposited Funds.")

14        **E.      Public Policy Weighs In Favor Of Enjoining Bitstamp From Transferring The
               Disputed Funds To Stellar.**

15

16        Bitstamp is a disinterested party in this action.  By transferring the Disputed Funds to

17  McCaleb and Stellar, Bitstamp not only exposes itself to potential civil liability to Ripple Labs,

18  which has made an official claim to the Disputed Funds in its answer, but may even face potential

19  regulatory or criminal exposure for doing so.  Allowing the interpleader action to proceed by

20  enjoining any premature transfer of the Disputed Funds would prevent these problems and also

21  protect the interests of Bitstamp, the interpleading party.  *See Trustees of ILWU-PMA Pension

22  Plan v. Coates*, No. C-11-3998 EMC, 2013 WL 556800, at *6 (N.D. Cal. Feb. 12, 2013) ("The

23  primary purposes for an action in interpleader are (1) to protect the party depositing the funds with

24  the court from secondary, follow-up actions and (2) to protect the resources of the interpleading

25  party.") (internal quotation marks and citations omitted).

26        Although Bitstamp seems to have suddenly been able to ameliorate its prior legal concerns

27  based on one email by Stephenson, Bitstamp's initial concerns about releasing the funds were

28  indeed well-founded and should still be a concern for Bitstamp and the Court.  The March 20,

1   2015 transaction, and even the August and September 2014 transactions, appear to have been

2   structured to conceal the true owner of the XRP, which, if Bitstamp releases the funds, could be a

3   violation of the "Know Your Customer" requirements of the BSA.  Additionally, directing and

4   controlling transactions in another person's name, not only violates the Settlement Agreement, but

5   could also violate certain criminal laws, including, anti-money laundering and tax laws.  *See e.g.*,

6   31 U.S.C. § 5318 (h)(1) (anti-money laundering requirements); 26 C.F.R. § 1.6011–4 (requirement

7   to disclose participation in certain transactions by taxpayers); 26 C.F.R. § 301.6111–3

8   (requirement to disclose reportable transactions).  McCaleb is currently under investigation by the

9   U.S. Department of Justice for potential criminal wrongdoing, and Ripple Labs believes the

10  criminal investigation relates, at least in part, to financial transactions by McCaleb.  For these

11  reasons, the Court should be wary of permitting McCaleb and Stellar to facilitate an extra-judicial

12  transaction directed by McCaleb for his and his company's benefit.

13          Injunctive relief is also warranted to demonstrate to the public that the Court will not

14  permit circumvention of the judicial system through threats and coercion.  McCaleb and Stellar

15  should not be rewarded for their threats to sue Bitstamp, a bystander who simply used the judicial

16  system as it was intended.

17          Finally, public policy favors the enforcement of settlement agreements.  *See Am. Impex*

18  *Corp. v. Int'l Ace Tex, Inc.*, No. CV 09-7082 PA (EX), 2009 WL 3963791, at *3 (C.D. Cal.

19  Nov. 16, 2009) (holding that "an injunction would fulfill the public interest in encouraging and

20  enforcing settlement agreements"); *see also Davies v. Grossmont Union High Sch. Dist.,* 930 F.2d

21  1390, 1398 (9th Cir. 1991) ("In a case presenting no public interest that would be harmed by

22  enforcement of the [settlement agreement] the countervailing interest in settlement will be enough

23  to justify enforcement").  The Settlement Agreement would be meaningless if McCaleb (and his

24  company, Stellar) are permitted to benefit from McCaleb's breach and avoid the express terms

25  relating to irreparable harm.

26      **F.      The Requested Relief Does Not Change the Status Quo Ante.**

27          This Application only asks the Court to preserve the *status quo* pending resolution of the

28  claims over the disputed funds.  "The status quo is the last, uncontested status preceding the

1   commencement of the controversy." *Washington Capitols Basketball Club, Inc. v. Barry*, 419

2   F.2d 472, 476 (9th Cir. 1969).  In order for the Court to provide full relief to Ripple Labs in the

3   event it prevails on the merits of action, (or other parties) a temporary restraining order and

4   preliminary injunction must be in place.

