Grant P. Fondo (SBN 181530)
gfondo@goodwinprocter.com
Nicole L. Chessari (SBN 259970)
nchessari@goodwinprocter.com
**GOODWIN PROCTER LLP**
135 Commonwealth Drive
Menlo Park, California 94025-1105
Tel.: 650.752.3100
Fax.: 650.853.1038

Richard M. Strassberg (*Pro Hac Vice*)
rstrassberg@goodwinprocter.com
**GOODWIN PROCTER LLP**
353 East 72nd Street 36th Floor
New York, NY 10021
Tel.: 212.813.8800
Fax.: 212.355.3333

Attorneys for Defendant/Cross-Plaintiff
RIPPLE LABS INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BITSTAMP LTD., a foreign company,<br><br>   Plaintiff,<br><br>   v.<br><br>RIPPLE LABS INC., a California Corporation, JACOB STEPHENSON, an individual, NANCY HARRIS, an individual, JED MCCALEB, an individual, and DOES 1 Through 10, Inclusive,<br><br>   Defendant. | Case No. 15-cv-01503-WHO<br><br>**DECLARATION OF REBECCA SCHWARTZ IN SUPPORT OF RIPPLE LABS INC.'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY**<br><br>Date:      **TBD**<br>Time:     **TBD**<br>Location: Courtroom 2, 17th Floor<br><br>Hon. William H. Orrick<br><br>***IMMEDIATE ACTION REQUESTED*** |
| RIPPLE LABS INC., a California Corporation,<br><br>   Cross-Plaintiff,<br><br>   v.<br><br>JED MCCALEB, an individual, JACOB STEPHENSON, an individual, and DOES 1 Through 10, Inclusive,<br><br>   Cross-Defendants. | |

I, Rebecca Schwartz, declare as follows:

1. I am the Project Manager for Risk and Compliance at Ripple Labs Inc. ("Ripple Labs"). I submit this declaration in support of Ripple Labs' Application for Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue and for Expedited Discovery. I am over the age of 18 years. Unless otherwise indicated, I have personal knowledge of the matters stated herein and, if called upon to do so, I could and would competently testify to them under oath.

2. Ripple Labs is a San Francisco-based company which develops software that implements and interacts with what is known as the Ripple protocol. The Ripple protocol is a decentralized ledger payment standard software used to transfer and exchange things of value, including U.S dollars, foreign currency and digital currency known as XRP. XRP is the native currency of the Ripple protocol and cannot be used outside of the Ripple protocol.

3. I am informed and believe that Jed McCaleb ("McCaleb") is a founder of Mt. Gox.

4. Mr. McCaleb is the former Chief Technology Officer ("CTO") director and co-founder of Ripple Labs.

5. I am informed and believe that, in conjunction with his role at Ripple Labs, Mr. McCaleb helped create and retained 9 billion XRP for himself. A finite number of 100 billion XRP was created and 32,174,248,947.51 XRP is currently available to the public, as shown at https://www.ripplelabs.com/xrp-distribution/. The 9 billion XRP initially retained by Mr. McCaleb is included in the roughly 32 billion XRP that is available to the market.

6. I am informed and believe that, in or around July 2013, Mr. McCaleb resigned as CTO of Ripple Labs, but remained as a director until March 2014.

7. I am informed and believe that, as early as October 2014, Mr. McCaleb began working on developing a new rival crypto currency company, now known as Stellar Development Foundation ("Stellar"), based largely on Ripple Labs' technology.

8. The original code used to create the Stellar protocol was a "fork" of the Ripple protocol. In software engineering, a fork is a competing project based on a version of the pre-

DECLARATION OF SCHWARTZ IN SUPPORT OF RIPPLE LABS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY
Case No. 15-cv-01503-WHO

existing project's source code.

9. Bitstamp is a large "gateway" for XRP, and plays an important role in the Ripple protocol ecosystem. Bitstamp is a leading gateway that holds the currency that Ripple protocol users send to one another.

10. Ripple Labs' Chief Risk Officer, Greg Kidd, is a Bitstamp investor and Arthur Britto, a Ripple Labs co-founder and advisor, is on Bitstamp's Board of Directors.

11. In addition to Mr. Britto, I am informed and believe that Bitstamp's Board consists of four additional individuals, including Bitstamp's Chief Executive Officer, Bitstamp's Chief Technology Officer, Pantera Capital's ("Pantera") Chief Executive Officer, who serves as the chairman, a partner from Pantera. Bitstamp's Board composition is available at https://www.bitstamp.net/about_us/.

12. I am informed and believe that Mr. McCaleb is a venture partner at Pantera. This information is available at https://panteracapital.com/about/.

13. In March 2014, Mr. McCaleb resigned from Ripple Labs' Board of Directors and, almost immediately, began selling large amounts of XRP. This resulted in a decrease in the market price of XRP.

