MARK S. PARRIS (*admitted pro hac vice*)
PAUL F. RUGANI (*admitted pro hac vice*)
ANDREW ARDINGER (STATE BAR NO. 267417)
ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue
Suite 5600
Seattle, Washington  98104-7097
Telephone:     +1-206-839-4300
Facsimile:     +1 206-839-4301
E-mail:     mparris@orrick.com

GABRIEL M. RAMSEY (SBN 209218)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, California  94105-2669
Telephone:     +1-415-773-5700
Facsimile:     +1 415-773-5759
E-mail:     gramsey@orrick.com

*Attorneys for Defendants*
*Jed McCaleb, Jacob Stephenson, and Nancy Harris*

TERRY GROSS (SBN 103878)
ADAM C. BELSKY (SBN 147800)
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, CA 94104
Tel: (415) 544-0200
Fax: (415) 544-0201
E-mail:   terry@gba-law.com

*Attorneys for Proposed Intervenor-*
*Defendant Stellar Development*
*Foundation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

BITSTAMP, LTD., a foreign company,

Plaintiff,

v.

RIPPLE LABS, INC., a California Corporation,
JACOB STEPHENSON, an individual, NANCY
HARRIS, an individual, JED MCCALEB, an
individual, and DOES 1 through 10, inclusive,

Defendants.

---

RIPPLE LABS, INC., a California Corporation,

Cross-Plaintiff,

v.

JED MCCALEB, an individual, JACOB
STEPHENSON, an individual, and DOES 1
through 10, inclusive,

Cross-Defendants.

Case No. 15-cv-01503-WHO

**DEFENDANTS MCCALEB,
STEPHENSON, HARRIS'S AND
INTERVENOR-DEFENDANT
STELLAR DEVELOPMENT
FOUNDATION'S RESPONSE TO
PLAINTIFF'S MOTION FOR AN
ORDER OF DISCHARGE OR, IN THE
ALTERNATIVE, FOR VOLUNTARY
DISMISSAL**

Date:        June 10, 2015
Time:        2:00 p.m.
Dept:        Courtroom 2, 17th Floor
Judge:      Hon. William H. Orrick

1

# TABLE OF CONTENTS

2

3

I.      Introduction ................................................................................................. 1

4

5

II.     Factual Background ..................................................................................... 3

6

    A.  The Alleged Sales of XRP ..................................................................... 3

7

    B.  Bitstamp's Interpleader Complaint ....................................................... 4

8

9

    C.  Frost's Involvement with Ripple and Bitstamp .................................... 6

10

    D.  Bitstamp's Motion for Discharge or Voluntary Dismissal ................... 6

11

12

III.    Argument ...................................................................................................... 8

13

A.      Bitstamp's Request For Voluntary Dismissal Should Be Granted ....................................... 8

14

B.      Bitstamp Should Not Be Discharged,
15      Because It Is Not A Good Faith Stakeholder .................................................... 12

16

17              1.      Bitstamp's Interests Coincide with Ripple's Interests .............................. 14

18              2.      Stellar Has Independent Claims Against Bitstamp
19                      that Also Preclude Discharge .................................................. 17

20

C.      In No Event Should Bitstamp Be Awarded Attorney's Fees
21      From the Interpleaded Funds ......................................................... 17

22

IV.     Conclusion ................................................................................................... 19

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Abex Corp. v. Ski's Enterps., Inc.*,
    748 F.2d 513 (9th Cir. 1984)........................................................................ 17

*Bierman v. Marcus*,
    246 F.2d 200 (3d Cir. 1957)........................................................................ 12

*Companion Life Ins. Co. v. Schaffer*,
    442 F. Supp. 826 (S.D.N.Y. 1977).......................................................... 13, 17

*Fid. Nat'l Title Co. v. United States SBA*,
    No. 13-cv-02030, 2014 U.S. Dist. LEXIS 159830 (E.D. Cal. Nov. 12, 2014).................. 18

*Flatt v. Superior Court*,
    9 Cal. 4th 275 (1994) ............................................................................ 15, 16

*Frazier v. Superior Court*,
    97 Cal. App. 4th 23 (2002)........................................................................ 15

*Garon v. eBay, Inc.*,
    No. 10-05737, 2011 U.S. Dist. LEXIS 148621 (N.D. Cal. Nov. 30, 2011) ...................... 7

*Great Am. Ins. Co. v. Bank of Bellevue*,
    366 F.2d 289 (8th Cir. 1966)...................................................................... 12

*Interfirst Bank Dallas, N.A. v. Purolator Courier Corp.*,
    608 F. Supp. 351 (N.D. Tex. 1985)............................................................ 12

*La v. San Mateo County Transit Dist.*,
    No. 14-cv-01768, 2014 U.S. Dist. LEXIS 164894 (N.D. Cal. Nov. 25, 2014) .................. 7

*Mack v. Kuckenmeister*,
    No. 08-CV-00370, 2011 U.S. Dist. LEXIS 41822 (D. Nev. Apr. 12, 2011) .................... 18

*Mendez v. Teachers Ins. & Annuity Ass'n & College Ret. Equities Fund*,
    982 F.2d 783 (2d Cir. 1992)................................................................... 12, 18

*Metro. Life Ins. Co. v. Leonis*,
    No. 14-cv-011104, 2014 U.S. Dist. LEXIS 159306 (N.D. Cal. Nov. 12, 2014) ......... 18, 19

*Metro. Life Ins. Co. v. Vines*,
    No. WDQ-10-2809, 2011 U.S. Dist. LEXIS 55881 (D. Md. May 24, 2011) .................. 12

*Michelman v. Lincoln Nat'l Life Ins. Co.*,
    685 F.3d 887 (9th Cir. 2012)................................................................... 8, 12

*Mock v. Collins*,
    No. EDCV 04-395, 2004 U.S. Dist. LEXIS 29254 (C.D. Cal. Sept. 1, 2004).................. 11

*New York Life Ins. Co. v. Conn. Dev. Auth.*,
    700 F.2d 91 (2d Cir. 1983)........................................................................ 12

*Partex Apparel Int'l LTDA S.A. de C.V. v. GFSI, Inc.*,
    No. 10-2678, 2012 U.S. Dist. LEXIS 42267 (D. Kan. Mar. 28, 2012) .......................... 8

*Phillips Petroleum Co. v. Hazlewood*,
    534 F.2d 61 (5th Cir. 1976)........................................................................................ 18

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011)..................................................................................... 16

*Prudential Ins. Co. of Am. v. A.M.*,
    No. 13-cv-00820, 2014 U.S. Dist. LEXIS 101542 (E.D. Cal. July 24, 2014) ................... 12

*Prudential Ins. Co. of Am. v. Hovis*,
    553 F.3d 258 (3d Cir.2009)........................................................................................ 13

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
    No. 08-4548, 2010 U.S. Dist. LEXIS 1433 (N.D. Cal. Jan. 8, 2010) ................................. 7

*Septembertide Pub., B.V. v. Stein & Day, Inc.*,
    884 F.2d 675 (2d Cir. 1989)....................................................................................... 19

*Truck Ins. Exchange v. Fireman's Fund Ins. Co.*,
    6 Cal. App. 4th 1050 (1992)....................................................................................... 15

