Pages 1 - 42

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

```
BITSTAMP, LTD., a foreign      )
corporation,                   )
                               )
            Plaintiff,         )
                               )
    v.                         )   NO. 15-cv-01503-WHO
                               )
RIPPLE LABS INC., a            )
California corporation, et     )
al.,                           )
                               )
            Defendants.        )
-----------------------------)
and related cross-action.      )   San Francisco, California
                               )   Wednesday, December 2, 2015
_____)
```

## TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING OF PROCEEDINGS

FTR 3:06 p.m. - 4:10 p.m. =  64 minutes


**APPEARANCES**:

For Plaintiff:              Farella, Braun + Martel LLP
                           235 Montgomery Street, 30th floor
                           San Francisco, California  94104
                    BY:    **JESSICA NALL, ESQ.**
                           **KELLY A. WOODRUFF, ESQ.**



               (Appearances continued on following page.)




Transcribed by:            Leo T. Mankiewicz, Transcriber
                           leomank@gmail.com
                           (415) 722-7045

APPEARANCES:   (cont.)

For Defendant, Counterclaimant, and Crossclaimant Stellar
Development Foundation:

                   Gross Belsky Alonso, LLP
                   One Sansome Street, Suite 3670
                   San Francisco, California  94104
        BY:  **TERRY GROSS, ESQ.**
             **ADAM C. BELSKY, ESQ.**


For Cross-Defendant George Frost:

                   Hosie Rice, LLP
                   600 Montgomery Street, 34th floor
                   San Francisco, CA  94111
        BY:  **SPENCER HOSIE, ESQ.**


For Defendants Jed McCaleb, Jacob Stephenson and Nancy Harris:

                   Orrick, Herrington & Sutcliffe
                   701 Fifth Avenue, Suite 5600
                   Seattle, Washington  98104
        BY:  **PAUL FRANCIS RUGANI, ESQ.**
             (by telephone conference)


For Defendant/Cross-Defendant Ripple Labs, Ltd.:

                   Goodwin Procter, LLP
                   135 Commonwealth Drive
                   Menlo Park, California  94025
        BY:  **GRANT P. FONDO, ESQ.**
             **NICOLE L. CHESSARI, ESQ.**

1   <u>Wednesday, December 2, 2015</u>

2                                                    <u>3:06 p.m.</u>

3                  P R O C E E D I N G S

4        **THE CLERK:**  Calling civil matter 15-1503, Bitstamp,

5   Limited versus Ripple Labs, Incorporated.  Counsel, please come

6   forward state your appearance.

7        And Mr. Rugani, and if you'll go ahead and do your

8   appearance while the others are coming forward.

9        **MR. RUGANI:**  Sure.  Paul Rugani from Orrick,

10  Herrington & Sutcliffe, on behalf of the individual defendants.

11       **MS. NALL:**  Jessica Nall and Kelly Woodruff from

12  Farella, Braun + Martel on behalf of plaintiff intervenor

13  Bitstamp.

14       **THE COURT:**  Good afternoon.

15       **MS. CHESSARI:**  Good afternoon, your Honor.  Nicole

16  Chessari from Goodwin Proctor on behalf of cross-defendant

17  Ripple Labs, Inc.

18       **MR. FONDO:**  Good afternoon, your Honor.  Grant Fondo

19  as well, for Ripple Labs.

20       **MR. HOSIE:**  Good afternoon, your Honor.  Spencer Hosie

21  representing individual cross-defendant George Frost.

22       **MR. GROSS:**  Terry Gross representing cross- and

23  counterclaimant Stellar Development Foundation.

24       **MR. BELSKY:**  And Adam Belsky, also representing

25  Stellar.  Good afternoon, your Honor.

1          **THE COURT:**  Good afternoon, everybody.  So we have

2     several things to do, so we'll deal with the motions and then

3     we'll do the case management conference afterwards.

4          So I'm inclined, Mr. Gross, to grant all the motions,

5     and I'm going to explain why, but then I want to hear from you,

6     because there is something peculiar about this case, and so I'm

7     interested in this.

8          But first, with respect to the anti-SLAPP motion by

9     Bitstamp, as pleaded, I think the only specific action that's

10     pleaded is freezing the SDF's RPQ account in the interpleader

11     action.  The other allegations are not specific, they're just

12     too general, and those actions that are specific that I found

13     are protected by the litigation privilege.

14          So I don't think -- and in addition to that, I don't

15     think there would be a continuing right to an injunction or

16     restitution, since they don't have the money.  So I don't think

17     that cause of action can be stated against them.

18          With respect to Mr. Frost, on the anti-SLAPP motion,

19     the same thing would apply, as the Complaint is currently

20     pleaded.  The other allegations are too general.  He's the

21     lawyer for Bitstamp, and so his activity is protected arising

22     from the litigation privilege, and again, the damages issue

23     I think is also problematic.

24          And then there is the motion to dismiss, and I read

25     through -- I've read through this Complaint several times, and

1  because there is the air of things going on but not the

2  specificity that helps me figure out whether Mr. Frost did

3  anything that was inconsistent with any of his client's

4  interests, whether he was acting independently, how he was,

5  what he did other than the things that one would expect a

6  lawyer to be doing.

7         And I've read the SDF's claims about what Mr. Frost

8  did really as what he was doing as Ripple or Bitstamp's lawyer,

9  and I read this whole Complaint as being the case of SDF versus

10 Ripple, and not the other people, where there is a real obvious

11 dispute.

12        So those are the things.  Now, I do think the fact

13 that Mr. Frost was acting as the lawyer for both of these

14 parties, which ended up allowing the freezing of the assets of

15 the interpleader is -- it definitely catches my attention, but

16 at the moment I don't see -- I don't see how that by itself --

17 those facts as pleaded give you a cause of action.

18        So I'm inclined, at the end of all this, to grant

19 Bitstamp's motion.  I'm not going to enter a final judgment,

20 and if there is -- there's a long way to go in this litigation,

21 it appears, between Ripple and SDF.  If, in the course of

22 discovery, there's good cause to add them back in after

23 discovery, I'll reconsider it on a motion, but I'm not --

24 I don't think they have to -- they should have to participate

25 in the litigation any further at this point.

1   And I think I would grant, with leave to amend, the

2   claims against Mr. Frost, and I would stay the attorneys' fees

3   motions until there's a final judgment, because there's just

4   too -- I don't think I know enough at the moment to be able to

5   make a conclusive determination on these things.

6   So Mr. Gross, go ahead and walk me through this.

7   **MR. GROSS:**  Well, I think you're right, the key here

8   is the presence of Mr. Frost, and I think without him being in

9   the conflicted position he was in, that we wouldn't have --

10  Stellar wouldn't have the same issues with Bitstamp as there

11  are.

