UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BITSTAMP LTD., <br><br>　　　　Plaintiff, <br><br>　　v. <br><br>RIPPLE LABS INC., et al., <br><br>　　　　Defendants. | Case No. 15-cv-01503-WHO <br><br> **ORDER REGARDING MOTIONS TO STRIKE AND MOTION TO DISMISS** <br><br> Re: Dkt. Nos. 129, 130, 157 |

## INTRODUCTION

Cross-defendant Bitstamp Ltd. and Counter-defendant George Frost each filed anti-SLAPP motions, moving to strike Counterclaimant and Cross-claimant Stellar Development Foundation's ("SDF") Counterclaim and Cross Claim for violation of California Business and Professions Code section 17200 *et seq.* (the "UCL claim").[1] Dkt. Nos. 130 [Bitstamp Mot.], 157 [Frost Mot.]. Frost also brings a motion to dismiss the two other causes of action alleged against him for interference with economic relations. Frost Mot. at 13. Because the facts alleged in the Counterclaim and Cross Claim arise from Frost's role as a lawyer for Bitstamp in freezing an account and filing a complaint in interpleader on his client's behalf, Bitstamp and Frost have met their burden under California's anti-SLAPP statute to show that SDF's UCL claim is based on protected activity. Since SDF has not demonstrated a reasonable probability of prevailing on its UCL claim, the anti-SLAPP motions are GRANTED. SDF has also failed to plausibly allege how Frost interfered with SDF's economic relations, so Frost's motion to dismiss those two claims is GRANTED with leave to amend.

---

[1] Bitstamp's administrative motion to file portions of its Special Motion to Strike Counterclaim under seal is GRANTED. Dkt. No. 129. The redacted portions rely on documents the Court has previously found satisfied the applicable "compelling reason" standard to justify sealing. Dkt. No. 126.

## BACKGROUND

The background of this action has been set forth in my previous orders. Dkt. Nos. 63, 24. As discussed in those orders, the relationships between the parties are crucial to an understanding of this case. Relevant here is that Ripple Labs Inc. operates a network to make payments and exchange currencies utilizing its virtual currency called XRP. SDF is an organization that operates its own financial software platform known as Stellar, with its own currency, called STR. Jeb McCaleb, who cofounded SDF, was also a cofounder of Ripple. Bitstamp is a company based in the United Kingdom that operates a worldwide digital currency exchange and is a gateway for XRP. Frost has previously served as Chief Legal Officer of Bitstamp and as a legal advisor to Ripple. The present motions arise out of SDF's Answer and Counterclaim and Cross claim filed on August 12, 2015. CC-Compl. [Dkt. 122]. Below I set forth the allegations that form the basis of the counterclaims and cross claims.

Starting in the fall of 2014, Ripple was the target of a federal criminal investigation concerning improper currency transactions. *Id*. ¶14. As a result of this investigation, Ripple entered into a settlement agreement with the US Department of Justice in which it admitted it: (1) had acted as a money services business and engaged in sales of virtual currency without registering as a money services business; (2) failed to implement an anti-money laundering program; and (3) failed to report suspicious activity related to several financial transactions. *Id*. Following this investigation, SDF alleges, Ripple "then began a scheme, along with Frost, to damage [SDF] and McCaleb, and thus to benefit Ripple." *Id.* ¶15. As a part of this scheme, "Ripple and Frost also took actions to prop up the prices of Ripple's XRP currency, and the value of Ripple's shares, in order to benefit themselves… and to benefit Ripple." *Id.* To do so, "it was beneficial to Ripple to keep the price of XRP propped up as it was selling its XRP." *Id.*

During negotiations to resolve concerns by Ripple related to sales of XRP by McCaleb, Ripple and McCaleb agreed that McCaleb would have monthly limits on the amount of XRPs that he could sell. *Id.* ¶16. The restriction only applied to approximately 7.5 billion XRPs, 5.5 billion owned directly by McCaleb and 2 billion held in the names of McCaleb's two children, and

excluded the 1.5 billion XRPs gifted to others such as philanthropic organizations and other family members. *Id.*  Frost participated in these settlement negotiations as Ripple's advisor. *Id.*

Immediately after the settlement agreement was executed, Ripple's senior executive allegedly encouraged one of its co-founders to sue McCaleb, in contravention of the agreement. Frost "acted as an attorney for that cofounder, while also serving as an advisor for Ripple." *Id.* ¶17.