5   **IV.      REQUEST FOR EXPEDITED RELIEF**

6          Given that Bitstamp is facing extreme pressure from Stellar to transfer the Disputed Funds

7   to it immediately, Bitstamp's Motion to Discharge indicated its intent to make this transfer, and

8   Bitstamp's notification to Ripple Labs that it may make the transfer at any time, even before the

9   Court can rule on its Motion to Discharge, Ripple Labs respectfully requests that the Court issue

10  the temporary restraining order as soon as it is able to consider this Application.  Ripple Labs

11  further requests expedited discovery, beginning immediately, so that it can promptly obtain

12  additional evidence to support its claims in advance of any preliminary injunction hearing.

13         Federal Rule of Civil Procedure 26(d) provides that early discovery may be permitted by

14  court order.  "In the Ninth Circuit, courts use the 'good cause' standard to determine whether

15  discovery should be allowed to proceed prior to a Rule 26(f) conference." *Interserve, Inc. v.*

16  *Fusion Garage PTE, Ltd.*, No. 09-cv-05812 JW (PVT), 2010 WL 143665, at *2 (N.D. Cal. Jan. 7,

17  2010) (internal citation omitted); *see also Hard Drive Prods., Inc. v. Does 1-118*, No. 11-cv-1567

18  LB, 2011 WL 1431612, at *2 (N.D. Cal. April 14, 2011); *IO Grp., Inc. v. Does 1–65*, No. 10-cv-

19  4377 SC, 2010 WL 4055667, at *2 (N.D. Cal. Oct. 15, 2010); *In re Countrywide Fin. Corp. Deriv.*

20  *Litig.*, 542 F. Supp. 2d 1160, 1179 (C.D. Cal. 2008).  Good cause may be found where the need

21  for expedited discovery, in consideration of the administration of justice, outweighs the prejudice

22  to the responding party.  *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D.

23  Cal. 2002); *Zynga Game Network Inc. v. Williams*, No. 10-cv-1022 JF (PVT), 2010 WL 2077191,

24  at *2 (N.D. Cal. May 20, 2010).  As set forth below, good cause exists for the expedited discovery

25  sought by Ripple Labs.

26         **A.      The Good Cause Factors Weigh Heavily In Favor Of Permitting Expedited
                   Discovery.**

27

28         Factors the Court shall consider in determining whether there is good cause for expedition

1   include: (1) the purpose of the requested early discovery; (2) whether the discovery requests are

2   narrowly tailored; (3) whether the discovery burdens the defendants; (4) whether the defendants

3   are able to respond to the requests in an expedited manner; and (5) how far in advance of the

4   formal start of discovery the request is made.  *See Semitool*, 208 F.R.D. at 276-77.

5       First, because Ripple Labs seeks injunctive relief, its request falls squarely within in the

6   exceptions to the standard discovery rule contemplated by Rule 26(d).  Courts have recognized

7   that good cause is found in cases involving claims of for injunctive relief.  *See id.*; *see also*

8   *Interserve*, 2010 WL 143665, at *2 ("Expedited discovery will allow plaintiff to determine

9   whether to seek an early injunction.");  Advisory Committee Notes to the 1993 amendments to

10  Rule 26(d) (Discovery before the Rule 26(f) conference "will be appropriate in some cases, such

11  as those involving requests for a preliminary injunction").  In addition, courts in this district

12  routinely permit expedited discovery in order to identify doe defendants. *E.g.*, *Uber Technologies,*

13  *Inc. v. Doe*, No. 15-CV-00908-LB, 2015 WL 1926291 (N.D. Cal. Apr. 27, 2015); *Skout, Inc v. Jen*