14. On May 22, 2014, Mr. McCaleb publicly announced his intention to sell all of his remaining XRP to the public beginning on or about June 6, 2014. Mr. McCaleb continued selling large amounts of XRP thereafter, which continued to negatively impact the XRP market price.

15. In or around May 2014, a dispute arose over whether Mr. McCaleb even had legal rights to the XRP that he was selling. Ripple Labs, Mr. McCaleb and other related parties engaged in discussions to resolve this dispute, which resulted in the culmination of a Settlement Agreement on August 13, 2014, between Ripple Labs and Christian Larsen (Ripple Labs' Chief Executive Officer) on one hand and McCaleb, Joyce Kim (who I am informed and believe is Mr. McCaleb's girlfriend and co-founder of Stellar), and Stellar on the other hand (the "Settlement Agreement"). The Settlement Agreement has a confidentiality provision. To adhere to these terms of the confidentiality provision, where applicable I will refer to individuals by their initials.

16. On or after August 13, 2014, Mr. McCaleb sold, and has continually sold approximately $10,000 worth of XRP per week from an account that he openly identified as belonging to him.

17. On August 14, 2014, Ripple account r3Q3B6A2giHDMef83AztzBStBm1JBmxUKX ("r3Q"), an account appearing to be owned by Mr. McCaleb's cousin, Jacob Stephenson, who I am informed and believe is a resident of Arkansas, sold approximately $16,884 worth of XRP.  r3Q continued to regularly sell well over the $10,000 worth of XRP per week, totaling $398,877 worth of XRP over a six week period, until September 25, 2014, when it ran out of XRP.

18. I noticed these atypical and large sales by r3Q, and on September 10, 2014, I telephoned Mr. Stephenson at his office at the University of Arkansas to confirm that he was aware of these transactions and had, in fact, authorized them.  During that call, Mr. Stephenson represented to me that he was responsible for the August and September 2014 sales by r3Q.

19. I am informed and believe that, on September 23, 2014, an investigator retained by Ripple Labs, through its counsel, called Mr. Stephenson again at his office at the University of Arkansas, to discuss the recent sales by r3Q and advise him that these sales violated the Settlement Agreement.  I am informed and believe that, during that call, Mr. Stephenson again represented that he executed the recent sales from r3Q.  I am informed and believe that the investigator notified Mr. Stephenson that Mr. McCaleb entered into a legal agreement with Ripple Labs, that it appeared that the XRP sales, through r3Q, violated that agreement, and advised Mr. Stephenson that Ripple Labs would consider taking legal action against him unless he ceased and desisted from making further XRP sales.

20. Within hours, of r3Q's depletion on September 25, 2014, another Ripple account rnj8sNUBCw3J6sSstY9QDDoncnijFwH7Cs ("rnj8"), one of Mr. McCaleb's original or "genesis" accounts began selling substantial amounts of XRP.  rnj8 was first created on or before December 2012 and, until this date, had never sold XRP.  However, from this date forward, rnj8 regularly sold well in excess of the $10,000 XRP per week limit, selling approximately $93,400 worth of

1    XRP over a two-week period, until it also ran out of XRP on October 8, 2014.

2          21.    The XRP sales by r3Q and rnj8 were done in a very similar, unique, and distinctive manner. Both accounts made small sales of XRP in unrounded amounts just seconds apart – too close in time to be manually entered – indicating that the sales were executed using "bots."– highly sophisticated computerized trading programs specially designed to place bids and offers on a digital currency exchange at speeds that no human individual can reproduce. I understand and believe that Bots can be programmed to offer small amounts for sale over an extended period of time, which prevents the market price on an exchange from falling too rapidly, so that a large amount of XRP can be sold at a stable market price, enhancing profitability. I further understand and believe that Bots require technical expertise and a working knowledge of the Ripple protocol to properly design and implement sales of XRP.

      22.    I am informed and believe that Mr. McCaleb is one of the few individuals with the expertise to design and operate a bot within the Ripple protocol because he helped write the Ripple protocol and has intimate knowledge of the program. I am further informed and believe that Mr. McCaleb used bots in the past to execute sales within the Ripple protocol from his own account and for others. For example, I am informed and believe that, in or around October 2013 through December 2013, Mr. McCaleb operated a business through the website coinconverter.com. I am further informed and believe that users within the Ripple protocol could log on to Mr. McCaleb's website and purchase services whereby Mr. McCaleb would use a bot to execute XRP sales within the Ripple protocol with minimal human interaction. I am further informed and believe that those Ripple protocol users gave Mr. McCaleb their Ripple account numbers along with their passwords, and Mr. McCaleb logged onto their accounts to execute the sales through bots of his own design in exchange for 1% of the proceeds from those bot sales.