*United Bank of Denver v. Oxford Prop.*,
    683 F. Supp. 755 (D. Colo. 1988) .............................................................................. 18

*United States Liab. Ins. Co. v. Sebelius*,
    No. CV-12-2516, 2012 U.S. Dist. LEXIS 77380 (C.D. Cal. June 4, 2012) ..................... 11

*W. Conference of Teamsters Pension Plan v. Jennings*,
    No. C-10-03629, 2011 U.S. Dist. LEXIS 71266 (N.D. Cal. June 3, 2011) ..................... 12

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................... 17

Fed. R. Civ. P. 13 ........................................................................................................... 17

1    I.       **INTRODUCTION**

2            Bitstamp Ltd.'s ("Bitstamp's") motion for discharge seeks to have the Court bless

3    Bitstamp's decision to bring a lawsuit that Bitstamp now recognizes it never should have brought

4    in the first place.  Bitstamp's own allegations establish that one of the supposed claimants, Ripple

5    Labs, Inc. ("Ripple"), actually had no colorable claim of ownership over the so-called "Disputed

6    Funds."  Indeed, Bitstamp must have known this at the time because its Complaint for

7    Interpleader alleged that:  (1) Ripple's only claim was for breach of contract against defendant

8    Jed McCaleb ("McCaleb"); and (2) Ripple voluntarily entered into the transaction that it now

9    seeks to unwind, and obtained the benefit of its bargain by receiving 96,342,361.6 XRPs ("XRP"

10   is a digital currency), which it still possesses, and for which it paid $1,038,172.  Under the facts

11   as alleged, Ripple could not claim an ownership interest in funds that Ripple knowingly paid to

12   defendant Jacob Stephenson in an arms-length transaction, regardless of whether that transaction

13   breached any contract between Ripple and McCaleb (which it did not).[1]  Bitstamp's motion now

14   confirms that there is no colorable basis for Ripple to claim ownership to the Disputed Funds and

15   acknowledges that proposed intervenor-defendant Stellar Development Foundation ("Stellar") is

16   the rightful owner.  And Bitstamp currently is not facing counterclaims.[2]  Voluntary dismissal,

17   not discharge, is the appropriate procedural outcome under such circumstances.

18           The question remains:  why did Bitstamp file this case?  Defendants suspect, and the

19   evidence available to them at this early stage in the litigation suggests, that (a) the involvement of

20   an attorney with what appears to be a significant conflict of interest; (b) a Ripple founder on

---

21           [1] On May 5, 2015, the U.S. Department of Justice entered into a settlement agreement
22   regarding a criminal investigation of Ripple, in which Ripple admitted that it had "willfully
     violated several requirements of the Bank Secrecy Act by acting as a money services business and
23   selling its virtual currency, known as XRP, without registering with FinCEN [the Department of
     Treasury's Financial Crimes Enforcement Network], and by failing to implement and maintain an
24   adequate anti-money laundering ("AML") program designed to protect its products from use by
     money launderers or terrorist financiers"; Ripple paid a $700,000 penalty to FinCEN and agreed
25   to be subject to numerous remedial actions.  Declaration of Terry Gross in Support of
     Defendant's Response to Plaintiff's Motion for an Order of Discharge or, in the Alternative,
26   Voluntary Dismissal ("Gross Decl."), filed herewith), Exs. E-F.

27           [2] However, Stellar and McCaleb do have counterclaims that they intend to assert against
     Bitstamp in the event that Bitstamp's motion for voluntary dismissal or Defendants' motion to
28   dismiss are not granted. *See* Section III.B.2, *infra.*

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-CV-01503-WHO

1  Bitstamp's board of directors who is also actively engaged in litigation with McCaleb and Stellar

2  in a separate lawsuit; and (c) a different Ripple executive who is an investor in Bitstamp all led

3  Bitstamp to act at Ripple's behest to enable Ripple to litigate in a federal forum that otherwise

4  would have been unavailable to Ripple.  Bitstamp's actions in first "freezing" the funds in

5  Stellar's account and then initiating this federal interpleader action (with federal jurisdiction

6  based solely on Bitstamp's diversity) enabled Ripple to obtain injunctive relief against the funds

7  that would not have been available had Ripple instead proceeded on its breach of contract claims

8  against McCaleb in arbitration, as required by the Settlement Agreement between them.

9      The attorney who filed the Complaint in Interpleader on Bitstamp's behalf, George Frost

10  (who remains counsel of record along with the additional counsel Bitstamp has since retained),

11  represented Ripple throughout the relevant time period, including providing legal advice to

12  Ripple concerning the Settlement Agreement at the heart of this dispute.  He also has been, and

13  continues to be, counsel to Arthur Britto, one of Ripple's founders and its Chief Strategist and

14  also a Bitstamp board member.  Britto is currently suing McCaleb and Stellar, and Frost has

15  advised Britto in connection with that lawsuit.  Indeed, although Defendants have not yet been

16  able to take discovery in this case, the information available to them suggests that Frost was still

17  advising Ripple right up to the moment this action was filed (if not even later).  Frost's ongoing,

18  and likely contemporaneous, representation of both Ripple and Bitstamp calls into serious

19  question the legitimacy of Bitstamp's motives in initiating this action.  Moreover, it suggests that

20  Bitstamp did not actually have a genuine fear of facing claims by Ripple.  Purported interpleaders

21  who act without a good faith fear of liability to competing claimants are not entitled to discharge.

22      Accordingly, this Court should grant Bitstamp's motion for voluntary dismissal.  If,

23  however, it is not inclined to do so, it should deny Bitstamp's motion for discharge and permit

24  Defendants to take discovery into the relationship between Bitstamp and Ripple and into

25  Bitstamp's purported good faith in filing this lawsuit.

26

27

28

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-cv-01503-WHO

## II.    FACTUAL BACKGROUND

### A.    The Alleged Sales of XRP

The XRP in question was sold by Stephenson and Nancy Harris, both of whom had been given their XRP by McCaleb in December 2012.  As disclosed in the Settlement Agreement involving Ripple and McCaleb, that XRP had not been in McCaleb's control since the gift was made in December 2012.  The Settlement Agreement restricted McCaleb's ability to sell "McCaleb XRP"—that is, "approximately 7,500,000,000 XRP in the Ripple Network in accounts ***owned or controlled*** by Jed McCaleb," including such XRP "held by or for the benefit of his children or other family members."  Dkt. 9[3] ¶ 29 (emphasis added); Cross-Compl. Ex. 1[4] ¶ 20(c). The 7.5 billion XRP figure was arrived at during negotiations between the parties to reflect only the accounts owned or controlled by McCaleb—Ripple's counsel expressly stated in those negotiations that the 7.5 BB XRPs were comprised only of the roughly 5.5 billion held in accounts owned by McCaleb and roughly 2 billion in accounts owned by McCaleb's children. *See* Gross Decl., Ex. G.  As Exhibit A to the Settlement Agreement, McCaleb was also asked to, and did, identify accounts outside his control and held by others at the time to which he had given additional XRP, and those accounts included friends, additional family members, and various nonprofit organizations related to poverty alleviation, education, and scientific research to which McCaleb had made significant philanthropic donations.  *See id.* Cross Compl. Ex. 1 at Ex. A. These accounts contained additional XRP that were excluded from the 7.5 billion XRP governed by the Settlement Agreement because they were no longer owned or controlled by McCaleb.  *See id*.  Among those additional accounts were accounts for Stephenson and Harris, who received their XRP as a gift.