12  And you know, part of what Bitstamp is trying to do in

13  its motion is distance itself from Mr. Frost, that whatever he

14  did, he was doing -- I mean, they have the -- this argument

15  that *respondeat superior* doesn't apply.  I'll address that

16  later, because we think very clearly it does when you have an

17  officer.

18  But putting that aside for the moment, what we have

19  with Mr. Frost is, you know, a tremendous conflict and bias

20  both, against Stellar Development Foundation.  Mr. Frost was

21  counsel for -- let me back up a second.

22  The underlying dispute, as you know, is between Ripple

23  and Mr. McCaleb.  It's a dispute that never should have been in

24  federal court; pure breach of contract dispute.  There is, you

25  know, an agreement between the parties.  I mean, the contract

1  requires arbitration.  That's where your Honor sent it, that's

2  where it is, that's where it should have been, that's where

3  this whole thing should have been at the beginning.

4        If Ripple had a problem, they should have come in and

5  moved for -- with this, they should have moved for a TRO, an

6  injunction, a pre-judgment attachment of the funds.  Instead,

7  they didn't.  Instead, what we believe they did is they

8  colluded with Mr. Frost, who bonds Bitstamp into this entire

9  course of action that was meant really to damage Stellar and to

10 drive it out of business.

11       And that's what we're here about, is what we see is a

12 scheme that is trying to drive out what they perceive as

13 competition and drive them out of business, and you can see

14 from their papers and their allegations, you know, where they

15 talk about is that Stellar is in a fragile financial situation

16 and that's why, you know, when they were having this auction,

17 and that's why, you know, part of why they were trying to stop

18 it.  They perceive that, and that's what they wanted.

19       But we have Mr. Frost here.  He represented Ripple at

20 the time that Ripple entered into the agreement with

21 Mr. McCaleb.  We have e-mails from that time that, you know,

22 that he was on, relating to that.

23       As the Court has seen, there's, you know, an e-mail

24 exchange that was between Ripple's counsel and McCaleb's

25 counsel and Stellar's counsel at the time that that agreement

1   was reached that said the 7.5 billion is just the 5 billion

2   XRP, or five and a half billion XRP that McCaleb has and the

3   2 billion his kids have.  Nothing about, you know, XRP that was

4   given away to family members.  Frost knew that.  Frost knew

5   exactly what the terms of that settlement agreement was,

6   because he was there and he participated in it.

7          Now, at the same time, shortly after that, there's

8   another lawsuit that's mentioned in the, I believe, the

9   cross -- the counterclaim --

10                     (Simultaneous colloquy.)

11          **THE COURT:**  -- the co-founder also.

12          **MR. GROSS:**  Right.  Now, that's in state court, okay?

13  And Mr. Hosie actually is counsel for Britto, the other

14  co-founder in that case.  Frost is also counsel for Britto.

15  Britto is actually a member of the board of directors of

16  Bitstamp.  I mean, there's a lot of intertwining here, and --

17          **THE COURT:**  Right, and that's by itself not

18  actionable, is it?

19          **MR. GROSS:**  Well, no, no, it's not actionable by

20  itself, but when we're looking at it within the whole thing, we

21  have Frost, who, in the Britto lawsuit, he didn't sue just

22  Mr. McCaleb, he sued Stellar also.  It goes a little further,

23  your Honor.  It goes a little further.

24          When Stellar -- when Ripple and McCaleb and Stellar

25  reached that settlement agreement in August of 2014, one of the

1    terms of that was that Ripple wasn't going to do anything to

2    assist any lawsuits or, you know, sort of -- that was supposed

3    to have brought peace between the parties and they weren't

4    going to do anything to assist.  But then, boom, immediately

5    thereafter, within days of signing that agreement is when

6    Britto files his lawsuit, and I don't represent Mr. McCaleb

7    here in the arbitration but, you know, there are possibilities

8    of counterclaims against Ripple for -- you know, for breaching

9    that settlement agreement by giving support to Britto in his

10   lawsuit.

11           Okay, now, I mean, so you can understand, this takes

12   you a little bit away from Frost, but not that much.  One of

13   the officers of Ripple, Greg Kidd, is funding the Britto

14   lawsuit and is helping him, and we also understand that Frost

15   represents Greg Kidd, okay, and that's part of -- and Ripple

16   says, well, it's just our officer, it's not us, you know, you

17   have to -- so we're not responsible for what Greg Kidd is

18   doing.

19           So you can understand there's this morass that Frost

20   is in the center of, where he's involved with all of these

21   things.

22           But so then the situation we have is, what happens

23   when, you know, when Bitstamp became involved?  I mean, what

24   happened?  And essentially, the facts that we have is that --

25   what we are alleging here is that what happened is that, you

1    know, when Ripple is first talking to -- is first talking to

2    Frost about it, is Ripple talking to Frost as their attorney or

3    as Bitstamp's attorney?  I mean, are they adverse, as they

4    should be, or not?

5         I mean, I had conversations with Mr. Frost at the

6    beginning when he was counsel, you know, the counsel of record,

7    and trying to find out, well, when did you stop representing

8    Ripple or how were you not conflicted at this time when you

9    were adverse?  And never got an answer about when he stopped.

10        I actually asked Mr. Hosie's firm in the Britto

11   lawsuit, where we have served subpoenas on Mr. Frost for

12   communications with respect to things, and I've asked, can you

13   just tell us, when did he stop representing Ripple?  Never, you

14   know, and we've never gotten an answer to that, and that's

15   obviously, from our position, the reasonable inference from

16   that is that he clearly was representing Ripple at the same

17   time he was representing Bitstamp while there was supposedly

18   this -- the adverse nature between Ripple and Bitstamp.

19        But meanwhile, you know, at the same time, when you

20   look at some of the things that happened here, now, our -- the

21   scheme that we are alleging is a scheme not just to file an

22   interpleader action, but it was a scheme to -- and it's not

23   just to go after McCaleb or Mr. Stephenson for something that

24   happened, but if you look, you know, at the actions, it's

25   basically to go after Stellar.

1          What we see happened here is that Ripple and Mr. Frost

2     were concerned when Stellar was going to be getting funds from

3     this transaction, and so they traced it to another exchange,

4     and that's where they used coercion against the owner of that

5     exchange to say, you've got to give that money back to Ripple.

6          And again, I personally don't understand why, when a

7     party voluntarily engages in a transaction, as Ripple did with

8     Mr. Stephenson, they're entitled to then go to, you know,

9     anybody else who's involved with the transaction or the funds

10    downstream and say, oh, by the way, we didn't really mean that

11    transaction, and we really own that money and we're supposed to

12    get it back.  But that's where you --

13          **THE COURT:**  That's a --

14                    (Simultaneous colloquy.)

15          **MR. GROSS:**  -- figure out the litigation, in the

16    arbitration, okay.