In or about March 2015, Ripple learned that Jacob Stephenson, a relative of McCaleb, was offering for sale approximately 96 million XRPs and that he was engaged in the purchasing of STRs. *Id.* ¶18. In an attempt to prop up the price of XRP and prevent SDF from receiving the funds from Stephenson's purchase of STRs, Ripple, acting through an agent, purchased the XRPs that Stephenson was offering for sale. *Id.* ¶¶17-18. Specifically, Ripple offered to purchase 96,342,367 XRPs from Stephenson for $963,424. *Id.* ¶18. However, it used "a method that manipulated the market and inflated the price seemingly paid for the XRPs, in that Ripple's agent told Stephenson that he would send Stephenson $1,038,172 (which was $74,748 more than the agreed upon price), and that Stephenson should send the excess $74,748 to an account designated by Ripple." *Id.* ¶19.

The transaction went through as described, with Stephenson transferring the approximately $74,000 to the account indicated and Stephenson receiving only $963,424. *Id.* SDF alleges the transaction was fraudulent because (i) "Ripple never intended to allow the transaction to be finalized or to allow Stephenson to use the agreed-upon purchase price" as Ripple intended to freeze the money it paid to Stephenson and (ii) Ripple skimmed $74,748 off the top of the transaction but intended to claim that Stephenson, McCaleb and SDF were liable to it for the full $1,038,172 amount. *Id.* ¶20. This transaction allegedly permitted Ripple to improperly inflate the price per XRP of the transaction and mislead other purchasers. *Id.* ¶21.

On March 20, 2015, Stephenson transferred approximately $963,000 to the Coinex exchange to purchase 306,935,500 STRs. *Id.* ¶23. SDF received approximately $940,000 from this transaction. *Id.* Ripple, through its Chief Risk Office Greg Kidd, contacted Coinex via telephone to demand that it either reverse the transaction and deliver the funds to Ripple or ensure

that the $940,000 paid to SDF remain on the Ripple network. *Id.* ¶24. On March 26, 2015, Ripple sent a letter to the Coinex operator to demand that Coinex deliver $961,000 to Ripple that Stephenson had transferred to Coinex and used to purchase STRs. *Id.* Ripple's agent threatened that if the operator of the Coinex exchange and Coinex did not comply with Ripple's demand, then Ripple would "drive it out of business, including shutting down Coinex's bank accounts by making false reports about Coinex and its operator to U.S. authorities, New Zealand authorities and Coinex's bank for allegedly violating criminal laws." *Id.* ¶25. The Coinex operator, after undergoing an investigation, found no wrongdoing but yielded to Ripple's threats and transferred the funds that SDF had on the Coinex exchange into SDF's Bitstamp account on the Ripple network (the "rPQ account"). *Id.* This included not just the $940,000 from the Stephenson transaction, but also an additional $66,000 held by SDF for a total of $1,006,130. *Id.* This transfer allowed Ripple and Frost to "exercise dominion and control" over SDF's funds. *Id.*

Ripple, Frost and Bitstamp then allegedly took actions to have SDF's rPQ account frozen. *Id.* ¶26. As a part of this scheme, on March 26 and 30, 2015, Ripple sent demand letters to Frost claiming that the funds in SDF's account belonged to Ripple due to an alleged breach of contract by McCaleb and demanded that the funds be immediately transferred to Ripple. "Ripple and Frost knew, however, that the XRP offered for sale by Stephenson were not part of the 5.5 billion owned by McCaleb nor of the 2 billion XRPs owned by McCaleb's children, and thus that these XRP were not subject to any limits on sales in the Ripple-McCaleb settlement agreement." *Id.* As such, they knew there was no basis for Ripple's claim that it was entitled to ownership or control of the funds. "That Ripple's scheme was designed to harm SDF is evident from the fact that Ripple had known for months that Stephenson was selling large amounts of XRP yet took no actions to reverse any such transactions, and from the fact that when Ripple through its agent purchased Stephenson's XRP in March 2015, it took no action to reverse this transaction until Ripple learned that Stephenson was using the proceeds of the transaction to purchase STRs." *Id.* ¶28.