14  *Processing, Ltd*, No. 14-CV-02341-JSC, 2015 WL 224930 (N.D. Cal. Jan. 15, 2015).  McCaleb's

15  evasive behavior thus far demonstrates that a judicial order is required to compel him to disclose

16  the identities of individuals whom have aided him in his breaches of the Settlement

17  Agreement.  Ripple Labs cannot serve the unnamed defendants and this action and cannot

18  expeditiously proceed without discovery to determine the identity of these individuals.  Thus,

19  Ripple Labs' purposes for the requested expedited discovery are justified and proper.

20      Second, Ripple Labs requests are narrowly tailored.  Ripple Labs seeks expedited

21  discovery to obtain documents and testimony[8] from two parties, McCaleb and Stephenson, on

22  limited subjects.  With respect to discovery to allow Ripple Labs to determine the doe defendants,

23  those subjects consist of: (1) XRP in McCaleb's ownership or control, (2) XRP transactions by

24  McCaleb or for his benefit, and (3) McCaleb's and Stephenson's bank records.  Ripple Labs also

25

---

26  [8] Because depositions are also routinely permitted in these circumstances, the Ripple Labs requests permission to take McCaleb's and Stephenson's depositions, as they are likely to have extensive knowledge on all of the subjects
27  described below.  *See*, *e.g.*, *KLA-Tencor Corp. v. Murphy*, 717 F. Supp. 2d 895, 898 (N.D. Cal. 2010) (noting that the court had "granted plaintiff leave to take expedited discovery, including oral depositions of the individual defendants"
28  in connection with a motion for preliminary injunction).

- 18 -

1    has a short, 10-month period for its requests: from August 13, 2014 until present.  These requests

2    are narrow in scope and are designed solely to assist Ripple Labs in determining the extent of

3    McCaleb's unlawful XRP sales through the use of unidentified third parties, in support of its

4    request for preliminary injunction.  With respect to discovery relating to whether current

5    circumstances would require Ripple Labs to pursue a preliminary injunction, Ripple Labs seeks

6    only to obtain only (1) information relating to the Disputed Funds frozen by Bitstamp, (2)

7    information relating to demands to Bitstamp by McCaleb, Stellar, or Stephenson to release the

8    Disputed Funds, (3) communications by and among McCaleb, Stephenson and Harris regarding

9    XRP transfers/sales, and (4) communications by and among Stellar officers, directors, employees,

10   founders, or agents regarding XRP transfers/sales, including the March 20, 2015 sale by r3Q and

11   subsequent transfers of the Disputed Funds.  These requests are narrowly tailored to the specific

12   issue at hand – McCaleb's violation of the Settlement Agreement.

13          Finally, neither McCaleb nor Stephenson will be burdened by the early production of

14   discovery and both are capable of responding to these requests in an expedited manner.  McCaleb

15   possesses key evidence relating to these XRP sales made at his direction to circumvent the

16   Settlement Agreement.  Because of the narrow scope of the requested discovery, whatever

17   logistical issues McCaleb and Stephenson may encounter in producing the requested information

18   would be minimal, and are outweighed by the potential harm to Ripple Labs.  The burden on

19   McCaleb to prepare for a deposition on topics for which he has first-hand knowledge would not be

20   unduly significant.  Accordingly, these factors also weigh in favor of expedited discovery.  *See*

21   *Interserve*, 2010 WL 143665, at *2 (permitting expedited discovery because "the administration of

22   justice outweigh[ed] the prejudice to the responding party," including any "logistical

23   inconvenience").