      23.    I am informed and believe that, on or around March 16, 2015, Stellar initiated an auction of its native currency, STR. I am further informed and believe that Stellar placed 650 million STR into an account on the Coinex gateway from which the auction would draw ("Auction STR"). I am further informed and believe that Stellar's unaudited quarterly financials, as of

September 30, 2014, showed that its expenses were in the range of $700,000 for the past six months, about half of which was for payroll. All of this information is available at https://www.stellar.org/blog/announcing-first-stellar-auction/.

24. I am informed and believe that, as of March 19, 2015, Stellar held more than 649 million Auction STR on the Coinex gateway. The listed price for Auction STR was $0.0031 US dollars per STR. As such, as of March 19, 2015, Stellar has raised an estimated $1,479.78 of the apparently $2,000,000 it hoped to raise.

25. On or around March 17, 2015, rUf6pynZ8ucVj1jC9bKExQ7mb9sQFooTPK ("rUf6"), one of McCaleb's genesis accounts now registered to Nancy Harris, Mr. Stephenson's mother and Mr. McCaleb's aunt, transferred 89,999,900 XRP to r3Q. I am informed and believe, based on the discussion I had with Mr. Stephenson, discussed further in Paragraph 26, below, that Ms. Harris received this account from Mr. McCaleb a few years ago. Prior to this transfer by rUf6, on or around January 6, 2015, it had also transferred 10 million XRP to r3Q.

26. On or around March 19, 2015, r3Q offered 98,846,600 XRP it received from Nancy Harris for sale on the Ripple protocol.

27. On or about March 19, 2015, I contacted Mr. Stephenson by phone by calling him at his office at the University of Arkansas. When I spoke with him, he stated that he recalled we spoke a few months ago and did not appear to want to speak with me. I explained that we saw unusual activity on his account and wanted to conduct due diligence on the proceeds of the transaction. I also asked him what the proceeds of 98 million XRP offer were for and he said he did not have to answer to my question. I asked him if he was trading on his own account and he said "yes." I asked him again about the source of funds and he stated that Mr. McCaleb gave it to his family two or so years ago. Mr. Stephenson stated that his brother and mother each have a Ripple account and that he controls all of their accounts. He said the most recent account that transferred funds was that of his mother. He said that he knew there was "bad blood," but that this was not part of that. I believe the "bad blood" he referenced was in relation to Ripple Labs' relationship with Mr. McCaleb. As we ended the call, Mr. Stephenson further stated that this was

DECLARATION OF SCHWARTZ IN SUPPORT OF RIPPLE LABS' *EX PARTE* APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY
INJUNCTION SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY
Case No. 15-cv-01503-WHO

the last of the XRP and that this will "not be an ongoing problem" anymore.

28. Soon after the call, r3Q withdrew its approximately 98 million XRP offer from March 19, 2015. On March 20, 2015, r3Q offered 96,342,361.6 XRP, XRP received from the account purportedly owned by Harris, for sale on the Ripple protocol.

29. Because it appeared that the offer was made by McCaleb's family member and/or by or for McCaleb, in violation of the Settlement Agreement, Ripple Labs purchased all of the XRP from r3Q to prevent this large amount of XRP from becoming available on the open market and to minimize or avoid potential harm it would suffer from the large sale. The purchase price was $1,038,172, paid by an agent of Ripple Labs at Ripple Labs' direction. The funds used to purchase the 96,342,361.6 XRP were Ripple Labs' funds.

30. Bitstamp acted as the gateway for this transaction. Ripple Labs delivered the money to Bitstamp, r3Q delivered the XRP to Bitstamp, and both parties used Bitstamp to facilitate the transfer the money/XRP to the other party. This exchange only happened on the Ripple protocol, and was not a physical transfer of funds. The "transfer" was electronic with Bitstamp holding all of the U.S. dollars and Ripple Labs holding the 96,342,361.6 XRP. Currently, Ripple Labs still holds the 96,342,361.6 XRP.

31. I am informed and believe that, after executing the March 20, 2015 transaction, r3Q attempted to use the Disputed Funds to purchase Auction STR through the Coinex gateway.

32. I am informed and believe that, on or around March 24, 2015, Mr. McCaleb, Mr. Stephenson, and seven of Mr. McCaleb's family and/or friends, attempted to cash out all of their accounts on the Ripple protocol, through Bitstamp. I am informed and believe that Bitstamp initially froze these transactions as suspicious, but ultimately allowed these individuals to remove all U.S. dollars in their Ripple accounts and transfer them to their personal bank accounts.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 14th day of May, 2015 in San Francisco, California.



REBECCA SCHWARTZ

DECLARATION OF SCHWARTZ IN SUPPORT OF RIPPLE LABS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MOTION FOR EXPEDITED DISCOVERY
Case No. 15-cv-01503-WHO