The Ripple account belonging to Stephenson from which the XRP were sold is referred to

---

[3] Citations to the paragraphs of Dkt. 9 are to the Cross-Complaint portion of that document.

[4] Ripple has lodged an unredacted copy of the Settlement Agreement at issue with the Court. *See* Dkt 10 and related documents. For ease of reference and judicial efficiency, and without waiving any arguments or admitting any allegations, Cross-Defendants cite to that copy of the Settlement Agreement. References to the "Cross-Compl Ex. 1" are to Exhibit 1 to the Cross-Complaint, lodged under seal with the Court.

as "r3Q."[5]  Initially, r3Q allegedly executed more than $400,000 sales of XRP between August 14, 2014 and September 25, 2014.  Dkt. 9 ¶ 38.  Subsequently, on March 20, 2015, r3Q allegedly sold roughly 96 million XRP for $1,038,172.  Dkt. 9 ¶ 9.  The 96 million XRP allegedly were transferred to r3Q from an account referred to as "rUf6," which belongs to Harris.  *Id.* ¶ 42.

Ripple itself purchased the 96 million XRP for $1,038,172.  Dkt. 23 at 7.  The transaction took place in the Ripple Network.  *See id.*  Stephenson's XRP were transferred to Ripple, and the $1,038,172 was paid to Stephenson using U.S. dollars on deposit with Bitstamp.  *See id.* Stephenson then transferred these funds to another exchange, Coinex, and subsequently Stephenson made a purchase via Coinex of STR, which resulted in Coinex paying Stellar roughly $1 million from these funds.  Then, Coinex sent these funds to Stellar on the Ripple Network using U.S. dollars on deposit with Bitstamp.  *See* Dkt. 21 ¶ 4.  At Ripple's demand, and in response to Ripple's supposed threats of legal action, Bitstamp put a "freeze" on this account owned by Stellar, and Bitstamp continues to maintain that freeze over Stellar's funds to this day. *See* Dkt. 1 ¶ 24.

**B.**     **Bitstamp's Interpleader Complaint**

On April 1, 2015, Bitstamp filed a Complaint for Interpleader.  *See* Dkt. 1.  Bitstamp's complaint concerns only the March 20 transaction, and not any prior sales of XRP.  Bitstamp's allegations demonstrate that at the time it filed its Complaint it knew the following key facts, as described in more detail below—Ripple's demand derived entirely from breach of contract claims against McCaleb arising out of a transaction that Ripple voluntarily engaged in and for which it retained the benefit of its bargain.  Thus, Ripple only possessed a legal claim for damages, not a colorable assertion of ownership over specific funds.  Specifically, Bitstamp's Complaint reveals:

(1)  Ripple's two demand letters to Bitstamp asserted only a breach of contract claim.  *See id.* ¶ 13 ("Bitstamp received a letter from Ripple Labs claiming that it was entitled to

---

[5] Ripple also asserts claims in connection with certain alleged sales from an account referred to as "rnj8," which Ripple alleges was owned and controlled by Mr. McCaleb.  *See* Dkt. 9 ¶ 8. This account, however, is not owned or controlled by Mr. McCaleb.  Declaration of Jed McCaleb in Support of Defendants' Response to Plaintiff's Motion for an Order of Discharge or, in the Alternative, Voluntary Dismissal ("McCaleb Decl.") ¶ 2, filed herewith.

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-CV-01503-WHO

1    approximately $75,000 in Bitstamp's possession," because "Ripple Labs and McCaleb (and

2    others) entered into a contract . . . under which McCaleb agreed to abide by certain limitations

3    regarding the sale of XRP within his ownership and control, and pursuant to that contract,

4    McCaleb agreed to limit sales, and that of his family members, to $10,000 XRP per week, and

5    . . . this agreement had been breached by the sale of XRP by Ripple account number r3Q[]"); ¶ 14

6    ("Bitstamp received a second letter from Ripple Labs claiming that it was entitled to

7    approximately $963,000 of additional funds in Bitstamp's possession due to the breach of the

8    Contract").

9         (2)  Ripple voluntarily entered into a purchase of XRP from Stephenson's r3Q account, in

10   which Ripple paid $1,038.172 to Stephenson and received in exchange 96,342,361.6 XRPs.  *See*

11   *id.* ¶ 19 ("[O]n or around March 20, 2015, Ripple Labs, through its agent, purchased all of the

12   remaining XRP offered by r3Q, which consisted of 96,342,361.6 XRP, for $1,038,172").

13        (3)  Ripple claimed that this sale by Stephenson was a breach by McCaleb of his contract

14   with Ripple.  *Id.*  ¶ 20 ("Ripple Labs further represents that the XRP sale was done in breach of

15   McCaleb's Contract with Ripple Labs").

16        Bitstamp thus alleges in its Complaint that Ripple engaged in a monetary transaction with

17   Stephenson in which it paid $1 million to Stephenson and obtained in exchange property from

18   Stephenson (XRPs).  Bitstamp then alleges that Ripple told Bitstamp that the sale Ripple had just

19   voluntarily engaged in was a breach of contract by McCaleb and Ripple had a claim to the money

20   that it had just voluntarily paid to Stephenson (despite the fact that Ripple at the time possessed

21   the XRP it had purchased).  Finally, Ripple demanded that Bitstamp freeze funds that it alleged

22   were Stephenson's funds derived from this transaction.[6]

23

24

25

26      [6] Bitstamp also obviously knew, but did not disclose in its Complaint, that Stephenson had
     utilized the funds it had obtained from selling his XRP to Ripple to engage in a subsequent
27   transaction on the Coinex exchange, whereby Stephenson purchased STR on the Coinex
     exchange and Stellar received approximately $1 MM from Stephenson's funds.  *See* Dkt. 1 ¶ 18
28   (alleging Stephenson's intent to purchase STR); *see also* Dkt. 9 ¶ 42; Dkt. 21 ¶ 4.

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
                                                            15-CV-01503-WHO

Bitstamp does not allege that Stephenson and Harris were parties to the Settlement Agreement or that they entered into any agreement with Ripple to limit their ability to sell XRP. *See generally* Dkt. 1; *accord* Dkt. 9 (no such allegations in Ripple's Cross-Complaint).

### C.      Frost's Involvement with Ripple and Bitstamp

George Frost filed this action on behalf of Bitstamp and remains counsel of record to Bitstamp. Dkt. 1; Gross Decl. Ex. A. He is currently listed as Bitstamp's Chief Legal Officer. *Id*. Ex. B; *see also* Dkt. 21 (Frost declaring that he "serve[s] as general counsel to Bitstamp"). Frost, however, represented Ripple during the period when many of the events took place that form the basis of the current dispute between Ripple and McCaleb. In particular, Frost was representing Ripple at the time it entered into the Settlement Agreement and advised Ripple in connection with the settlement. *Id*. ¶ 4. Moreover, when this action was filed, Frost also represented Arthur Britto, a member of Bitstamp's board of directors, who is also a founder of Ripple and current serves as Ripple's Chief Strategist. *Id*. ¶¶ 5-7; 16. Frost has represented Britto personally since at least 2012 and continuing until the present. *Id*. ¶ 9. Less than a month before Bitstamp filed its Complaint, Britto filed a lawsuit against both McCaleb and Stellar, which is still pending. *Id.* ¶ 5. Britto's litigation counsel has asserted that Frost advises Britto concerning Britto's current lawsuit against McCaleb and Stellar. *Id*. ¶ 9. In addition, Frost also represents Greg Kidd, Ripple Lab's Chief Risk Officer, and Kidd is financing Britto's lawsuit. *Id.* ¶ 11.