17          But we do have evidence that what Ripple -- what

18    happened was, there were threats that were made to the operator

19    of the CoinEX exchange, which was to threaten criminal -- you

20    know, reporting them to criminal authorities if they did not

21    return the funds or put them in a Bitstamp account.

22          And so the whole purpose was to get Stellar's funds,

23    not to get Mr. McCaleb's funds, but to get Stellar's funds in a

24    place where they could prevent Stellar from having access to

25    it; and part of that is getting them into a Bitstamp account

1    and then freezing them.

2            Now, I know that you've mentioned, Bitstamp argues,

3    well, freezing is just a part of litigation.  It's preparatory

4    to litigation.  But it's not a necessary part to, you know, for

5    the litigation.  They don't have to freeze it.  I mean, they

6    don't have to freeze it at all.  They could put it into the

7    Court's registry if they wanted to.

8            That -- you know, and again, we have a situation where

9    Ripple, who is the supposed injured party, decides they're not

10   filing a lawsuit, which is what they easily could have done,

11   but instead, what -- the scheme of getting it just to a place,

12   you know, coercing Stellar's funds into a place where they can

13   deny Stellar access to it.

14           Now, there are two cases --

15           **THE COURT:**  Is the allegation that either Bitstamp or

16   Ripple or Mr. Frost were operating against their interest in

17   order to do something mean to your client?  I mean, is there --

18           **MR. GROSS:**  Bitstamp was acting against --

19           **THE COURT:**  With all of these parties, one of the

20   things that I struggle with in this is, what did somebody do

21   that was sort of -- that was against their interest or out of

22   the norm of sort of aggressive -- generally aggressive but

23   legal behavior.

24           **MR. GROSS:**  You're talking about Ripple, right?

25           **THE COURT:**  I'm talking about anybody.

1        **MR. GROSS:**  Okay.

2        **THE COURT:**  You know, what I see in this case is I see

3   a big grudge match is what I see, and it ought to be between

4   two parties, and instead, it's between a lot more, and I'm

5   trying to figure out what the benefit is of having all the

6   other parties in, and I'm trying to figure out what the

7   allegations are, besides the -- I understand why your client is

8   feeling aggrieved with these folks, but I'm trying to figure

9   out what the legal hook is and what the factual --

10       **MR. GROSS:**  Well, so --

11       **THE COURT:**  -- basis of it is.

12       **MR. GROSS:**  Okay.  So basic -- I mean, you're right,

13   it is a grudge match, but it's not -- Stellar is not part of

14   the grudge match.  The grudge match is between Ripple and

15   Mr. McCaleb, and Stellar is, in essence, a bystander to this,

16   and Stellar would have been a bystander to the grudge match but

17   for the fact that there was a decision that was made to go

18   after Stellar's funds, okay?  And which is what happened.

19       Now, part of the scheme that we've alleged, and have

20   evidence for, is -- was to get Stellar's funds put in a

21   Bitstamp account.  Now, why would Ripple want Stellar's funds

22   in a Bitstamp account?  Why would that be part of the coercion,

23   unless they knew, once they got it in a Bitstamp account, they

24   could prevent Stellar from having access to it?

25       So that's scheme that we see here, your Honor, and as

1    in, you know, the *Episcopal* -- the *In re: Episcopal* court case,

2    or in the *Renewable Resources* cases, you know, what they

3    clearly say is that just because there may be a lawsuit, you

4    know, some protected activity that happens somewhere later down

5    the line, doesn't mean that the case is then arising from that

6    protected activity, and that's what our case is here.

7         The scheme here isn't about filing an interpleader

8    action.  The scheme here is joint agreement that is happening

9    between Ripple and Frost as Bitstamp's chief legal officer to

10   get Stellar's funds in a Bitstamp account so that Stellar can

11   be deprived access to that.

12        And I mean, there are other aspects, you know, about

13   that with respect to what Frost was doing.  I mean, first of

14   all, Stellar -- while Stellar had these funds, you know --

15   Stellar had these funds, Stellar was trying to open its account

16   at Bitstamp, so that it could -- I mean, it's the same as when

17   you go to a bank.  When you go to a bank, you open -- you know,

18   you go in and they ask for certain information, and they kept

19   providing information, and Bitstamp kept saying, oh, well, we

20   need something else, we need something else.

21        And I spent some time talking to the chief compliance

22   officer for Bitstamp, trying to get this account, you know,

23   authorized and open, and I kept getting questions from him that

24   were questions that it seemed only would have come from Ripple,

25   not from Bitstamp itself.

1    There are many of the facts that are in -- that Ripple
2    was doing, Bitstamp has admitted in its pleadings.  It said it
3    was monitoring Mr. Stephenson's account, even before it got --
4    even before, I believe it was, the March 26th demand letter.
5    Why would it have been monitoring Mr. Stephenson's account?
6    They knew nothing about Mr. Stephenson or know who he was.  The
7    only way they would have known who Mr. Stephenson was is if
8    Mr. Frost got that information from Ripple.
9    And so there are, you know, all these other factors
10   that lead to this web of collusion where Frost is working with
11   Ripple trying to say, okay, with this scheme, what can we do to
12   make sure that these funds that belong to Stellar, we can get
13   them somewhere that can be -- where we can prevent Stellar from
14   having access to them.
15   **THE COURT:**  Okay, so the bottom line for you, you've
16   got -- I see you have one more thing to say.
17   **MR. GROSS:**  Well, no, one of the things -- it is, but
18   one of the things you said is --
19   **THE COURT:**  It does, this --
20   **MR. GROSS:**  -- where is there -- I think you said,
21   where is Bitstamp acting adverse to its own interest, okay, and
22   I don't think -- the law is, when an officer is doing
23   something, it doesn't have to be adverse to the company's
24   interest.
25   **THE COURT:**  No, I think actually you've laid this --

1   I think you've been very clear that the problem that you have

2   with Mr. Frost is really the fact that he was representing both

3   companies in a way that was beneficial to Ripple's interest,

4   and that that's sort of -- that's the nub of things, that he

5   knew information as Ripple's lawyer which he then used in order

6   to get Bitstamp to do the things that he did.

7        **MR. GROSS:**  Well, I think it's a little more than

8   that.  It's more -- the funds had left Bitstamp, and they'd

9   left Ripple, and they were now with CoinEX in New Zealand, and

10  the typical thing that would have happened in that situation

11  is, you know, CoinEX would have just done a wire transfer of

12  U.S. Dollars to Stellar through its own bank, but instead,

13  because of this coercion, those funds got brought back to --

14       **THE COURT:**  But Ripple didn't want your client to get

15  the funds.

16       **MR. GROSS:**  That's right.  Ripple --

17       **THE COURT:**  And so, I mean, that's -- I just -- I'm

18  just -- I'm struggling, Mr. Gross.  You've got to help me,

19  here.