"Frost, acting as Bitstamp's chief legal officer, but also acting on behalf of Ripple," caused Bitstamp to improperly freeze SDF's account. *Id.* ¶27. He then filed the complaint in

4

interpleader, on behalf of Bitstamp, "despite knowing that Ripple's claim of a breach of contract was false, that Ripple had no basis to claim these funds, and that there was no likelihood that Ripple would sue Bitstamp." *Id.* These actions deprived SDF of the use of the funds in its rPQ account. *Id.* Additionally, SDF alleges that "Frost and Bitstamp's collusion is also evident from the fact that Bitstamp's Complaint goes out of its way to advocate for Ripple," for example by alleging that Stephenson's account was controlled by McCaleb despite having "no valid basis for any such assertion." *Id.*

SDF brings three causes of actions: (1) violation of the UCL against Ripple, Frost, Does 1-20 and Bitstamp; (2) Interference with Economic Relations against Ripple, Frost and Does 1-20; and (3) a secondary cause of action for Interference with Economic Relations against Ripple, Frost and Does 1-20. Bitstamp and Frost have filed independent anti-SLAPP motions, moving to strike SDF's UCL claim against them. Frost also brings a motion to dismiss the remaining two causes of action for Interference with Economic Relations. I heard argument on December 2, 2015.

**LEGAL STANDARD**

**I.    ANTI-SLAPP MOTION**

California Code of Civil Procedure section 425.16 "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). These lawsuits are also known as "Strategic Lawsuits Against Public Participation," or "SLAPPs." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). Under section 425.16, a party may file an "anti-SLAPP motion" to strike "a cause of action based on an act in furtherance of [the] right to petition or free speech." *Metabolife*, 264 F.3d at 840 (internal quotation marks and citations omitted). If the party prevails on the motion, it is entitled to attorneys' fees. Cal. Code Civ. Proc. § 425.16(c)(1).

In ruling on an anti-SLAPP motion, a court must engage in a two-step process. *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002). First, the moving party must make a prima facie showing that the lawsuit arises from an act in furtherance of its First Amendment right to free speech. *Makaeff*, 715 F.3d at 261; *see also Equilon*, 29 Cal. 4th at 67. In

evaluating this requirement, courts look to "what activities form the basis for each of Plaintiffs' causes of action," then "ask whether those activities are 'protected.'" *Graham-Sult v. Clainos*, 756 F.3d 724, 735 (9th Cir. 2014). "An act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right." *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014).

If the moving party satisfies the first inquiry, the burden shifts to the non-moving party to establish a reasonable probability that it will prevail on its claim. *Makaeff*, 715 F.3d at 261. "For a plaintiff to establish a probability of prevailing on a claim, he must satisfy a standard comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010). This standard requires that a claim be dismissed if the plaintiff presents an insufficient legal basis, or if no reasonable jury would find in its favor. *Metabolife*, 264 F.3d at 840; *see also Price*, 620 F.3d at 1000 (an anti-SLAPP motion will be granted if the plaintiff "presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff") (internal quotation marks and citations omitted).

## II. MOTION TO DISMISS

To survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully," demanding instead sufficient factual allegations to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

## I. FROST'S MOTION TO STRIKE

### A. Step One: Protected Activity

The first prong in this analysis is procedural – I must determine whether Frost has made a "threshold showing" that the action arises from protected activity within the meaning of the statute. *Equilon*, 29 Cal. 4th at 67. California Code of Civil Procedure section 415.16 states, in relevant part, that protected activity includes: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." Cal. Code Civ. Proc. § 425.16(e). The statute applies to "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech." Cal. Code Civ. Proc. § 425.16(b)(1).

The California Supreme Court has held that "any act" includes litigation activity "such as the filing, funding, and prosecution of a civil action." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1056 (2006). Further, the protection also may include actions taken "in connection with anticipated litigation." *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1263 (2008); *see also Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999) ("[C]ommunications preparatory to or in anticipation of the bringing of an action or other official proceeding are… entitled to the benefits of section 425.16.") (internal quotation marks and citations omitted); *Tuck Beckstoffer Wines LLC v. Ultimate Distributors, Inc.*, 682 F. Supp. 2d 1003, 1015 (N.D. Cal. 2010) (protected activity within the meaning of the anti-SLAPP statute includes, "without limitation, the filing of a complaint, the assertion of allegations therein, the service of subpoenas, and any factual investigation related to the issues in dispute.").