24          Based on the foregoing, the Court should grant Ripple Labs' Motion for leave to propound

25   expedited limited discovery in this case.  Ripple Labs respectfully requests the Court enter an

26   Order granting Ripple Labs' Motion and order that McCaleb and Stephenson respond to the

27   following discovery within 10 days:

28          1.      Documents sufficient to identify all XRP accounts in McCaleb's and Stephenson's

- 19 -

RIPPLE LABS' *EX PARTE* APPLICATION FOR TRO AND AN ORDER TO SHOW CAUSE WHY A PRELIM. INJUNCTION
SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY, Case No. 15-cv-01503-WHO

1    ownership and/or control;

2         2.      Documents relating to XRP sales and transfers by, for, or at the direction of

3    McCaleb, Harris, and/or Stephenson for the period August 13, 2014 until the present;

4         3.      Documents relating to XRP sales and transfers of XRP for the benefit of McCaleb,

5    Stephenson, and/or Stellar for the period August 13, 2014 until the present;

6         4.      McCaleb's and Stephenson's bank records, including records of virtual currency

7    accounts with Bitstamp, Coinex, or other gateways, for the period August 13, 2014 until the

8    present;

9         5.      Communications by or among McCaleb, Stephenson, and/or Harris regarding or

10   relating to Ripple Labs, XRP, Stellar, or STRs for the period August 13, 2014 until the present;

11        6.      Communications by, among McCaleb, Harris, and/or Stephenson regarding or with

12   Bitstamp, Coinex, or other gateways from August 13, 2014 until the present;

13        7.      Documents relating to the XRP sales at issue in this matter and Stephenson's

14   purported attempt to purchase approximately $1 million worth of STRs;

15        8.      Communications by or among McCaleb and Stellar officers, directors, employees,

16   founders, or agents regarding XRP sales and/or the Stellar auction; and

17        9.      Deposition testimony from McCaleb and Stephenson regarding discovery sought in

18   Requests 1-8 above.

19   **V.    CONCLUSION**

20        For the foregoing reasons, Ripple Labs respectfully requests this Court issue an immediate

21   Order (1) enjoining Bitstamp from transferring the Disputed Funds to any private party until this

22   matter is fully adjudicated, or at least until this Motion and Bitstamp's Motion to Discharge (Dkt.

23   No. 20) may be heard by the Court, (2) directing Bitstamp deposit the Disputed Funds with the

24   Court, (3) requiring Bitstamp to show cause why a preliminary injunction should not issue, and

25   (4) expediting discovery in anticipation of the preliminary injunction hearing.  Ripple Labs is also

26   willing to deposit the XRP with the Court and will work with the Court to facilitate the transfer in

27   the most efficient manner.

28

Dated:  May 14, 2015                              Respectfully submitted,

                                    By:    /s/ Grant P. Fondo
                                           Grant P. Fondo (SBN 181530)
                                           gfondo@goodwinprocter.com
                                           Nicole L. Chessari (SBN 259970)
                                           nchessari@goodwinprocter.com
                                           **GOODWIN PROCTER LLP**
                                           135 Commonwealth Drive
                                           Menlo Park, California 94025-1105
                                           Tel.: 650.752.3100
                                           Fax.: 650.853.1038

                                           Richard M. Strassberg (*Pro Hac Vice*)
                                           rstrassberg@goodwinprocter.com
                                           **GOODWIN PROCTER LLP**
                                           353 East 72nd Street 36th Floor
                                           New York, NY 10021
                                           Tel.: 212.813.8800
                                           Fax.: 212.355.3333

                                           Attorneys for Defendant/Cross-Plaintiff
                                           RIPPLE LABS INC.

1

## **CERTIFICATE OF SERVICE**

2     I, Grant P. Fondo, hereby certify that a copy of the foregoing document and attachments,

3 filed through the CM/ECF system, will be sent electronically to the registered participants as

4 identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class

5 mail postage prepaid on all counsel who are not served through the CM/ECF system on May 14,

6 2015.

7

8                                                /s/ Grant P. Fondo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RIPPLE LABS' *EX PARTE* APPLICATION FOR TRO AND AN ORDER TO SHOW CAUSE WHY A PRELIM. INJUNCTION
SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY, Case No. 15-cv-01503-WHO