Stellar's counsel contacted Frost shortly after Bitstamp's Complaint was filed and informed Frost that Stellar believed he was conflicted due to his prior and continuing representation of Ripple. Frost gave a cryptic reply, saying only: "I've told them [Ripple] that as to this matter I'm adverse. . . . In this situation, I'm adverse to them [Ripple]. I'm no longer advising them, since the onset of this action I'm not advising them." *Id*. ¶ 4. Frost expressly refused to state when he ceased representing Ripple, claiming that the date his representation ceased was privileged information. *Id.*

### D.      Bitstamp's Motion for Discharge or Voluntary Dismissal

On May 13, 2015, Bitstamp filed a Motion for Order of Discharge or, in the Alternative,

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-cv-01503-WHO

for Voluntary Dismissal. *See* Dkt. 20.  In its Motion, Bitstamp makes the following judicial admissions, all of which are consistent with the facts alleged in its Complaint:[7]

- "[T]he underlying issue is a contract dispute between Ripple Labs and McCaleb and Stephenson that does not require Bitstamp's participation as a stakeholder." *Id.* at 1.

- "Ripple Labs does not appear to face any injury if Bitstamp were to release the Disputed Funds."  *Id.*

- "[E]ven though Ripple claims that the funds relate to a breach of contract[,] Ripple Labs has possession of the XRP that it received when it paid out approximately $1 million in the disputed transaction.  Therefore, Ripple Labs has thus received the 'benefit of the bargain' from the exchange, even though it claims that the transaction itself violates a Settlement Agreement between itself and Jed McCaleb." *Id.*

- "[T]here are no claims against Bitstamp, and it lays no claim to the Disputed Funds." *Id.*

- "[Ripple's] dispute with McCaleb and Stephenson is a simple contract dispute to which Bitstamp is not a party." *Id.* at 1-2.

- "[T]his is a contract-based dispute between Ripple, on the one hand, and McCaleb and Stephenson, on the other hand. Ripple Labs is free to assert its contract claims against the parties to the Settlement Agreement outside of this interpleader action.  Bitstamp is not a party to their contract dispute and should not be involved." *Id.* at 8.

---

[7]  These judicial admissions demonstrate that Bitstamp, at the time it filed the Complaint for Interpleader, knew or should have known that there was no basis for interpleader.  *See, e.g., Ling La v. San Mateo County Transit Dist.*, No. 14-cv-01768, 2014 U.S. Dist. LEXIS 164894, *10 n.2 (N.D. Cal. Nov. 25, 2014) (J. Orrick) (statement in joint case management statement was a judicial admission establishing latest date on which statute of limitations could have accrued for purposes of 12(b)(6) motion to dismiss and dismissing causes of action at issue without leave to amend) ; *Garon v. eBay, Inc.*, No. 10-05737, 2011 U.S. Dist. LEXIS 148621, *14-16 (N.D. Cal. Nov. 30, 2011) (J. Ware) (granting 12(b)(6) motion to dismiss Sherman Act claim with prejudice based on judicial admission in plaintiffs' memorandum in opposition to administrative motion to consider whether cases were related); *Realnetworks, Inc. v. DVD Copy Control Ass'n*, No. 08-4548, 2010 U.S. Dist. LEXIS 1433, *10-13 (N.D. Cal. Jan. 8, 2010) (J. Patel) (in granting 12(b)(6) motion and dismissing claims with prejudice, taking judicial notice of "admissions and concessions already made in this action" during preliminary injunction process).

1   **III.**   __ARGUMENT__

2       **A.**   __Bitstamp's Request For Voluntary Dismissal Should Be Granted__

3           Bitstamp correctly has concluded that there is no legitimate dispute concerning the

4   ownership of the Disputed Funds and, accordingly, no legitimate risk of Bitstamp facing liability

5   from Ripple if those funds were released to Stellar.  Dkt. 20 at 8.  It also correctly observes that

6   no counterclaims have yet been filed against Bitstamp.  *Id*.  And it correctly observes that

7   voluntary dismissal will not prejudice any party—Ripple and Defendants will remain free to

8   litigate the dispute between one another in the appropriate forum.  *Id*.  The allegations in

9   Bitstamp's Complaint demonstrate that at the time Bitstamp filed the Complaint, it knew these

10   same facts that it now says authorize voluntary dismissal:  that there was no legitimate dispute

11   concerning the ownership of the Disputed Funds and no legitimate risk of Bitstamp facing

12   liability from Ripple if those funds were released to Stellar.  For those reasons, voluntary

13   dismissal under Rule 41(a)(2) is appropriate and should be granted.

14           Furthermore, an interpleader is an inappropriate vehicle to resolve a breach of contract

15   claim between the two purported stakeholders; the stakeholders may have claims against one

16   another, but not against the party attempting to interplead funds.  *See, e.g.*, *Michelman v. Lincoln*

17   *Nat'l Life Ins. Co*., 685 F.3d 887, 897 (9th Cir. 2012) (claim for breach of  a contract to which the

18   party interpleading funds is not a party "supplie[s] no basis for interpleader"); *Partex Apparel*

19   *Int'l LTDA S.A. de C.V. v. GFSI, Inc*., No. 10-2678, 2012 U.S. Dist. LEXIS 42267, *18-29 (D.

20   Kan. Mar. 28, 2012) (finding breach of contract claim insufficient basis for interpleader action

21   because if one party "has a claim to the funds, that claim is against [the other party], not [the

22   interpleading party]").  Defendants have moved to dismiss under Rule 12(b)(6) for exactly this

23   reason, further supporting that dismissal, not discharge, is the proper resolution of this action.  *See*

24   Dkt. 41.

25           The purpose of interpleader is for an innocent stakeholder "to 'protect itself against the

26   problems posed by multiple claimants to a single fund."  *Lee v. West Coast Life Ins. Co.*, 688 F.3d

27   1004, 1009 (9th Cir. 2012).  Where competing claims are lacking, courts find interpleader

28   improper.  *See, e.g., Bierman v. Marcus*, 246 F.2d 200, 201-04 (3d Cir. 1957); *John Hancock*

1   *Mut. Life Ins. Co. v. Beardslee*, 216 F.2d 457, 459-61 (7th Cir. 1954); *National Accident Ins.*

2   *Underwriters, Inc. v. Citibank, FSB*, 333 F. Supp. 2d 720, 726 (N.D. Ill. 2004).  "[I]n order to

3   avail itself of the interpleader remedy, a stakeholder must have a good faith belief that there are or

4   may be colorable competing claims to the stake."  *Michelman v. Lincoln Nat'l Life Ins. Co.*, 685

5   F.3d 887, 894 (9th Cir. 2012).  While, as *Michelman* states, this is a low threshold that is often

6   met (*id.*), Bitstamp's allegations demonstrate that its Complaint fails to meet this basic threshold

7   requirement and thus should be dismissed.