20       **MR. GROSS:**  I know, but the reason is, why would --

21  the only reason Ripple would want those funds, Stellar's funds,

22  to be put back in a Bitstamp account, is because it had an

23  agreement with Mr. Frost and with Bitstamp that once the funds

24  got there, they could prevent access -- Stellar having access

25  to it, okay?

1    Because otherwise, it would make no sense to do that,

2    but that's the crux there, that that's -- that's the only

3    reason that makes sense that they would try and get it there,

4    you know, because CoinEX was resisting everything that Ripple

5    was doing.

6    CoinEX was -- you know, Ripple was saying, you've got

7    to give the money back.  CoinEX was saying, I can't, there's

8    already been a transaction, Stephenson doesn't own it anymore,

9    there's a third party that owns it.  They wouldn't -- you know,

10   but finally caved to the threat of -- you know, that they'd be

11   turned over to criminal authorities for this alleged money

12   laundering, et cetera.

13   And the only reason that Ripple would want that is

14   because they had reached an agreement with Frost, representing

15   Bitstamp, that then actions would be taken to prevent Stellar

16   from having access to it.

17   Now, that some of those actions might end up being,

18   you know, being a -- Bitstamp might decide to file an

19   interpleader lawsuit is incidental to the entire scheme

20   because, I mean, there could have been many things they could

21   have done.  They could have just frozen them.

22   I will also tell you, your Honor, that under, you

23   know, what banks do, you know, what banks are supposed to do

24   under anti-money laundering policies, is if they see any

25   activity that they think triggers or violates money laundering,

1  it's not to freeze accounts; they're just supposed to notify

2  the banking authorities of it, and stuff.

3        But yet here, you know, we -- one of the things

4  that --

5        **THE COURT:**  Do those rules apply?

6        **MR. GROSS:**  No one knows what rules apply yet, you

7  know, in this situation, okay, but it's more as an example of

8  what it might be, and what kind of liability, you know,

9  because, you know, Bitstamp or an exchange might have liability

10  if they improperly freeze funds when, you know, where they

11  don't give access to their customers' funds that they're

12  supposed to have access to, the same way that would happen with

13  a bank.

14        So while those -- what law applies in this situation

15  has not yet been played out in the cryptocurrency arena, what

16  happens in the bank arena is instructive about things that

17  would happen here.

18        **THE COURT:**  You need to wind up.

19        **MR. GROSS:**  Okay.  So anyway, my point with -- anyway,

20  you understand my point, is that Frost is the key, and that

21  clearly, from all of the things that happened, is Frost had

22  made an agreement with Ripple beforehand, on behalf of

23  Bitstamp, of what was going to happen once those funds got back

24  there.  This is, therefore, the filing -- the later filing of

25  an interpleader action is incidental to this entire scheme.

1    So then, if you need me to address the motion to

2    dismiss aspects right now...?

3         **THE COURT:**  I want to have heard everything from you

4    that I'm going to hear except your closing comments.

5         **MR. GROSS:**  You know, with the -- I mean, with respect

6    to the motion to dismiss, we lay out in our opposition, in

7    detail, all of the allegations that reference Frost and things

8    that Frost did.  I've given a little more flavor here right now

9    with respect to, you know, other aspects, you know, that Frost

10   did, and there have been some information that was provided by

11   Bitstamp's motion in reply itself about actions that Bitstamp

12   was taking that clearly involved Frost.

13        But we think that all of those allegations demonstrate

14   a collusion of Mr. Frost with Ripple to clause this damage

15   to -- to Stellar as a competitor.

16        I think you next -- you were talking about the -- that

17   there's no right to restitution or injunction.  Well, Stellar

18   has been deprived of access to its funds, to a million dollars,

19   right now, for more than six months, and we don't know how much

20   longer that's going to go on.  They're entitled to restitution

21   for the loss of use of that.

22        Now, with respect to Bitstamp, Bitstamp would say,

23   well, we only had it for 71 days.  Well, they're entitled to

24   restitution for those 71 days.

25        With respect to injunctive relief, Bitstamp is a major

1    exchange for bitcoin and XRPs.  There is that Stellar

2    Development Foundation, you know, could easily need to use the

3    Bitstamp exchange for transactions that take place in Bitstamps

4    or XRPs if that's -- if those exchanges are happening, your

5    Honor, with their -- you know, with SDRs and stuff.

6          And so therefore, there is a likelihood that there

7    could be -- that will be further dealings with -- between

8    Stellar and Bitstamp, or further dealings with any other

9    competitor of Ripple and Bitstamp, and there needs -- there

10   should be -- you know, what Stellar would be asking for is

11   injunctive relief to prevent improper freezing of funds -- this

12   might be exactly the same thing we were talking about

13   earlier -- to prevent the improper freezing of funds based on,

14   you know, claims of -- such as here, which is breach of

15   contract, which shouldn't, you know, really lead to conflicting

16   claims in interpleader actions.

17         And I think one of the things I want to point out,

18   your Honor, is that -- I mean, one of the things that happened

19   after the interpleader action was filed is there was -- the

20   Bitstamp board of directors consulted about this and they

21   consulted with outside unconflicted counsel, and at one point

22   decided -- well, in the first papers that were filed here was,

23   you know, their motion to discharge or in the alternative for

24   voluntary dismissal, informing the Court that, well, now that

25   we've looked at the transaction, we've noticed that it's really

just a run-of-the-mill breach of contract cause of action, and there really isn't any dispute and the funds should go to Stellar.  Okay?

Well, that's part -- I mean -- I think part of that shows that Frost was conflicted.  Frost was -- Frost acting as Stellar's chief legal officer and freezing the funds and taking part in that was acting -- was acting on behalf of Ripple as well as, you know, acting on behalf of Bitstamp, something that shouldn't have happened.

But I mean, that's the kind of injunctive relief that we would be asking for in this case.

**THE COURT:**  All right, let's bring Mr. Hosie in here.

**MR. HOSIE:**  Thank you, your Honor.  And if Mr. Frost was their lawyer and owed them a duty of care, and this were a malpractice action, his point may have merit, but Mr. Frost wasn't their lawyer and they have sued him for representing his client in filing an interpleader action.  That is quintessentially privileged activity.

In terms of the detail, if they had facts, your Honor, they would have pled facts.  They didn't.  There's a reason for that.  On this kind of pleading, Mr. Frost could have been the second shooter on the knoll, they could have -- say he had Mr. Hauptmann in his back yard.

There are no facts there, and they have sued the lawyer for the opposing party.  That has to matter, your Honor.

1    Pragmatically, that has to make a difference.  Are we to sue

2    Mr. Gross for representing Stellar?  Is he going to sue

3    Ripple's counsel for sending the letters that sparked the

4    interpleader?

5            At the end of the day, your Honor, they sued Mr. Frost

6    for doing his duty as a lawyer.