7

Here, Frost brings an anti-SLAPP suit directed only at SDF's first cause of action – violation of California's UCL statute. CC-Compl. ¶¶29-31. He argues that "[t]his is a case of a lawyer being sued for acting as a lawyer." Frost Mot. at 2. Frost states that "the only specific conduct alleged as to Mr. Frost is his filing of the interpleader and the freezing of funds that necessarily preceded it" and, therefore, it arises from protected activity. *Id.* at 8. SDF acknowledges that while the UCL claim encompasses the freezing of the funds and the filing of the interpleader, it argues "the principal thrust of the cause of action is the illegal scheme to prevent SDF from benefiting from Stephenson's purchase of STRs by coercing SDF's funds to be placed in a Bitstamp account." Frost Opp. at 13 [Dkt. No. 163].

However, SDF's causes of action, as pleaded, tell a different story. Frost's anti-SLAPP motion is directed only to SDF's first cause of action under the UCL, and I must focus on the facts upon which the claim is based and "not a rephrasing of the claims that comes in response to an anti-SLAPP motion to strike." *Tuck Beckstoffer Wines LLC*, 682 F. Supp. 2d at 1016. Beyond incorporating "[e]ach of the acts and practices described herein," the only concrete activities SDF isolates as supporting this cause of action are Frost's role in "causing Bitstamp to freeze the funds in SDF's rPQ account and depriving SDF of the use of these funds." CC-Compl. ¶31.

"For purposes of the anti-SLAPP statute, a cause of action 'arises from' conduct that it is 'based on.'" *Graham-Sult*, 756 F.3d at 735. "Thus, we first ask what activities form the basis for *each* of Plaintiffs' causes of action. We then ask whether those activities are 'protected,' bringing the cause of action within the scope of the anti-SLAPP statute." *Id.* (emphasis added). Because Frost's anti-SLAPP motion is limited only to the first cause of action, I must confine my analysis to the specific conduct it is based on. A plain reading of the allegations establishes that SDF's claim under the UCL is based on the freezing of the disputed funds and the filing of the interpleader action. *See* CC-Compl. ¶27 ("Frost, acting as Bitstamp's chief legal officer, but also acting on behalf of Ripple, cause Bitstamp to improperly freeze SDF's account containing the $940,000 in Bitstamp USD, and then filed on behalf of Bitstamp a complaint in interpleader."),

¶31.[2]

Frost contends that the freezing of the funds and the filing of the interpleader are protected activity under California Code of Civil Procedure section 415.16. Frost Mot. at 9-10. SDF responds that some of Frost's conduct, such as enabling Bitstamp to freeze the disputed funds, is not encompassed by the litigation privilege. It is not necessary that I decide whether the freezing of the funds constitutes protected litigation privilege; even a mixed cause of action, involving protected and non-protected activity, is subject to an anti-SLAPP motion "if at least one of the underlying acts is protected conduct, unless the allegations of protected conduct are merely incidental to the unprotected activity." *Salma v. Capon*, 161 Cal. App. 4th 1275, 1287 (2008); *see also Blackburn v. ABC Legal Servs., Inc.*, No. 11-cv-01298-JSW, 2011 WL 8609453, at *2 (N.D. Cal. June 16, 2011) ("Where a cause of action alleges both protected and unprotected activity, the cause of action will be subject to section 425.15 unless the protected activity is merely incidental to the unprotected conduct") (internal citations and quotation marks omitted). "A plaintiff cannot frustrate the purposes of the anti-SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one cause of action." *Salma*, 161 Cal. App. 4th at 1287-88 (internal quotation marks, citations, and modifications omitted).

Here, the freezing of the funds is not so divorced from the filing of the interpleader to be "merely incidental" to the protected activity. Accordingly, Frost has made a threshold showing that SDF's UCL claim is based on protected activity.