8       In *Michelman*, a former husband and wife each claimed entitlement to the proceeds of

9   their deceased daughter's life insurance policy.  Although ultimately allowing interpleader

10  because the insurance application itself was ambiguous as to the policy's owner and the policy

11  was a community property asset not awarded to either party in their divorce, the Ninth Circuit

12  rejected as a basis for interpleader the ex-husband's claim that he had "a side agreement with [ex-

13  wife] that precluded her from removing him as a beneficiary without his knowledge or

14  permission."  *Id.* at 897.  In rejecting the husband's contention, the Ninth Circuit held that,

15  "[e]ven if this were true, the fact that [ex-wife] violated an agreement with [ex-husband] to which

16  [plaintiff insurer] was not a party would not invalidate the change in beneficiary," and thus

17  "[s]uch a claim supplied no basis for interpleader."  *Id.*

18      Similarly, here, Bitstamp sought interpleader based on what it knew was a simple contract

19  dispute between Ripple and McCaleb.  Bitstamp based its request for interpleader on Ripple's

20  claim that "Ripple Labs and McCaleb (and others) entered into a contract . . . under which

21  McCaleb agreed to abide by certain limitations regarding the sale of XRP."  Dkt. 1 ¶ 13; *see also*

22  *id.* ¶ 14.  Yet, as in *Michelman*, a claim that McCaleb breached an agreement with Ripple, even if

23  true, does not provide any valid basis for Bitstamp to believe that Ripple had a valid claim to the

24  funds, such that Bitstamp could be subject to liability to Ripple if Bitstamp released the sale

25  proceeds to the account owners.  *See* Dkt. 20 at 3 ("Ripple Labs does not appear to face any

26  injury if Bitstamp were to release the Disputed Funds to . . . [Stellar] . . . even though Ripple

27  claims that the funds relate to a breach of contract").  Indeed, Bitstamp had no problem with

28  Ripple maintaining possession of the XRP that Stephenson paid in consideration for those sale

1   proceeds.  *See id.* ("Ripple Labs has possession of the XRP that it received when it paid out

2   approximately $1 million in the disputed transaction.  Therefore, Ripple Labs has thus received

3   the 'benefit of the bargain' from the exchange, even though it claims that the transaction itself

4   violates a Settlement Agreement between itself and Jed McCaleb.").

5          Bitstamp clearly knew from Ripple's own statements, as alleged in the Complaint, that

6   Ripple did not have a claim that the particular funds contained in the r3Q and rPQ accounts (a

7   total of $1,038,172) belonged to Ripple.  Rather, Bitstamp knew that Ripple was asserting only

8   that McCaleb had breached a contract with Ripple, and that Ripple might be entitled to damages

9   in the amount of funds paid by Ripple in the transaction.  Such a claim is not a valid basis for

10  interpleader.  Interpleader is only valid when there are two competing claims to *ownership* of

11  funds, not when one claimant simply asserts a contractual claim that the other claimant owes it

12  money.  See *Michelman*, 685 F.3d 887, 897 (rejecting as "basis for interpleader" one claimant's

13  claim to "have a side agreement with [other claimant]"); *Partex*, 2012 U.S. Dist. LEXIS 42267,

14  *18-29 (reconsidering and rejecting defendant's interpleader counterclaim based on allegations

15  that one or more receivers had taken plaintiff manufacturer's accounts and operations and

16  "demanded that [defendant] make payment directly to them rather than to [plaintiff]").

17         In *Partex*, the defendant who sought to interplead funds had admitted that it owed the

18  funds in question to plaintiff pursuant to a contract.  *See* 2012 U.S. Dist. LEXIS 42267, at *9-10.

19  The defendant argued only that it had "withheld payment [to plaintiff] to avoid paying the wrong

20  party."  *Id.* at *7.  The other purportedly interested party had alleged it was entitled to the funds

21  based on an unrelated transaction.  *See id.* at *22.  The court rejected the proposed interpleader

22  counterclaim because "the adverse nature of [other allegedly interested party's] claim is far from

23  clear.  If [that party] has a claim to the funds, that claim is against [plaintiff manufacturer], not

24  [the defendant]."  *Id.* at *26-27.  Although that party claimed to have actually obtained an "Order

25  of Attachment" from a foreign court—a step toward actual legal entitlement that Ripple has not

26  taken—the party, like Ripple, had not demonstrated an actual, formal legal interest in the

27  allegedly disputed funds.  *See id.* at 27 (finding that "no party has sought to register or enforce

28  any foreign judgments in this action" and that "[t]his unverified, unsworn, uncertified [Order of

1    Attachment] does not provide any basis, let alone a sufficient basis, for concluding that [the party

2    proposing interpleader] has any real, reasonable fear of double liability").  Interpleader is

3    improper where, as here, it is just a proxy for a claim one party could assert directly against

4    another.  *See id.* ("If [the alleged other claimant] has a claim to the funds, that claim is against

5    [plaintiff], not [defendant and proposed interpleader]").

6         Bitstamp simply had no reasonable belief that Ripple could sue it if Bitstamp released the

7    funds at issue to the account owners, as its own allegations confirm.  An assertion that Ripple

8    might bring a hypothetical tort action directly against Bitstamp is insufficient to support an

9    interpleader action.  *See John Hancock Mut. Life Ins. Co. v. Beardslee*, 216 F.2d 457, 460-61 (7th

10   Cir. 1954) (daughter asserting that plaintiff insurer's employee misled decedent as to his ability to

11   change beneficiary was not a claimant for purposes of interpleader because "[a]ny possible tort

12   action that [daughter] might have brought, based on the alleged misinformation given her by an

13   employee of the plaintiff, could not have changed the contract embodied in the policy of

14   insurance").  As in *Beardslee*, "[i]nstead of amounting to a claim of right, [Ripple's] letter could

15   only be considered as a plea for help." *Id.*  Accordingly, Bitstamp lacked any basis for seeking

16   interpleader.  *See Bierman v. Marcus*, 246 F.2d 200, 201-04 (3d Cir. 1957) ("where the plaintiff

17   knows that he can safely pay one party without substantial risk of vexatious demand by a rival

18   claimant, interpleader will not lie"); Dkt. 20 at 1 ("Ripple Labs does not appear to face any injury

19   if Bitstamp were to release the Disputed Funds to … [Stellar] … even though Ripple claims that

20   the funds relate to a breach of contract").[8]

21   _____

22        [8] If the Court dismisses the Complaint, it should decline to exercise supplemental jurisdiction
     over Ripple's Cross-Complaint. A district court "may decline to exercise supplemental
23   jurisdiction . . . when it "has dismissed all claims over which it has original jurisdiction." 28
     U.S.C. § 1367(c)(3).  The only basis for federal jurisdiction in this case is Bitstamp's diversity, as
24   the nominal plaintiff, from all of the other parties.  Ripple's Cross-Complaint raises only state-
     law breach of contract and tort claims between non-diverse parties.  Because the Court will have
25   then dismissed all claims over which it has original jurisdiction, it should dismiss Ripple's Cross-
     Complaint. *See, e.g. United States Liab. Ins. Co. v. Sebelius*, No. CV-12-2516, 2012 U.S. Dist.
26   LEXIS 77380, *2-3 (C.D. Cal. June 4, 2012) (declining to exercise supplemental jurisdiction after
     dismissing interpleader); *Mock v. Collins*, No. EDCV 04-395, 2004 U.S. Dist. LEXIS 29254, *7-
27   10 (C.D. Cal. Sept. 1, 2004) (declining to exercise supplemental jurisdiction over plaintiffs'
     pendent state law claims for declaratory and injunctive relief where court lacked jurisdiction over
28   plaintiffs' statutory interpleader claim).