7            **THE COURT:**  Well, but he was -- Mr. Gross isn't wrong

8    that Mr. Frost was in this unique position of advising two

9    different companies in order to effectuate something that one

10   of the companies that he represented really knew about and he

11   was able to make the deal happen on the other end.  That's the

12   allegation.

13           **MR. HOSIE:**  Your Honor, if that's basis for liability,

14   Wilson Sonsini's going to sue 10,000 times.  Every single

15   venture capital firm in the valley is going to be a defendant.

16           The question is:  What did he do wrong in this case?

17   He did nothing wrong in this case.  Everything else is just

18   allegation.  It's lawsuit by innuendo.

19           **THE COURT:**  All right.

20           **MS. WOODRUFF:**  Kelly Woodruff, your Honor.  I have

21   just a couple of points.

22           Mr. Gross said, we have evidence -- he used the term

23   "evidence" -- that threats were made to CoinEX, and it's true,

24   I think that they do have evidence.  They alleged a lot of

25   detail in their counterclaim and their crossclaim, all against

Ripple.  There's not a single factual allegation against

Mr. Frost or Bitstamp.

        If they had those facts, they would have alleged them.

They did not.  They cannot and actually meet the Rule 11

standards.  They know that.  Bitstamp and Frost had nothing to

do with the CoinEX deal or they would have alleged it, because

they know all the facts of what happened.

        The freezing and the interpleader were absolutely part

and parcel of each other.  I don't think that there's any need

to argue that.  They were one day apart.  Freezing the funds

was necessary to get the pleading papers on file.  That's all.

I think an argument that it was not related is silly.

        Bitstamp was monitoring several accounts, not just

related to these parties.  It monitors accounts for people who

are all on a watch list, and Mr. McCaleb was subject of a

federal criminal investigation.  He still is, and Bitstamp was

and had been monitoring accounts that they thought belonged to

him or any of his family members.  That was part of their

anti-money laundering policy that they were following when they

got these demand letters from Ripple.  It implicated their AML

policy and they had to act.  It's quite simple, as your Honor

has already ruled.

        With regards to the restitution claim of the lack

of -- er, I think Mr. Gross said they're entitled to

restitution of the lack of use of their money.  No, that's not

what resti- -- that's damages.  They may be entitled if they

had a different claim other than a UCL claim for damages, for

the loss of use of money, but they don't get restitution for

loss of money.  Bitstamp has no money of theirs, they haven't

lost any money.  The money was transferred from one Stellar

account to another Stellar account, apparently.

And injunction, I'm honestly not sure I followed the

argument.  There's no -- nothing to be enjoined here, so

there's nothing.

So I really don't have anything more to respond.

I think that your Honor is right to grant the motion.

I did want to point out two things with regard to the

attorneys' fees.  One, Judge Rogers just recently in a case

called *Semiconductor Equipment v. The Peer Group* -- I'll give

you the cite -- it's 2015 WestLaw 5535806, it was

September 18th, 2015, or if you want to pull it off of PACER,

it's case number 15-866, Judge Rogers.  In that case, the

plaintiff had filed a complaint, the defendant filed an

anti-SLAPP motion.  The plaintiff exercised its rights to amend

the complaint without leave of court, under the new 15(a), and

so -- withdrawing the offending SLAPP claim, and so Judge

Rogers denied the anti-SLAPP motion, and yet -- and that case

is still going forward -- yet still went on and found the

defendant as the prevailing party on the anti-SLAPP motion and

awarded the defendant attorneys' fees.

1        So we understand that you're not ready to enter

2    judgment on the case, but we would ask that you entertain our

3    motion for attorneys' fees on the anti-SLAPP motion.

4        **THE COURT:**  You know, my difficulty with doing that is

5    that there is so much smoke at the moment in this case that --

6    and Mr. Frost's involvement in the case can potentially

7    implicate Bitstamp in ways that I haven't seen and that haven't

8    been alleged, as far as I can tell.

9        And so what I want to do is to get you out of the line

10   of fire, let discovery happen in the way that it's supposed to

11   happen in cases, and if your client isn't -- Mr. Gross doesn't

12   try to bring you back in with some, you know, compelling

13   evidence, then we'll deal with the motions that you've already

14   got.  You've got the interpleader motion, which -- for a lot

15   more money than I'm planning to give, and the current motion.

16       So both of those things will be there at the end of

17   the day.

18       **MS. WOODRUFF:**  I understand that point with regard to

19   the interpleader motion, although I think that that could be

20   remedied; if there was actually a claim that was asserted

21   against us, we could be forced to give money back if it were a

22   claim for damages, but leaving aside that, I think that's

23   different from the anti-SLAPP motion, which is that at this

24   point, Stellar has indisputably filed a SLAPP against Bitstamp,

25   and filed it for no other reason than to do exactly what your

1   Honor is doing, which is to try to extort settlement on the

2   attorneys' fees from us on the interpleader action.

3   There is no -- there was no purpose -- there's no

4   remedy that they're seeking, they have no damages, there's

5   nothing -- this counterclaim against Bitstamp is purely

6   retaliatory. It is a quintessential SLAPP. Their prevailing

7   on the lawsuit is not their purpose. Their purpose is to

8   hinder and break down Bitstamp so badly that it will say, okay,

9   we'll walk away from our attorneys' fees.

10   And so by not at least giving us the attorneys' fees

11   on the anti-SLAPP motion, which we were required just to get

12   out of this, and this threat of deposing our international

13   clients, I think that this is a case that absolutely demands

14   attorneys' fees. I mean, under the California laws, and as

15   applied in the Ninth Circuit, attorneys' fees are mandatory on

16   the anti-SLAPP motion.

17   **THE COURT:** I'm not saying you won't get them, but

18   I appreciate your argument.

19   **MS. WOODRUFF:** Okay. Thank you, your Honor.

20   **THE COURT:** Mr. Gross, last word.

21   **MR. GROSS:** Okay, so, let's see. With respect to

22   Mr. Hosie's argument, I mean, I think I've already addressed

23   most of those things, that it's --

24   **THE COURT:** I think, actually, you've addressed all of

25   these things --

1    **MR. GROSS:**  Okay.

2    **THE COURT:**  -- but if there was something else...

3    **MR. GROSS:**  Yeah.  Yeah, where Ms. Woodruff was saying

4    that Bitstamp monitors lots of accounts and that's why they

5    were monitoring the relatives of Mr. McCaleb, Ripple accounts

6    are anonymous.  They're not on --

7    **THE COURT:**  We're getting way beyond the pleadings at

8    this point.

9    **MR. GROSS:**  We might be, but this is -- she's made a

10   statement, it's beyond the pleadings here.  I'm just --

11   **THE COURT:**  No, everybody has.

12   **MR. GROSS:**  This is true.

13   **THE COURT:**  Well, okay, but --

14   **MR. GROSS:**  But there is -- but it's basically only,

15   as I mentioned before, the only way that they would have known

16   that some account might have been a relative of Mr. McCaleb's

17   is if Mr. Frost and Ripple were conferring, you know, in that

18   way about it.