**B.     Step Two: Probability of Success on the Merits**

Next, I must determine whether SDF has made a showing of probability of prevailing on the merits. Frost makes three primary arguments: (1) the UCL claim is barred by collateral estoppel; (2) the claim arises from litigation privilege; and (3) SDF has not stated a claim under the UCL. Frost Mot. at 12-14. I agree with Frost that SDF has not stated a claim under the UCL.

Frost argues that SDF does not have a probability of success on the UCL claim, in part,

---

[2] This analysis is consistent with *Renewable Resources Coal., Inc. v. Pebble Mines Corp.*, 218 Cal. App. 4th 384 (2013), upon which SDF primarily relies. Frost Opp. at 14. As the *Renewable* court directed, my focus is on "the gravamen of an action" and not on the extraneous allegations pertinent to SDF's other causes of action. 218 Cal. App. 4th at 387.

9

1  because SDF fails to seek available relief.  Frost Mot. at 11.  Specifically, under the UCL private
2  plaintiffs "are generally limited to injunctive relief and restitution."  *Clark v. Superior Court*, 50
3  Cal. 4th 605, 610 (2010) ("In a private unfair competition law action, the remedies are generally
4  limited to injunctive relief and restitution.") (internal quotation marks and citations omitted); *Cel-*
5  *Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 179 (1999) ("Prevailing
6  plaintiffs are generally limited to injunctive relief and restitution.").  Damages are not available.
7  *Clark*, 50 Cal. 4th at 610 ("Not recoverable are damages, including punitive damages and
8  increased or enhanced damages."); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134,
9  1150-51 (2003) ("The nonrestitutionary disgorgement remedy sought by plaintiff closely
10 resembles a claim for damages, something that is not permitted under the UCL.").

11          SDF responds that its prayer for relief includes a request for injunctive relief and that "if
12 SDF prevails on its unfair competition claim, it will be entitled to injunctive relief to prevent
13 future acts of unfair activity."  Frost Opp. at 12; *see also* CC-Compl. at p. 15.  However, a plaintiff
14 seeking injunctive relief from a federal court must establish Article III standing by demonstrating
15 not only that he has "suffered or is threatened with a concrete and particularized legal harm" but
16 also that there is "sufficient likelihood that he will again be wronged in a similar way."  *Bates v.*
17 *United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal citations and quotation
18 marks omitted).  This requires SDF to show a "real and immediate threat of repeated injury."  *Id.*
19 (internal citations and quotation marks omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 496
20 (1974).  SDF's broad, conclusory statement that it is entitled to injunctive to "prevent future acts
21 of unfair competition" is insufficient to establish standing for injunctive relief.

22          SDF's prayer for relief also includes a request for "restitution and/or disgorgement of
23 defendants' unlawful revenues or profits."  CC-Compl. at 15.  However, SDF has not described
24 what restitution it is entitled to.  SDF has not demonstrated that Frost is in possession of any of
25 SDF's money or property obtained through unfair business practices.  *See Korea Supply*, 29 Cal.
26 4th 1144-45 ("We defined an order for restitution as one compelling a UCL defendant to return
27 money obtained through an unfair business practice to those persons in interest from whom the
28 property was taken, that is, to persons who had an ownership interest in the property or those

10

claiming through that person.") (internal quotation marks and citations omitted). Accordingly, SDF has failed to demonstrate a probability of success on its UCL claim.

Frost's motion to strike SDF's claim for violation of the UCL is GRANTED.

## II. BITSTAMP'S MOTION TO STRIKE

Bitstamp, in its separate anti-SLAPP motion, seeks to strike the only claim against it – violation of the UCL. It makes functionally identical arguments to Frost, asserting that the allegations against it are protected activity within the meaning of California Code of Civil Procedure section 425.16. Bitstamp argues that "the only alleged acts purportedly giving rise to Bitstamp's liability for unfair competition are freezing the Disputed Funds in connection with initiating the interpleader action and actually filing the complaint in interpleader." Bitstamp Mot. at 13-14. With regard to the allegations against Frost, Bitstamp contends that "SDF does not allege that Frost took any actions on behalf of, or within the scope of his employment with, Bitstamp other than related to Bitstamp's freezing of the Disputed Funds and filing the interpleader action." Bitstamp Mot. at 14.