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-CV-01503-WHO

**B.**   **Bitstamp Should Not Be Discharged, Because It Is Not A Good Faith Stakeholder**

Before Bitstamp can be granted discharge, it must carry its burden to show that interpleader is proper. *Prudential Ins. Co. of Am. v. A.M.*, No. 13-cv-00820, 2014 U.S. Dist. LEXIS 101542, at *5 (E.D. Cal. July 24, 2014) ("The stakeholder seeking discharge and judgment in interpleader has the burden of demonstrating that interpleader is justified"); *see also Interfirst Bank Dallas, N.A. v. Purolator Courier Corp.*, 608 F. Supp. 351, 353 (N.D. Tex. 1985) (same); *Metro. Life Ins. Co. v. Vines*, No. WDQ-10-2809, 2011 U.S. Dist. LEXIS 55881, at **5-6 (D. Md. May 24, 2011) (in the first stage of interpleader, "it must be determined whether the stakeholder has properly invoked interpleader").  Interpleader is proper only where the stakeholder acted in good faith based on the fear of multiple liability. *Michelman*, 685 F.3d at 894  ("[W]e . . . now expressly hold that  in order to avail itself of the interpleader remedy, a stakeholder must have a good faith belief that there are or may be colorable competing claims to the stake"); *Bierman v. Marcus*, 246 F.2d 200, 203 (3d Cir. 1957) ("[W]here the plaintiff knows that he can safely pay one party without substantial risk of vexatious demand by a rival claimant, interpleader will not lie"); *W. Conference of Teamsters Pension Plan v. Jennings*, No. C-10-03629, 2011 U.S. Dist. LEXIS 71266, at *13 (N.D. Cal. June 3, 2011) ("The primary test for determining the propriety of interpleading the adverse claimants and discharging the stakeholder (the so-called 'first stage' of interpleader) is whether the stakeholder legitimately fears multiple vexation directed against a single fund") (internal quotations and citation omitted).

Because interpleader is an equitable action controlled by equitable principles, a stakeholder seeking discharge must do equity and come into the court with clean hands. *Great Am. Ins. Co. v. Bank of Bellevue*, 366 F.2d 289, 293 (8th Cir. 1966).  If an interpleaded party presents evidence that a stakeholder commenced the action in bad faith, discharge should be denied. *New York Life Ins. Co. v. Conn. Dev. Auth.*, 700 F.2d 91, 96 (2d Cir. 1983) ("Judgment discharging the stakeholder in an interpleader action may, of course, be delayed or denied if there are serious charges that the stakeholder commenced the action in bad faith."); *Mendez v. Teachers Ins. & Annuity Ass'n & College Ret. Equities Fund*, 982 F.2d 783, 788 (2d Cir. 1992) (upholding

1   denial of motion for discharge where stakeholder's "delay in commencing an interpleader action

2   clearly was unreasonable and impliedly was commenced in bad faith").  Further, if the

3   interpleaded party presents evidence of potentially valid claims against the stakeholder, then the

4   stakeholder should not be discharged, and the interpleaded party should be permitted to litigate its

5   claims against the stakeholder within the interpleader proceeding. *See, e.g*., *Companion Life Ins.*

6   *Co. v. Schaffer*, 442 F. Supp. 826, 829 (S.D.N.Y. 1977) (declining to discharge plaintiff because

7   "it may be that the stakeholder is independently liable, and I therefore hold that it should remain

8   in the proceeding to answer to any claim to that effect which discovery may bring to light" where

9   stakeholder insurer allegedly allowed its employee to designate himself as a beneficiary).  "The

10  modern approach . . . is that, where a claimant brings an independent counterclaim against the

11  stakeholder, the stakeholder is kept in the litigation to defend against the counterclaim, rather than

12  being dismissed after depositing the disputed funds with the court." *Prudential Ins. Co. of Am. v.*

13  *Hovis*, 553 F.3d 258, 264 (3d Cir.2009).

14          Here, contrary to Bitstamp's assertion that it is a "disinterested stakeholder" (Dkt. 20 at

15  10), the following facts show that Bitstamp colluded with Ripple in filing this interpleader action

16  and are sufficient to preclude discharge.  Those facts support counterclaims that Defendants

17  intend to assert against Bitstamp if Defendants' motion to dismiss or Bitstamp's motion for

18  voluntary dismissal are denied.[9]

19  

20          [9] While the Court can deny Bitstamp's motion for discharge without providing Defendants the
    opportunity for discovery, Bitstamp's motion for discharge cannot properly be granted without
21  allowing Defendants discovery into the issue of whether Bitstamp was disinterested or acted in
    bad faith. *See, e.g.*, *Companion Life*, 442 F. Supp. at 829 (refusing to discharge stakeholder prior
22  to discovery concerning possible conflict of interest of stakeholder's agent).  As discussed below,
    Defendants have presented evidence that Bitstamp was not acting as a disinterested stakeholder.
23  Other evidence concerning this topic is wholly within other entities' possession, such as
    communications between Ripple and Bitstamp about the XRP transactions concerning McCaleb,
24  Stephenson and Stellar; information as to when Frost represented Ripple and Frost's involvement
    in any aspect of Ripple's claims concerning McCaleb; and communications between Britto and
25  Ripple concerning any aspect of Ripple's claims against McCaleb; documents and information
    concerning Bitstamp's other alleged concerns relating to the Disputed Funds and whether
26  Bitstamp took any actions relating these concerns, or whether such concerns were a subterfuge.
    The document requests that Defendants intend to serve on Bitstamp, once permitted to do so, are
27  attached as Gross Decl. Ex. H.  Defendants would be happy to complete that discovery, and
    related depositions, on an expedited basis if Bitstamp desires.

28

1

### 1.    Bitstamp's Interests Coincide with Ripple's Interests

2         George Frost filed this action on behalf of Bitstamp and remains counsel of record to

3    Bitstamp.  Dkt. 1; Gross Decl. Ex. A.  He is currently listed as Bitstamp's Chief Legal Officer.

4    Gross Decl. Ex. B; Dkt. 21 (Frost Decl.) ¶ 1 ("I am an attorney . . . for Plaintiff Bitstamp Ltd.

5    . . . and serve as general counsel to Bitstamp").  Frost, however, represented Ripple during the

6    period when many of the events took place that form the basis of the current dispute between

7    Ripple and McCaleb.  In particular, Frost advised Ripple in connection with the Settlement

8    Agreement on which Ripple's claims in this action are based.  Frost has been, and continues to

9    be, counsel to Arthur Britto, one of Ripple's founders and its Chief Strategist, who is also a

10   Bitstamp board member.  Britto is suing McCaleb and Stellar, and is advising Britto in connection

11   with that lawsuit (if not after).  Indeed, as far as McCaleb and Stellar have been able to determine

12   without discovery, Frost was still advising Ripple right up to the moment this action was filed.