19       With respect to the restitution, Bitstamp has lots

20   of -- has accounts that have lots of fiat money in them, and

21   I assume, as almost all banks do that act as exchanges, they

22   earn interest or they earn money on them, okay?  So I mean,

23   I've been involved in class actions against title companies and

24   banks with respect to this, and so if they earned any money,

25   you know, with respect to that, we're entitled to that as

1  restitution.  It might be a small amount, but there is some

2  restitutionary element there with respect to that.  And that's

3  a factual issue that's before your Honor.

4       One of the other aspects is that, you know, there is a

5  right to -- I mean, as your Honor has noted in *Rogers*, that an

6  anti-SLAPP motion in federal court that's brought on purely

7  legal grounds is treated under Rule 12, and Rule 12 and Rule 15

8  allows, you know, reasonable leave to amend.

9       So that we would ask, if your Honor is inclined, to

10  grant either of the anti-SLAPP motions, that we be -- that

11  Stellar be granted leave to amend, if possible, and again, it

12  will depend on what your ruling is and what the issues are, and

13  there are Ninth Circuit cases on that, as well, your Honor.

14       There is, if I may, the first one is the *Verizon* case

15  which was cited, which, when an anti-SLAPP motion to strike the

16  initial complaint without leave to amend, they said that

17  conflicts, that collides with Rule 15(a), and then *Greensprings*

18  in 2010, the Ninth Circuit again addressed that issue, and said

19  that this thing was rejected -- the claim that Bitstamp is

20  making that there is no leave to amend appears to have been

21  rejected in *Verizon*.

22       And again, there's lots of cases that grant leave to

23  amend.  The two cases that Bitstamp cites are, your Honor, are

24  quite distinguishable.  In one of them, in *Flores*, they cite a

25  second decision in *Flores* that doesn't grant leave to amend,

1    but they don't cite the earlier one, which is 416 F. Supp.

2    2006, in which the court did grant leave to amend.  And so it

3    was only after one leave to amend that the court said they

4    couldn't amend.

5           And in *Blackburn*, the other case, they refused leave

6    to amend because that was one that was a summary judgment

7    motion or, you know, that had failed to submit evidence.  So it

8    was quite different than a pleading motion as this one is, your

9    Honor.

10          **THE COURT:**  Well, I'll look at that again.  I have to

11   say, I let Bitstamp out of this case back in the beginning, and

12   the only reason that I entertained this was because of all of

13   the smoke from the allegations that you've described, you know,

14   several months ago, and -- but your allegations in the first

15   amended, or -- in this complaint, or cross-complaint, whatever

16   we're dealing with, are no better.  I mean, they're no more

17   specific.

18          So I don't know what else you'll be able to allege,

19   and I am -- you've got Mr. Frost, who I will allow you to amend

20   on, and if you're able to develop the evidence, I'm not

21   precluding you from bringing Bitstamp back in, but at the

22   moment, what you're doing is digging a much bigger attorneys'

23   fees hole.

24          **MR. GROSS:**  We understand that, your Honor.  We

25   understand, but we, truly, we think there is a wrong here.  We

1    think Frost is a bad actor here, and we think that if Frost is

2    in the case, Bitstamp should be in the case as well; that if

3    we -- because, you know, they're --

4         **THE COURT:**  I get that.

5         **MR. GROSS:**  I don't know how they can disavow the

6    actions that Frost took and say, oh, he was just not acting on

7    behalf of the company.  What they cite, what they claim is the

8    law just isn't the law.

9         **THE COURT:**  All right.

10        **MR. GROSS:**  If I may, your Honor, perhaps this --

11   I mean, it seems to me you're still going to -- you're inclined

12   to, or you're going to, grant Bitstamp's anti-SLAPP motion.

13        **THE COURT:**  Well, I always -- well, I am going to

14   grant Bitstamp's anti-SLAPP motion, yes.

15        **MR. GROSS:**  Okay.

16        **THE COURT:**  But what I do with it after that, I hear

17   what you've argued.

18        **MR. GROSS:**  I appreciate all the other procedural

19   things that you said about not entering final judgment, et

20   cetera.  We would like to be able to have discovery against

21   Bitstamp as if they were a party.  As they just pointed out,

22   they have international clients and stuff.  We would like to

23   not have to serve subpoenas on them, but to be able to keep

24   them in the case and get discovery as if they were a party, if

25   that's what's going to happen, your Honor.

1          **THE COURT:**  I hear you.  I'm not -- I don't think I've

2    reached that --

3          **MR. GROSS:**  We can brief that, if you want.

4          **THE COURT:**  -- issue, but there may be some reasonable

5    way that Bitstamp will cooperate with discovery to make you not

6    jump through hoops without requiring people who are tangential

7    to this to have to respond to deposition subpoenas and so

8    forth.

9          So are we submitted now, with these various motions?

10         **MS. WOODRUFF:**  Can I just ask, do you want any

11   response on the ability to amend?  Because Mr. Gross -- the

12   *Greensprings* case did not rule -- specifically held that it was

13   not addressing the issue, to be clear, and the *Flores* case,

14   yes, we did cite the second opinion because the second opinion

15   said that the first opinion got it wrong and improperly granted

16   leave to amend.

17         And then, it's not just two cases.  We cited four

18   cases.  Judge White, Judge Hamilton, Judge Illston and Judge

19   Ware have all said that granting leave to amend would

20   completely undermine the purpose of getting us out quickly from

21   a very obvious SLAPP suit.

22         **THE COURT:**  Right.  Well, and you know, the real issue

23   on -- for those cases is, is somebody -- is it so obvious that

24   there's going to be no chance that the client -- that the

25   party's going to be brought back in.  So that's the thing that

1    I'm thinking about, and there have been two shots at, or,

2    there's been one real shot in a pleading and an earlier shot

3    that --

4        **MS. WOODRUFF:**  Well, and to be clear, the *Verizon* case

5    was 2004, before the amendments to the Rule 15, and Stellar

6    very easily could have amended its complaint in response to our

7    anti-SLAPP motion if it actually had any facts, which it does

8    not, that would survive their Rule 11 obligation.  They could

9    have and they didn't.  Now they need leave of court to amend,

10   and I would strongly request that it not be granted.

11       **THE COURT:**  All right.

12       **MS. WOODRUFF:**  Thank you, your Honor.

13       **THE COURT:**  Everybody submitted?  Great.  All right,

14   let's go on to the case management conference.

15       So going back to a comment that I made earlier, this

16   litigation does seem very much like a grudge match, and grudge

17   matches really don't belong -- they come to court all the time

18   but they really don't belong here and they don't belong in the

19   manner that -- in some free-flowing manner.