SDF responds that the basis for the unfair competition claim against Bitstamp, however, is not the litigation activity of filing the complaint in interpleader, but "Ripple's Frost's, and Bitstamp's illegal scheme to damage SDF: first by engaging in market manipulation to prop up the XRP price; and second through unlawful threats that coerced Coinex into placing SDF's funds in a Bitstamp account on the Ripple network, enabling Bitstamp to then freeze SDF's funds and deny SDF access to its funds." Bitstamp Opp. at 7-8 [Dkt. No. 151] (citing CC-Compl. ¶¶2-3, 15, 18-21, 23-26) (modifications omitted). As with Frost's motion, I must analyze the conduct upon which the claim is based on and determine whether it arises out of protected activity.

Notably, paragraphs 18-21 and 23-25 of SDF's Counterclaim and Cross claim are devoid of references to Bitstamp. *See* CC-Compl. ¶¶18-21, 23, 24. Only paragraph 26 contains a concrete reference to Bitstamp's specific *conduct*, alleging that "Ripple, Frost and Bitstamp then took actions to have SDF's rPQ account….immediately frozen." *Id*. ¶26. This conduct parallels that alleged in the cause of action Bitstamp is seeking to strike, which asserts that "Frost was an agent and employee of Bitstamp…when he committed the acts of unfair competition alleged

11

1 above, including causing Bitstamp to freeze the funds in SDF's rPQ account and depriving SDF of
2 the use of these funds." *Id.* ¶31. In its Counterclaim and Cross Claim, SDF does not specifically
3 identify any other facts upon which its claim for unfair competition relies.[3]

4       A plain reading of SDF's allegations indicates that the "gravamen" of its unfair
5 competition claim against Bitstamp is the freezing of the disputed funds and the filing of the
6 interpleader action. SDF has not identified any additional independent action Bitstamp took,
7 beyond that which is attributable to Frost. Therefore, I find, as I did in Frost's motion, that
8 Bitstamp has made its threshold showing that SDF's cause of action against it is based on
9 protected activity. Because I also find that SDF has not shown that it is entitled to relief against
10 Bitstamp for the same reasons it has not made that showing against Frost, I conclude that it has not
11 met its burden to show its probability of prevailing on the merits.

12       Bitstamp's motion to strike SDF's claim for violation of the UCL is GRANTED.

### III. FROST'S MOTION TO DISMISS

14       Frost argues that SDF's second and third claims, both for Interference with Economic
15 Relations, should be dismissed because "these claims are based on *Ripple's* dealings with others"
16 and "[t]here are no well-pleaded factual allegations that Mr. Frost played any role in those
17 matters." Frost Mot. at 3 (emphasis in original). SDF responds that the "well-pled allegations of
18 SDF's Crossclaim, together with the reasonable inferences that can be draw from them, plainly
19 allege that Frost was engaged in a wide-ranging scheme with Ripple to damage SDF." Frost Opp.
20 at 8. While this is a close question, I agree that as pleaded SDF has not stated a claim.

21       SDF argues it has sufficiently alleged a conspiracy between Ripple and Frost to benefit
22 themselves and damage SDF. *Id.* For example, it alleges Frost took actions to prop up the price

---

[3] The remaining referenced allegations in SDF's opposition do not provide concrete allegations regarding any Bitstamp conduct related to the freezing of the funds or SDF's subsequent deprivation of those funds. The referenced sections consist of more generalized allegations regarding primarily Frost's role as a co-conspirator with Ripple. *See* CC-Compl. ¶2 ("Ripple, …began a scheme, along with George Frost and Bitstamp, to damage SDF and Jed McCaleb); *Id.* ¶3 (As a part of this scheme, Ripple and Frost took actions to prop up the price of the Ripple XRP currency); *Id.* ¶15 ("Ripple then began a scheme, along with Frost, to damage SDF and McCaleb, and thus to benefit Ripple."); *Id.* ¶25 ("This transfer allowed Ripple and Frost to exercise dominion and control over SDF's funds.").