13   Frost has been counsel to Greg Kidd, another Ripple executive and Bitstamp investor.  In

14   addition, Frost, Kidd and Britto are represented by the same counsel in Britto's lawsuit against

15   Defendants, and Kidd (a Ripple officer) is financing Britto's lawsuit.  Gross Decl. ¶¶ 4-11.

16   Frost's ongoing, and likely contemporaneous, advice to both Ripple and Bitstamp suggests that

17   Bitstamp did not have a genuine fear of facing claims by Ripple and instead commenced the

18   interpleader at Ripple's behest and as part of Ripple's strategy to avoid arbitration or state court

19   for the resolution of its breach of contract claim.  Further clouding Bitstamp's neutrality on the

20   matter, on information and belief, independent board members of Bitstamp were not even

21   informed of the filing of the interpleader.  McCaleb Decl. ¶ 3.

22         Ripple's assertion that it is entitled to the Disputed Funds arises entirely from its August

23   2014 Settlement Agreement with McCaleb, which it (wrongly) alleges has been breached.  *See*,

24   *e.g.*, Dkt. 1 ¶ 13.[10]  Frost was representing Ripple at the time it entered into that Settlement

25   Agreement and Frost advised Ripple in connection with the settlement.  Gross Decl. ¶¶ 7-8.

26

27   _____

         [10] *See also* Dkt. 9 ¶ 1 ("This is an action for injunctive relief and specific enforcement to
     prevent McCaleb from continuing to breach a settlement agreement that he entered into with
     Ripple Labs"); ¶ 2 ("On or about August 13, 2014, Ripple Labs and McCaleb entered into the
28   written Settlement Agreement").

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-CV-01503-WHO

Naturally, Defendants were surprised to see one of Ripple's attorneys file this Interpleader action on behalf of Bitstamp, who is supposed to be a disinterested third party.  Stellar's counsel thus contacted Frost shortly after Bitstamp's Complaint was filed and informed Frost that Stellar believed he was conflicted due to his prior and continuing representation of Ripple.  Frost gave a cryptic reply, saying only:  "I've told them [Ripple] that *as to this matter* I'm adverse. . . .  In this situation, I'm adverse to them [Ripple].  *I'm no longer advising them, since the onset of this action I'm not advising them.*"  Gross Decl. ¶ 4 (emphasis added).  Yet Frost expressly refused to state when he ceased representing Ripple, claiming that the date his representation ceased was privileged information.  *Id.* ¶¶ 4; 10.  The logical conclusion from Frost's answers (and his non-answers) is that Frost continued to represent Ripple at least until the very moment the Complaint in Interpleader was filed and may even continue to do so to this day.  Ripple's letters to Bitstamp on March 26 and March 30, 2015, purporting to demand the Disputed Funds (Dkt. 1 ¶¶ 13-14), may thus have been sent on the advice of the attorney who then filed this action on behalf of Bitstamp.[11]  Frost's potential involvement on both sides of the Ripple-Bitstamp demands raises a significant question about whether those demands were engineered to give Bitstamp a purported basis for bringing an interpleader action.

Frost's representation of Ripple also likely gave rise to a duty of loyalty to Ripple—and a corresponding duty not to act adversely to Ripple—at the time of the Complaint for Interpleader.  *Flatt v. Superior Court*, 9 Cal. 4th 275, 288 (1994) ("So inviolate is the duty of loyalty to an existing client that not even by withdrawing from the relationship can an attorney evade it"); *see also Frazier v. Superior Court*, 97 Cal. App. 4th 23, 35 (2002) (describing duty of loyalty).[12]  The duty of loyalty precludes concurrent representation of a client whose interests are adverse to the

---

[11] Frost may also have been advising Ripple in connection with its earlier correspondence to McCaleb and Stephenson concerning the XRP sales at issue.  *See, e.g.*, Dkt. 9 ¶ 39.

[12] Frost's representation of Ripple and Bitstamp needs to be analyzed as a concurrent representation, rather than a successive representation, since Frost represented both Ripple and Bitstamp during events that underlie Ripple's demand to Bitstamp claiming ownership of the Disputed Funds. *See Truck Ins. Exchange v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1057 (1992) (holding that "a law firm that knowingly undertakes adverse concurrent representation may not avoid disqualification by withdrawing from the representation of the less favored client before hearing").

interests of a current client. *Flatt*, 9 Cal. 4th at 284 (stating that "in all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or 'automatic' one"). Frost's dual representation suggests that he was conflicted when he filed the complaint and that Bitstamp's and Ripples interests were not actually adverse to each other.

Frost's alignment with Ripple is evident from the manner in which Bitstamp alleged its interpleader claim.  A normal disinterested interpleader merely alleges the existence of property to which two competing parties have claimed a stake and a legitimate fear of legal action from both parties.  Bitstamp's Complaint, however, goes out of its way to advocate Ripple's inaccurate view of the world.  For example, though Bitstamp knows that Stephenson is the owner of account r3Q, Bitstamp alleges that "[o]n information and belief, r3Q *is controlled by* Stephenson *and McCaleb*." Dkt. 1 ¶ 15 (emphasis added); *see also* Dkt. ¶ 17 ("On information and belief, rUf6 *is controlled by* Harris, Stephenson *and McCaleb*") (emphasis added).[13]  Similarly, Bitstamp includes several allegations about a so-called "Stellar Auction"—an event that is completely irrelevant to whether Bitstamp has received conflicting claims to ownership of the Disputed Funds and serves no purpose other than to try to support Ripple's theories in this case.  *See* Dkt.1 ¶ 16; Dkt. 9 ¶ 49 (making the same allegations).  Bitstamp's allegations show that it did not sue as a disinterested third party, but instead to try to aid Ripple in its pursuit of the Disputed Funds.

Nor is this the only lawsuit in which Frost is acting adverse to McCaleb.  At the time that Frost filed the Complaint for Bitstamp, he also represented Arthur Britto, a member of Bitstamp's board of directors and one of the founders of Ripple.  Frost has represented Britto personally since at least 2012 and continuing until the present.  Gross Decl. ¶ 9.  Less than a month before Bitstamp filed its Complaint, Britto filed a lawsuit against both McCaleb and Stellar, which is still pending.  Britto's litigation counsel has asserted that Frost advises Britto concerning Britto's current lawsuit against McCaleb and Stellar.  *Id.* ¶¶ 5; 9.  Thus, Frost himself was adverse to both

---

[13]   The phrase "on information and belief" means that the declarant does not have firsthand information, but that the statement is "based on secondhand information *that the declarant believes is true*."  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011).  Bitstamp would have no reason to believe as true that McCaleb controlled the r3Q and rUf6 accounts, because Bitstamp's records would only show the names of registered owners.