20       So this brings me to ADR and Judge Garcia, and so is

21   everybody in agreement to going back to Judge Garcia within the

22   next 90 days?  Because if you're not, I'm going to require you

23   to go somewhere.

24       So tell me about Judge Garcia and tell me about 90

25   days.

1      **MS. NALL:**  So, I mean, I think the parties are

2  generally in agreement to go back to Judge Garcia, if the Court

3  is so inclined.  We have been having off-the-record discussions

4  still with counsel for Stellar in furtherance of settlement

5  but, you know, we had the ADR call, and she seemed inclined to

6  have us continue with some sort of settlement discussion, and

7  if it was between, you know, court-ordered ADR or somebody

8  other than Judge Garcia, I think that we would prefer to go to

9  Judge Garcia.  I think that was the general sentiment.

10      **THE COURT:**  I mean, is that everybody's sentiment?

11      **MR. GROSS:**  I mean, I think our side and counsel for

12  Ripple seem to have a very good working relationship, and even

13  with respect to it, but we still haven't been able to settle,

14  and we were making progress with Judge Garcia.

15      I mean, at the same time -- I mean, I guess I would

16  say, if there was -- I mean, I didn't mention this on the ADR

17  call and I just thought about it afterwards, but if there's

18  some settlement judge that would beat heads in some way rather

19  than, you know, be -- you know, you have some strength in that

20  way, it might help us, though, you know, we are continuing to

21  talk and trying to see if we can get somewhere, but we're at

22  loggerjams on some issues.

23      **THE COURT:**  All right.  Well, sir, you've got an ADR

24  call on the 17th, I think, or something -- I wrote down the

25  17th.  So if you decide to go back to Judge -- I want you to go

1   somewhere, within 90 days, and try harder to resolve this, and

2   you can -- you don't have to do it here now.

3          Either go to Judge Garcia and tell my courtroom

4   deputy, or have the call on the 17th and you'll get placed with

5   somebody through the court system, and I'll rely on what I hear

6   back from Ms. Lange on that, and -- but within the next 90

7   days.  I just encourage you to try to sit down and get this

8   done.

9          **MR. GROSS:**  May I suggest that you cut that down to 45

10  days or something like that?  We're just engaged in serving

11  large amounts of discovery and scheduling depositions and stuff

12  like that, and by 90 days, we will have spent a great deal of

13  money that I think us, as lawyers, feel should not be spent.

14  As lawyers, we all feel this case should settle.

15          **THE COURT:**  Right.  Well, so --

16          **MR. GROSS:**  So --

17          **MS. WOODRUFF:**  I think we're amenable to 45 days.

18  Again, I think one of the problems is -- and Mr. Gross

19  previewed this earlier, there's a lot of cases, there's a lot

20  of different disputes in different matters --

21          **THE COURT:**  Yeah.

22          **MS. WOODRUFF:**  -- and so, you know, if we're going to

23  have those discussions in mediation, it makes sense to have

24  them all there.  And so, you know, resolving multiple matters

25  at the same time can be difficult with many different parties

1   that have grudges, so...

2          **UNIDENTIFIED SPEAKER:**  (Inaudible.)

3          **THE COURT:**  Yes, I hear you.  So 45 days is fine by

4   me, and so it's just a question of getting on the schedule of

5   the person that you prefer.  So hopefully, Judge Garcia has

6   that time, if you want to go to him.  If you decide that you

7   want to go to somebody else that we can get you to, we'll try

8   and do that.  All right?

9          Ms. Nall.

10          **UNIDENTIFIED SPEAKER:**  (Inaudible).

11          **MS. NALL:**  Your Honor, one clarifying question on the

12   (inaudible.)

13          **THE COURT:**  Yes.

14          **MS. NALL:**  -- awaiting an order on questions that were

15   submitted today, but we would not like to incur the cost of

16   educating someone, you know, different, as we did before, we

17   had called the mediator.

18          But I just wanted to clarify, we're not one of the

19   parties that's going to be ordered within the 45 days, is that

20   right?

21          **THE COURT:**  Well, I don't know.  What's --

22          **MR. GROSS:**  If I may, your Honor, one of the things

23   that Judge Garcia did was that he asked Ms. Nall if she would

24   be on telephone standby and stuff, and so she was, and I think

25   that would be helpful, because I can imagine that if Ripple and

1    Stellar and McCaleb are making progress, that we might want to

2    pull -- only in that instance would it make sense to start

3    this, you know, having discussions with Bitstamp.

4         MS. NALL:  That's fine with us.  We just prefer to not

5    be involved in all of the grudge matches that's been detailed.

6         THE COURT:  So that's fine.  So telephone standby, it

7    will be great.

8         Okay, so then what happens if this doesn't -- if you

9    don't do what I really hope you do?  We ought to set a trial

10   calendar.  The date that you wanted I'm jammed up on.  So the

11   first date that I have is January 2nd of 2017.  So that's two

12   months later.  And if that day works for you, then we'll work

13   backwards.

14                        (Laughter.)

15        MR. GROSS:  Is there any lawyer you know that has said

16   yes, I want January 2nd?

17        THE COURT:  Well, you know, if that is how active --

18   usually the moving party wants to go as fast as possible, or

19   they pretend they want to go as fast as possible.

20        MR. GROSS:  We do want to go fast, but I'd rather go,

21   you know, February 1st or whatever is --

22        THE COURT:  Okay.

23        MS. NALL:  You want to spend Christmas preparing?

24        MR. GROSS:  A month after Christmas.

25        THE COURT:  Okay.

1          **MS. NALL:**  That's fine with us, your Honor.

2          **THE COURT:**  So would you like to go -- so I can give

3     you anytime from January 17th on, and if you'd like, I set two

4     trials on a Monday, and I've got one on the dates through

5     February 6th but, you know, most of them will settle, or

6     probably all of them will.

7          So what date would you like?

8          **MR. GROSS:**  We're in 2017.

9          **THE COURT:**  We're in 2017.

10         **MS. NALL:**  We're all right with February 6th, your

11    Honor.

12         **THE COURT:**  Okay.

13         **MR. GROSS:**  Would it be possible -- I mean, can we

14    work on the schedule, the rest of the schedule, your Honor, and

15    see if we can submit something?

16         **THE COURT:**  Okay.

17         **MR. GROSS:**  I would --

18         **THE COURT:**  Yeah, that's fine.

19         **MR. GROSS:**  If possible, I would propose that the

20    pretrial conference take place in December.

21         **THE COURT:**  That's okay.  So then you don't have to

22    worry about it over the holidays.  That's fine.  But I'd like

23    you to -- so set the hearing on dispositive motions two months

24    before the pretrial conference, and then aside from that, we'll

25    set the trial for February 6th, and let's set a last day to

1   amend of March 1st, 2016, and --

2            **MR. GROSS:**  Can we push that back a little, since

3   we're going to be --

4            **THE COURT:**  The mediation?