of Ripple's XRPs in detriment to SDF.  CC-Compl. ¶2 ("Ripple, in order to divert public attention from the federal criminal investigation against it, began a scheme, along with George Frost ("Frost") ... to damage SDF and Jed McCaleb."); *Id.* ¶3 ("That as part of this scheme, Ripple and Frost took actions to prop up the price of Ripple's XRP currency, and the value of Ripple's shares."); *Id.* ¶18 ("Ripple and Frost conspired to prop up the price of Ripple's XRPs and the value of Ripple's shares, and to prevent SDF from receiving funds from the purchase of STRs by Stephenson.").  SDF asserts Frost stood to benefit from this scheme because he held a substantial investment in XRPs and that he acted simultaneously as an advisor to Ripple and as Chief Legal Officer of Bitstamp.  *Id.* ¶8 ("That Frost is the Chief Legal Officer of Bitstamp" and "served at all relevant times as an advisor to Ripple."); *Id.* ¶15 ("Ripple and Frost also took actions to prop up the price of Ripple's XRP currency, and the value of Ripple's shares, in order to benefit themselves because each owns a substantial amount of XRPs, and to benefit Ripple.").

   SDF also alleges that, despite knowing that Ripple's claim that there was a breach by McCaleb of his agreement with Ripple was false or that there was anything improper about Stephenson's sale, Frost froze SDF's funds when these funds were placed in the Bitstamp account in order to exercise dominion over them.  *Id.* ¶16 (Frost advised Ripple during settlement negotiations with McCaleb about sales of XRP owned by McCaleb in which "Ripple and McCaleb entered into a settlement agreement in which the parties agreed that McCaleb would have monthly limits on the amount of XRP that McCaleb could sell from this $7.5 billion XRP (which, as stated above, consists only of McCaleb's personal XRP and his children's XRP and excludes the additional 1.5 billion gifted to others)"); *Id.* ¶26 ("Ripple and Frost therefore knew that the representation that Stephenson's sale was a breach of contract by McCaleb was false.  Ripple and Frost also knew that the funds in the rPQ account that they were requesting Bitstamp freeze were not owned or controlled by either Stephenson or McCaleb, but were owned by SDF .... They thus knew that there was no basis for Ripple's claim in its letters that Ripple was entitled to any ownership or control of these funds."); *Id.* ¶25 ( The transfer of funds that SDF had on the Coinex exchange into SDF's Bitstamp account on the Ripple network "allowed Ripple and Frost to exercise dominion and control over SDF's funds.").

13

Relying on these allegations, SDF's first cause of action for Interference with Economic Relations asserts that because Ripple, Frost and Does 1-20 knew of a contract between SDF and Coinex, "Ripple, Frost and Does 1-20 intended to disrupt the performance of this contract [between SDF and Coinex]," that "Ripple's and Frost's threat disrupted the economic relationship between SDF and Coinex," and that "[a]s a proximate result of the conduct by Ripple, Frost and Does 1-20 and the breach of SDF's contract with Coinex, SDF has suffered damages." *Id.* ¶¶35, 37-38. SDF's second cause of action for Interference with Economic Relations alleges that "[i]n March 2015, upon information and belief, Ripple, Frost and Does 1-20 learned that Stephenson desired to purchase STRs," that "[d]uring the period March to May 2015, Ripple, Frost and Does 1-20 made threats to Bitstamp that Ripple was the owner of the funds in SDF's possession that were the proceeds of Stephenson's transaction in purchasing STRs, with the intention that Bitstamp freeze those funds and not deliver them to SDF," and that "Ripple's and Frost's threats disrupted the [sic] Stephenson's economic relationship with Coinex and the economic benefit accruing to SDF." *Id.* ¶¶45, 49, 50.

SDF's allegations at present suffer from two dispositive deficiencies. First, as SDF recognizes, Frost acted as Bitstamp's chief legal officer but also a legal advisor to Ripple. *Id.* ¶¶2, 8. Additionally, SDF alleges that Frost may have "acted as an attorney" for an unidentified co-founder of Ripple during the settlement agreement discussions between Ripple and McCaleb. *Id.* ¶17. Reading the Counterclaim and Cross Claim from the perspective of Frost's multiple roles, many of the allegations against Frost appear to stem from the varied responsibilities of these positions. If Frost was indeed acting as Ripple's advisor, allegations of conspiracy between Ripple and Frost become difficult to decipher. When is Frost acting within his legal duty to Ripple and when is he acting pursuant to his own individual interests?

"Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 45 (1989) (internal quotation marks, modifications, and citations omitted); *see also Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 209 (2010) ("If the plaintiff seeks to assert a

conspiracy claim against an attorney based on the violation of a duty owed by the client, but not the attorney, and the attorney was acting within the scope of his or her professional responsibilities, the claim has no merit."). SDF's allegations against Frost fail to properly make that distinction. For example, SDF asserts that "[e]ach Cross-Defendant was further the agent of each remaining Cross-Defendant and was, at all times alleged herein, acting within the course and scope of the agency relationship." CC-Compl. ¶10. But at the same time, SDF also claims that Frost undertook some of the alleged behavior in order to benefit himself because he owned a "substantial amount" of XRPs. *Id.* ¶15. As I recognized in a previous order, the "mere fact that the same attorney has represented both Ripple Labs and Bitstamp… is hardly indicative of collusion, particularly in the concentrated world of digital currency." Dkt. No. 63 at 5. More is needed to clarify when Frost is acting with the scope of his duties versus when his actions are pursuant to his own individual gain.

Second, the remaining allegations are pleaded in such a conclusory fashion that it is difficult to identify the specific wrongdoing SDF is pleading with respect to Frost. For example, SDF claims that "Frost's threat disrupted the economic relationship between SDF and Coinex" but alleges only that an unidentified "agent of Ripple" threatened the operator of the Coinex exchange, and not Frost. CC-Compl. ¶25. SDF alleges repeatedly that Frost and Ripple engaged in a "scheme" to take "actions to prop up the price of Ripple's XRP currency," but no specific conduct is identified. *Id.* ¶¶15, 18. A "naked assertion of conspiracy" without "further factual enhancement" stops short of the line between possibility and plausibility of entitlement to relief under Rule 8(a)(2). *Twombly*, 550 U.S. at 557; *see also DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (C.A.1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation – for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint"). As currently pleaded, SDF has not stated enough facts to state a plausible claim against Frost.

Frost's motion to dismiss the second and third causes of action for Interference with Economic Relations is GRANTED.

### IV. LEAVE TO AMEND

SDF argues that it should be allowed leave to amend its Counterclaim and Cross Claim under Federal Rule of Civil Procedure 15(a)'s policy favoring liberal amendment. Bitstamp Opp. at 21. SDF asserts that it would amend its complaint, in part, to add Bistamp as a defendant to the remaining causes of action based on its allegations and Bitstamp's "liability as a co-conspirator for all actions taken by any other member of the conspiracy in furtherance of the conspiracy." *Id*. Bitstamp argues that allowing amendment would defeat the purpose of the anti-SLAPP statute. Bitstamp Reply at 11-14 [Dkt. No. 156].

The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted). Although "the purpose of the anti-SLAPP statute is to allow early dismissal of meritless first amendment cases aimed at chilling expression," the Ninth Circuit has ruled that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed.R.Civ.P. 15(a)'s policy favoring liberal amendment." *Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1090-91 (9th Cir. 2004) (internal citations and quotation marks omitted). Because it is not clear that leave to amend would be futile and in light of Rule 15(a)'s liberal policy favoring amendment, I allow SDF leave to amend.

### CONCLUSION

Bitstamp and Frost's motions to strike SDF's first cause of action are GRANTED. Frost's motion to dismiss SDF's second and third causes of action is also GRANTED. Any amended

complaint must be filed within 20 days of this Order.[4]

**IT IS SO ORDERED**.

Dated: January 14, 2016

WILLIAM H. ORRICK
United States District Judge

---

[4] Both and Bitstamp and Frost have indicated an intent to seek attorney's fees under California Civil Procedure Code § 425.16(c). Bitstamp Mot. at 21; Frost Mot. at 12. SDF has not addressed either request. In light of my decision to allow SDF to amend its complaint, and as discussed with the parties during the hearing, attorney's fees will be determined after final adjudication of these motions or at the conclusion of the litigation . *See* Cal. Civ. Proc. Code § 425.16(c) (only "prevailing" defendants are entitled to recover attorney fees and costs.)

17