McCaleb and Stellar when Bitstamp filed its Complaint.[14]

Moreover, Ripple and Bitstamp are significantly intertwined.  Britto is both a board member of Bitstamp and one of Ripple's first officers.  Greg Kidd, an officer of Ripple, is a significant investor in Bitstamp (Dkt. 23 at 7) and is financing Britto's lawsuit.  Gross Decl. ¶ 11. Kidd has also been represented by Frost concerning actions against McCaleb.  *Id.*

### 2. Stellar Has Independent Claims Against Bitstamp that Also Preclude Discharge

Since Bitstamp is not a disinterested stakeholder, yet took actions that improperly exercised dominion and control over Stellar's property, Stellar has valid legal claims that it can assert against Bitstamp.  At this stage in Bitstamp's interpleader action, Stellar has not yet had the opportunity to file any counterclaims against Bitstamp because Stellar has moved to dismiss under Rule 12(b)(6), on the grounds that Bitstamp's own allegations confirm the impropriety of these interpleader proceedings.  A counterclaim generally is asserted at the time a responsive pleading is filed (Fed. R. Civ. P. 13(a)), and a motion to dismiss under Rule 12 "must be made before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b).  In the event that Stellar's motion to dismiss or Bitstamp's motion for voluntary dismissal is not granted, Stellar potentially will file counterclaims against Bitstamp for, among other things: (1) conversion; (2) breach of contract; and (3) unfair business practices.  Accordingly, discharge now is improper until such time as Defendants' motion to dismiss, and Stellar's counterclaims, can be resolved. *See, e.g., Companion Life*, 442 F. Supp. at 829.

### C. In No Event Should Bitstamp Be Awarded Attorney's Fees From the Interpleaded Funds

Bitstamp has indicated that it will seek its attorney's fees for this action, on the ground that "'courts have discretion to award attorney fees to a disinterested stakeholder in an interpleader action.'"  Dkt. 20, at 5 n.1 (quoting *Abex Corp. v. Ski's Enterps., Inc.*, 748 F.2d 513, 516 (9th Cir. 1984)).  Whether a court should exercise its discretion to award attorney's fees

---

[14] Once Bitstamp engaged unconflicted counsel—the law firm now primarily representing Bitstamp on its Motion for Discharge—Bitstamp requested that this Court voluntarily dismiss the Complaint for Interpleader, asserting that there was no valid basis for an interpleader action since Ripple's only claim to the Disputed Funds was based on a breach of contract claim.  Dkt. 20 at 3.

1    depends "on the factors of each individual case." *Metro. Life Ins. Co. v. Leonis*, No. 14-cv-

2    011104, 2014 U.S. Dist. LEXIS 159306, *7 (N.D. Cal. Nov. 12, 2014).

3           "[A] party who files an interpleader action without exercising sufficient diligence in

4    investigating the merits of the allegedly competing claims, thereby causing unnecessary litigation,

5    is not entitled to attorney's fees." *Mack v. Kuckenmeister*, No. 08-CV-00370, 2011 U.S. Dist.

6    LEXIS 41822, *9 (D. Nev. Apr. 12, 2011); *see also Mendez v. Teachers Inc. & Annuity Ass'n &*

7    *College Retirement Equities Fund*, 982 F.2d 783, 789 (2d Cir. 1992) (upholding the denial of

8    attorney's fees to a stakeholder on this ground); *United Bank of Denver v. Oxford Prop.*, 683 F.

9    Supp. 755, 757 (D. Colo. 1988) ("Courts traditionally have refused to award costs and counsel

10   fees to a stakeholder who is in some way culpable as regards the subject matter of the interpleader

11   proceeding, but not sufficiently culpable to warrant denial of interpleader altogether.").  An

12   interpleader's fee request should be denied if "the interpleader is not a mere stakeholder but has a

13   substantial controversy with one of the claimants." *Phillips Petroleum Co. v. Hazlewood*, 534

14   F.2d 61, 63 (5th Cir. 1976) (affirming a trial court's denial of attorney fees when the interpleader

15   actively took a position opposing one of the claimant's claims and supporting the claims of the

16   other claimant); *see also Fid. Nat'l Title Co. v. United States SBA*, No. 13-cv-02030, 2014 U.S.

17   Dist. LEXIS 159830, *11 (E.D. Cal. Nov. 12, 2014) ("Courts may deny a stakeholder's motions

18   for fees if a substantial controversy contaminates its relationship with the claimants").

19          Here, Bitstamp, through its conflicted counsel Frost and its own intertwined interests with

20   Ripple, acted to promote Ripple's interests in filing this interpleader action, specifically using its

21   Complaint as a vehicle to press Ripple's allegations.  Moreover, Bitstamp admits in its Motion

22   that Ripple's claim to the interpleaded funds has no merit.  Bistamp's own allegations show that it

23   knew the same facts that prompted this admission at the time that it filed the action.  Thus,

24   Bitstamp has no entitlement to attorney's fees in this action.

25          Moreover, even if the Court were to determine that Bitstamp was entitled to recover any

26   attorney's fees, the Court should order Ripple to pay the fees.  Attorney's fees "are generally

27   awarded against the interpleader fund, but may, in the discretion of the court, be taxed against one

28   of the parties when their conduct justifies it." *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-CV-01503-WHO

1   F.2d 675, 683 (2d Cir. 1989).  Here, there is no basis for assessing attorney's fees against the

2   interpleaded funds, because, as Bitstamp admits, they belong to Stellar, and Stellar did nothing to

3   cause this dispute.  *See Metro. Life Ins. Co. v. Leonis*, *supra*, 2014 U.S. Dist. LEXIS 159306, at

4   *7 ("there is an important policy interest in seeing that the fee award does not deplete the fund at

5   the expense of the party who is ultimately deemed entitled to it").  Moreover, given the

6   substantial evidence that Ripple and its officers worked with Bitstamp to manufacture the

7   interpleader, Ripple (or Ripple and Bitstamp) should bear the costs of this misbegotten action.

8   **IV.**   **CONCLUSION**

9          For all of the above reasons, the Court should grant Bitstamp's motion for voluntary

10  dismissal and deny Bitstamp's motion for discharge.

11
                                           ORRICK, HERRINGTON & SUTCLIFFE LLP
12

13

14          Dated: May 28, 2015                    By:  */s/ Mark S. Parris*
                                                   MARK S. PARRIS
15

16                                                 *Attorneys for Defendants Jed*
                                                   *McCaleb, Jacob Stephenson and*
17                                                 *Nancy Harris*

18                                         GROSS BELSKY ALONSO LLP

19

20          Dated: May 28, 2015                    By:  */s/ Terry Gross*
                                                   TERRY GROSS
21

22                                                 *Attorneys for Proposed Intervenor-*
                                                   *Defendant Stellar Development*
23                                                 *Foundation*

24

25

26

27

28

DEF'TS' RESPONSE TO MOT. FOR DISCHARGE
15-CV-01503-WHO

1

## **ATTESTATION**

2          I, Mark S. Parris, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence

3    to the filing of this document has been obtained from each signatory hereto.

4

5

6

7          Dated: May 28, 2015                                    By:  */s/ Mark S. Parris*

8                                                                      MARK S. PARRIS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28