5            **MR. GROSS:**  The mediation, yes --

6            **THE COURT:**  How about May 1st?  And why don't we have

7   a further CMC on May 10th.

8            **MS. NALL:**  Is it possible to have it a tad bit sooner

9   than that?

10           **THE COURT:**  Yes.

11           **MS. NALL:**  So we can check in with you kind of after

12  mediation and, you know, get things going if we're

13  unsuccessful?  Perhaps February, end of February, if you're

14  available?

15           **THE COURT:**  I'm always happy to see you.  That's not

16  totally true.  February 23rd, if it's a Tuesday.

17           **MR. GROSS:**  That's a Tuesday.

18           **THE COURT:**  Is that a Tuesday?

19           **MR. GROSS:**  Yes.

20           **MS. NALL:**  That should work for us.

21           **THE COURT:**  February 23rd at 2:00 p.m.

22           **MS. NALL:**  Perfect.  Thank you, your Honor.

23           **THE COURT:**  And if you want to shift that date back

24  because the mediation didn't happen or whatever, just --

25           **MS. NALL:**  We'll let you know.

1        **THE COURT:**  Yeah.

2        **MS. NALL:**  Yeah, thank you.

3        **THE COURT:**  All right.  Is there anything else that we

4    need to do?

5        **MR. GROSS:**  With respect to discovery and Bitstamp, is

6    that for --

7        **THE COURT:**  So with respect to discovery, the only

8    thing that -- Bitstamp is not a party -- it would not be a

9    party if I let them out, but I would expect, particularly since

10   I'm holding the attorneys' fees motion hostage, that Bitstamp

11   will cooperate reasonably with respect to, you know, targeted

12   deposition subpoena.  I mean, your client's going to have to --

13   somebody knowledgeable is going to have to testify in addition

14   to Mr. Frost, I would think, and...

15       So I think the answer is that I will order both sides

16   to be reasonable and cooperate with respect to discovery, and

17   if there is a dispute over the -- anything that Mr. Gross

18   propounds, just send it right in to me with a joint letter and

19   say, this is beyond the scope of what would be normally

20   expected for a third party that is interested in the outcome of

21   the litigation, and then I'll deal with it.

22       So what -- I'm trying not to impose additional

23   discovery obligations, but I recognize that because you are so

24   intertwined in the dispute, at least as long as Mr. Frost

25   remains in the case, that it doesn't make sense to make Stellar

1     jump through hoops.

2          Go ahead, Ms. Woodruff.

3          **MS. WOODRUFF:**  Your Honor, of course, we'll be

4     reasonable and we'll cooperate to the extent possible.  I would

5     just like to perhaps have some parameters, because to the

6     extent that Bitstamp's involvement was with freezing and

7     interpleading, those claims are clearly discharged.

8          **THE COURT:**  Right.

9          **MS. WOODRUFF:**  So the only claims, the only discovery

10    that they would want from Bitstamp would have to do with the

11    other allegations that they've got in their current complaint

12    or in any amended complaint concerning CoinEX and things like

13    that, and I would just ask that your Honor direct that that be

14    reasonable.

15         For example, I can't think of any of our officers who

16    could possibly be deposed about any of that, since we had

17    nothing to do with any of it, but in terms of getting

18    documents, we'd certainly be willing to get documents that have

19    to do with those things, and...

20         **THE COURT:**  Well, what if you were required to

21    basically do a 30(b)(6) in response to issues that were laid

22    out and you could fight over, and then you could designate the

23    person with the most knowledge and get up the documents that

24    were germane?  That might address all of your concerns.

25         **MS. WOODRUFF:**  Well, it might, because that person

1   would probably be Mr. Frost, who might still be in the....

2   I mean, honestly, with respect to everything that happened up

3   until the time we got the demand letter from Ripple --

4          **THE COURT:**  It was all Mr. Frost.

5          **MS. WOODRUFF:**  Of course.  I mean, I'm not sure

6   Mr. Frost was involved before that.

7          **THE COURT:**  And so the claim -- well, so let's do it

8   that way, Mr. Gross, and if you identify during the course of

9   discovery that there are other people with knowledge about this

10  within Bitstamp's organization, your theory -- the theory that

11  you have expressed so far is basically the conflict, and so

12  I get that, and if that claim eventually goes forward, I'm not

13  sure that you'll need more than Mr. Frost.

14         **MR. GROSS:**  Well, there were several other things.

15  I mean, certainly there can be a PMK that can do it, but for

16  example, the AML compliance issues, you know, why -- what was

17  happening with not authorizing Stellar's account there?  We'd

18  like to -- that's something we'd like to look at.  In addition,

19  at some point they froze the personal account of Joyce Kim, who

20  is the CEO of Stellar and, you know, without any basis.

21         I mean, those are things that we'd like to be looking

22  at as well, and I don't know if Mr. Frost could be the PMK on

23  that or if it's some other compliance person or something, but

24  I mean, those are issues that are wound into this scheme that

25  we believe occurred.

1        **THE COURT:**  So I will look at those things.  I think

2   you need to develop -- I think the case needs to develop so

3   that you can be very specific about the things that you're

4   looking for, and then if Bitstamp disagrees with the 30(b)(6)

5   type notice, then come back to me and I'll make a ruling with

6   respect to it.  I think that's the easiest way to deal with it.

7        **MR. GROSS:**  And the 30(b)(6) would be through a

8   deposition notice or through a subpoena?

9        **THE COURT:**  Through a deposition notice.

10       **MR. GROSS:**  Okay, and for document productions, that

11  would be --

12       **THE COURT:**  It will come through the 30(b)(6).  Tell

13  them, just attach the documents that need to be provided, and

14  they'll be provided, 10 days in advance or something like that.

15       **MR. GROSS:**  Okay.  So we can just serve it on them.

16  We don't have to serve Bitstamp itself.

17       **THE COURT:**  Exactly.  That's what I'm trying -- I'm

18  trying to avoid everybody spending needless money and making

19  sure that you only are getting things that are really germane,

20  assuming that Bitstamp is totally out of the case, right?

21       **MR. GROSS:**  Okay.

22       **THE COURT:**  Okay?

23       **MR. GROSS:**  Thank you, your Honor.

24       **THE COURT:**  Thank you all very much.

25                                                    4:10 p.m.

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4

5            I, Leo Mankiewicz, certify that the foregoing is a

6    true and correct transcript, to the best of my ability, of the

7    above pages of the official electronic sound recording provided

8    to me by the U.S. District Court, Northern District of

9    California, of the proceedings taken on the date and time

10   previously stated in the above matter.

11           I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to the action in

13   which this hearing was taken; and, further, that I am not

14   financially nor otherwise interested in the outcome of the

15   action.

16

17   _____   12/11/2015

18           Signature of Transcriber          Date

19

20

21

22

23

24

25